

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA • ASIA PACIFIC • EUROPE

+1 202 736 8329
RPAL@SIDLEY.COM

June 18, 2024

**PUBLIC VERSION**

**FILED ELECTRONICALLY**

The Honorable Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

> Re:   Hindalco Industries Limited v. United States, Court No. 23-00260

Dear Mr. Toscano:

On behalf of Hindalco Industries Limited ("Hindalco"), plaintiff in the above-captioned proceeding, we hereby file Hindalco's Rule 56.2 Motion for Judgment on the Agency Record, Memorandum of Points and Authorities in support thereof, and proposed Order.

Copies of the attached confidential documents have been served on the parties listed in the attached certificate of service.

Pursuant to the "one day lag rule" set out in Rules 5(g) and 73.2(c) of the Rules of this Court, the public version of this brief will be electronically filed on June 18, 2024, one business day after the date of this filing. In addition, copies of the public version of the attached

# SIDLEY

The Honorable Mario Toscano
June 18, 2024
Page 2

documents will be served on the same day on the parties listed in the
attached certificate of service.

Please do not hesitate to contact the undersigned if you have any
questions regarding this matter.

Respectfully submitted,

Rajib Pal
Shawn M. Higgins
Kayla M. Scott

Counsel to Plaintiff, Hindalco
Industries Limited

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| HINDALCO INDUSTRIES LIMITED, | |
|             Plaintiff, | |
|      v. | |
| UNITED STATES, | Court No. 23-00260 |
|             Defendant, | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, | |
|             Defendant-Intervenors. | |

**MOTION FOR JUDGEMENT**
**ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Hindalco Industries Limited, hereby submits this Motion for Judgment on the Agency Record with regard to the two Counts set forth in its Complaint filed on January 5, 2024. This action challenges the final results issued by the U.S. Department of Commerce in the first administrative review of Common Alloy

Aluminum Sheet from India, Case No. C-533-896.  *See Common Alloy Aluminum Sheet From India: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 FR 76168 (Nov. 6, 2023).   In a Scheduling Order dated March 18, 2024, the Court directed that dispositive motions be filed by today's date.

For the reasons set forth in the accompanying Memorandum of Points and Authorities, Plaintiff hereby moves that the Court grant this motion for judgment on the agency record.

A proposed order is attached.

Respectfully submitted,

Rajib Pal
Shawn M. Higgins
Kayla M. Scott

Counsel to Plaintiff, Hindalco
Industries Limited

June 18, 2024

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| HINDALCO INDUSTRIES LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS,<br><br>Defendant-Intervenors. | Court No. 23-00260<br><br>**PUBLIC VERSION**<br><br>**Hindalco Business Proprietary Information has been removed from pages 30, 34, 58-63, 66-68, 74, 77, and GOI Business Proprietary Information has been removed from pages 35-36, 38** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Counsel to Hindalco
Industries Limited

June 18, 2024

# TABLE OF CONTENTS

**Page No**

**RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT** .........2

I.  Administrative Determination of Which Review Is Sought ...............2

II. Issues Presented and Summary of the Argument ...............................3

   A.  The Department's Conclusion that the Alleged Provision of Coal for LTAR Is Specific to Hindalco Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law..........................4

   B.  The Department's Calculation of the Benefit to Hindalco from the Alleged Provision of Coal for LTAR Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law.........................6

**STATEMENT OF FACTS** .......................................................................8

**STANDARD OF REVIEW**....................................................................15

**ARGUMENT**..........................................................................................17

I.  The Department's Conclusion that the Alleged Provision of Coal for LTAR Is Specific to Hindalco Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law...........................................17

   A.  Legal Framework .............................................................20

   B.  The Department's Conclusion that Predominant Use Makes the Alleged Provision of Coal for LTAR Specific to Hindalco Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ...............................................................................26

   C.  Even if the Department's Specificity Analysis Was Lawful, the Department's Decision to Countervail All Coal Purchased by Hindalco from CIL Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ......................................................37

II. The Department's Calculation of the Benefit to Hindalco from the Alleged Provision of Coal for LTAR Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law...........................39

   A.  Legal Framework .............................................................42

B.  The Department's Decision to Outright Reject the ICMW/McCloskey Benchmark Data Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law.........................57

C.  The Department's Decision Not to Use the ICMW/ McCloskey Data Exclusively for its Tier Two Coal Price Benchmark Is Unsupported by Substantial Evidence and Not Otherwise in Accordance with Law .............................................................................64

D.  The Department's Decision to Use the UN Comtrade Data for its Tier Two Coal Price Benchmark Without Adjustment to Account for Variations in Coal Grades Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law........................................76

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Asociacion Colombiana de Exportadores de Flores v. United States*,
704 F. Supp. 1114 (Ct. Int'l Trade 1989), *aff'd* 901 F.2d
1089 (Fed. Cir. 1990)..............................................................................16

*Changzhou Trina Solar Energy Co. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ...........................46, 49, 76

*Changzhou Trina Solar Energy Co. v. United States*,
No. 17-00246, 2020 WL 4464251 (Ct. Int'l Trade Aug. 4,
2020) ......................................................................................53, 55, 58

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
625 F. Supp. 3d 1355 (Ct. Int'l Trade 2023) .......................................43

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ..............................................................15

*Micron Tech. Inc. v. United States*,
117 F.3d 1386 (Fed. Cir. 1997) ............................................................15

*Target Corp. v. United States*,
609 F.3d 1352 (Fed. Cir. 2010) ............................................................16

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................................15

19 U.S.C. § 1677(5)(A) ...............................................................................20

19 U.S.C. § 1677(5)(E)(iv).......................................................6, 41, 42, 76

19 U.S.C. § 1677(5A)(D) .....................................................................18, 20

19 U.S.C. § 1677(5A)(D)(i)..................................................................18, 20

19 U.S.C. § 1677(5A)(D)(ii).......................................................................20

19 U.S.C. § 1677(5A)(D)(iii)...................................................................... 18, 21

19 U.S.C. § 1677(5A)(D)(iii)(I)................................................................... 28

19 U.S.C. § 1677(5A)(D)(iii)(II) ........................................................ *passim*

## Regulations

19 C.F.R. § 351.502(a) ............................................................................ 21

19 C.F.R. § 351.511(a)(2) ..................................................................... 6, 42

19 C.F.R. § 351.511(a)(2)(i) .......................................................... 41, 43, 76

19 C.F.R. § 351.511(a)(2)(ii) ................................................... 41, 43, 46, 76

## Administrative Materials

*Barium Chloride From India: Final Affirmative*
    *Countervailing Duty Determination*,
    88 FR 1044 (Dep't of Commerce Jan. 6, 2023), and
    accompanying Issues and Decision Memorandum
    ("*Barium Chloride from India* IDM").................................................. 53

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy*
    *Steel From the People's Republic of China: Final*
    *Affirmative Determination, and Final Affirmative*
    *Determination of Critical Circumstances, in Part*, 82 FR
    58175 (Dep't of Commerce Dec. 11, 2017), and
    accompanying Issues and Decision Memorandum ("*Cold-*
    *Drawn Mechanical Tubing from China* IDM").......................... *passim*

*Certain Fabricated Structural Steel From the People's*
    *Republic of China: Final Affirmative Countervailing Duty*
    *Determination*, 85 FR 5384 (Dep't of Commerce Jan. 30,
    2020) and accompanying Issues and Decision
    Memorandum ....................................................................................... 22

*Certain Hot-Rolled Carbon Steel Flat Products from India:*
*Final Results of Countervailing Duty Administrative*
*Review*, 73 FR 40295 (Dep't of Commerce July 14, 2008),
and accompanying Issues and Decision Memorandum
("*Certain Hot-Rolled Steel from India* IDM") ......................... 47, 55, 56

*Certain Mobile Access Equipment and Subassemblies Thereof*
*From the People's Republic of China: Final Affirmative*
*Countervailing Duty Determination*, 86 FR 57809 (Dep't of
Commerce Oct. 19, 2021), and accompanying Issues and
Decision Memorandum ("*Mobile Access Equipment from*
*China* IDM") ................................................................ 45, 51

*Certain Mobile Access Equipment and Subassemblies Thereof*
*From the People's Republic of China: Preliminary*
*Affirmative Countervailing Duty Determination*,
86 FR 41013 (Dep't of Commerce July 30, 2021), and
accompanying Issues and Decision Memorandum ("*Mobile*
*Access Equipment from China* PDM") .............................. 45, 50, 51, 73

*Certain Oil Country Tubular Goods From the Republic of*
*Turkey: Final Affirmative Countervailing Duty*
*Determination and Final Affirmative Critical*
*Circumstances Determination*, 79 FR 41964 (Dep't of
Commerce July 18, 2014) and accompanying Issues and
Decision Memorandum ("*OCTG from Turkey* IDM") ............. 23, 24, 25

*Certain Steel Wheels From the People's Republic of China:*
*Final Affirmative Countervailing Duty Determination,*
*Final Affirmative Critical Circumstances Determination*,
77 FR 17017 (Dep't of Commerce Mar. 23, 2012), and
accompanying Issues and Decision Memorandum ............................ 47

*Certain Tool Chests and Cabinets From the People's Republic*
*of China: Final Affirmative Countervailing Duty*
*Determination*, 82 FR 56582 (Dep't of Commerce Nov. 29,
2017), and accompanying Issues and Decision
Memorandum ("*Tool Chests and Cabinets from China*
IDM") ............................................................................ *passim*

*Certain Uncoated Paper From the People's Republic of China:*
*Final Affirmative Countervailing Duty Determination*,
81 FR 3110 (Jan. 20, 2016) ............................................................ 35, 76

*Certain Uncoated Paper From the People's Republic of*
*China: Final Affirmative Countervailing Duty*
*Determination*, 81 FR 3110 (Jan. 20, 2016) and
accompanying Issues and Decision Memorandum
("*Certain Uncoated Paper from China* IDM") ......................... 47, 48, 65

*Certain Uncoated Paper From the People's Republic of*
*China: Preliminary Affirmative Countervailing Duty*
*Determination and Alignment of Final Determination*
*With Final Antidumping Duty*, 80 FR 36968 (June 29,
2015) and accompanying Preliminary Decision
Memorandum ........................................................................................ 35

*Chlorinated Isocyanurates From the People's Republic of*
*China: Final Affirmative Countervailing Duty*
*Determination; 2012*, 79 FR 56560 (Dep't of Commerce
Sept. 22, 2014), and accompanying Issues and Decision
Memorandum ........................................................................................ 25

*Circular Welded Austenitic Stainless Pressure Pipe from the*
*People's Republic of China: Final Affirmative*
*Countervailing Duty Determination*, 74 FR 4936 (Dep't of
Commerce Jan. 28, 2009), and accompanying Issues and
Decision Memorandum ........................................................................ 47

*Citric Acid and Certain Citrate Salts from the People's*
*Republic of China: Final Results of Countervailing Duty*
*Administrative Review*, 76 FR 77206 (Dec. 12, 2011) and
accompanying Issues and Decision Memorandum ("*Citric*
*Acid from PRC* AR1 IDM") ............................................................ 27, 28

*Citric Acid and Certain Citrate Salts From the People's*
*Republic of China: Final Results of Countervailing Duty*
*Administrative Review; 2010*, 77 FR 72323 (Dec. 5, 2012)
and accompanying Issues and Decision Memorandum
("*Citric Acid from PRC* AR2 IDM") .............................................. 27, 28

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 40491 (Dep't of Commerce July 7, 2022), and accompanying Issues and Decision Memorandum ("*Crystalline Silicon Photovoltaic Cells* IDM") ............................. 44, 65

*Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 FR 12186 (Dep't of Commerce Mar. 11, 2005) and accompanying Issues and Decision Memorandum ...................................................................................... 23

*Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 36305 (Dep't of Commerce June 16, 2022) and accompanying Issues and Decision Memorandum............................. 22

*Multilayered Wood Flooring From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2020*, 88 FR 34828 (May 31, 2023) and accompanying Issues and Decision Memorandum ..................... 53

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 FR 73448 (Dep't of Commerce Dec. 12, 2005), and accompanying Issues and Decision Memorandum ...................................................................................... 48

*Supercalendered Paper From Canada: Final Results of Countervailing Duty Expedited Review*, 82 FR 18896 (Dep't of Commerce Apr. 24, 2017), and accompanying Issues and Decisions Memorandum.................................................... 48

*Wooden Cabinets and Vanities and Components Thereof*
*From the People's Republic of China: Preliminary Results*
*of Countervailing Duty Administrative Review, Rescission*
*of Administrative Review in Part, and Intent To Rescind*
*in Part; 2021*, 88 FR 29084 (Dep't of Commerce May 5,
2023) and accompanying Issues and Decision
Memorandum ....................................................................................... 22

## Other

Chapter 27, Harmonized Tariff Schedule of the United
States (2021), https://hts.usitc.gov/reststop/file?
release=2021HTSABasic&filename=Chapter%2027
("HTSUS Chapter 27") .................................................................. 70, 71

Statement of Administrative Action (SAA) accompanying the
Uruguay Round Agreements Act (URAA), H.R. Doc. No.
103-316, vol. 1 at 930 (1994) ("SAA"), reprinted in 1994
U.S.C.C.A.N. 4040 .................................................................... 21, 32, 36

*What Every Member of the Trade Community Should Know*
*About: Tariff Classification*, U.S. Customs and Border
Protection (May 2004),
https://www.cbp.gov/sites/default/files/documents/icp017r
2_3.pdf ................................................................................................ 71

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| HINDALCO INDUSTRIES LIMITED, | Court No. 23-00260 |
| Plaintiff, | **PUBLIC VERSION** |
| v. | **Hindalco Business Proprietary Information has been removed from pages 30, 34, 58-63, 66-68, 74, 77, and GOI Business Proprietary Information has been removed from pages 35-36, 38** |
| UNITED STATES, | |
| Defendant, | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, | |
| Defendant-Intervenors. | |

**MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Hindalco Industries Limited ("Hindalco") submits this

Memorandum of Points and Authorities in Support of Motion for

Judgment on the Agency Record, regarding the two Counts in its

Complaint. For the reasons below, Hindalco respectfully requests

that the Court reverse the challenged determination of the U.S.

Department of Commerce ("Department") and remand with instructions to recalculate Hindalco's countervailable subsidy rates.

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

## I.    Administrative Determination of Which Review Is Sought

Hindalco seeks review of the final results of the first administrative review ("AR1") of the countervailing duty ("CVD") order covering Common Alloy Aluminum Sheet ("CAAS") from India, with a period of review ("POR") of August 14, 2020, through December 31, 2021.  The Department published the final results in *Common Alloy Aluminum Sheet From India: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 FR 76168 (Nov. 6, 2023) ("*Final Results*") (APPX2299-2300), in which it calculated the subsidy rates for Hindalco and its cross-owned affiliate Utkal Alumina International Limited ("Utkal") to be 37.90% for 2020 and 32.43% for 2021.  The Department's associated analysis is contained in, *inter alia*, the memoranda entitled: "Common Alloy Aluminum Sheet from India: Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review; 2020-2021," Oct. 31, 2023 ("IDM") (APPX2254-2298);

2

"Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review of Common Alloy Aluminum Sheet from India; 2020-2021," Apr. 27, 2023 ("PDM") (APPX1008-1043); and "Countervailing Duty Administrative Review of Common Alloy Aluminum Sheet from India: Preliminary Results Calculation for Hindalco Industries Limited," Apr. 27, 2023 ("Prelim Hindalco Calc Memo") (APPX1044-2244).[1]

## II.    Issues Presented and Summary of the Argument

This memorandum addresses two issues regarding the Department's calculation of Hindalco's subsidy rates for the alleged provision of coal for less than adequate remuneration ("LTAR") by the Government of India ("GOI") through Coal India Limited and/or its affiliates and subsidiaries (collectively, "CIL") in AR1 of the CVD order on CAAS from India.

---

[1]    In the *Final Results*, the Department did not change Hindalco's subsidy rates, and therefore did not issue a final calculation memo. *See Final Results*, 88 FR at 76169 (APPX2300).

3

**A.    The Department's Conclusion that the Alleged Provision of Coal for LTAR Is Specific to Hindalco Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law**

The Department's conclusion in its *Final Results* that the alleged provision of coal for LTAR is *de facto* specific under Section 771(5A)(D)(iii)(II) of the Tariff Act of 1930, as amended (the "Act") (19 U.S.C. § 1677(5A)(D)(iii)(II)), and thus all coal supplied by CIL to Hindalco during the POR is countervailable, is not supported by substantial evidence and not otherwise in accordance with law.

First, the Department incorrectly concluded that the alleged program "is *de facto* specific {under 19 U.S.C. § 1677(5A)(D)(iii)(II)} because the record indicates predominant use by electricity generating industries," namely CIL's "power (utility)" and "power (captive)" sectors, which the Department grouped as "power generating industries" on the view that they share "similar{} … process and output because both industries purchase non-coking coal which is used for power generation." IDM at 23-24 (APPX2276-2277). However, CIL's "power (captive)" sector *is not a power generating industry* that the Department may group with the "power (utility)" sector. Rather, CIL's "power (captive)" sector accounts for

4

Case 1:23-cv-00260-JAL    Document 28    Filed 06/18/24    Page 18 of 96

captive power plants ("CPPs") operated by *a wide variety of manufacturers* across India, and therefore is *a group of numerous disparate industries* that undertake various production processes to output various products.  Meanwhile, CIL's "power (utility)" sector accounts for only power utility companies that produce and output electricity to the grid.  Accordingly, CIL's "power (utility) and power (captive)" sectors do not share similar process and output, and therefore may not be grouped for the specificity analysis.

Second, even if the Department's *de facto* specificity determination was lawful, the Department incorrectly countervailed all coal provided by CIL to Hindalco during the POR.  The record indicates that Hindalco purchased coal from CIL during the POR for some facilities within CIL's "power (captive)" sector and other facilities within CIL's "others (non-coking)" sector.  Because the Department found the alleged provision of coal for LTAR to be specific based on predominant use by CIL's "power (utility)" and "power (captive)" sectors, the Department erred by countervailing CIL's coal supplied to Hindalco's facilities in the "others (non-

coking)" sector to which the Department found the alleged provision of coal is not specific.

Accordingly, this Court should reverse the Department's findings referenced above, and remand this case to the Department with instructions to either: (i) find this alleged program not specific to Hindalco after not grouping the "power (utility)" and "power (captive)" sectors in its specificity analysis; or (ii) if the Court finds such grouping was lawful, not countervail CIL's coal supplied to Hindalco's facilities in the "others (non-coking)" sector.

## B. The Department's Calculation of the Benefit to Hindalco from the Alleged Provision of Coal for LTAR Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

The Department's benefit calculation in its *Final Results* for the alleged provision of coal for LTAR is also not supported by substantial evidence and not otherwise in accordance with law. The Department erred in its *Final Results* on this issue because it failed to use coal price benchmarks comparable to Hindalco's coal purchases from CIL to determine the quantum of the benefit, as required by 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(2). Such benchmarks are available from the free on board ("FOB")

world export price data for specific grades of thermal/steam coal supplied by Hindalco from independent commercial sources India Coal Market Watch ("ICMW") and McCloskey Thermal Coal Research ("McCloskey"), which the Department rejected in favor of non-specific UN Comtrade coal export price data supplied by Petitioners without any adjustment for variations in coal grades. IDM at 31-36 (APPX2284-2289).

First, the Department erred in outright rejecting the ICMW/McCloskey data due to an alleged lack of methodological information, quantity and value figures, and limited country coverage. To the contrary, the record contains sufficient information regarding these sources, and the Department regularly accepts and does not have a practice of verifying data from such sources for use as benchmark information.

Second, the Department erred in not using the ICMW/McCloskey data exclusively to construct its tier two coal price benchmark, because these sources are more specific, capture the vast majority of the trade volume covered by the UN Comtrade data, and the Department's statutory mandate for comparability trumps

7

its preference for broader country coverage and using weighted average prices.

Third, even if it was appropriate for the Department to use the UN Comtrade data instead of the ICMW/McCloskey data for its tier two coal price benchmark, the Department erred by not adjusting the UN Comtrade data to make due allowances for factors affecting the comparability of different grades of coal, because the record clearly demonstrates both that Hindalco purchases non-coking coal by grade and that coal prices vary drastically by grade.

Accordingly, this Court should reverse the Department's calculation of the benefit to Hindalco from the alleged provision of coal for LTAR, and remand this case to the Department with instructions to re-calculate the benefit by constructing its tier two coal price benchmark either: (i) using the ICMW/McCloskey data exclusively; or (ii) in the alternative, adjusting the UN Comtrade data for variations in coal grades.

## STATEMENT OF FACTS

On June 9, 2022, the Department initiated AR1 of the CVD order on CAAS from India. *See Initiation of Antidumping and*

8

*Countervailing Duty Administrative Reviews*, 87 FR 35165 (June 9, 2022) (APPX48279-48292).  Plaintiff was among the two identified Indian producers/exporters of subject merchandise.  *Id.*  As noted above, the AR1 POR was August 14, 2020, through December 31, 2021.

From July 2022 through April 2023, Plaintiff and the GOI supplied the Department with information in response to the Department's initial and supplemental questionnaires, as well as other requests and opportunities to submit information and comments, including during and after verification.  Of relevance to this case are the following submissions by Plaintiff and the GOI: Response from Sidley Austin LLP to Secretary of Commerce Pertaining to Hindalco's Section III Questionnaire Response (Aug. 17, 2022) ("Hindalco's IQR") (APPX9288-18502); Response from Sarvada Legal to Secretary of Commerce Pertaining to GOI Initial Questionnaire Response – Section II Part II (Aug. 24, 2022) ("GOI's IQR Pt-II") (APPX18503-20544); Response from Sarvada Legal to Secretary of Commerce Pertaining to GOI Supplemental Questionnaire Response Part I (Oct. 14, 2022) ("GOI's SQR1 Pt-I")

9

(APPX24779-25007); Response from Sidley Austin LLP to Secretary of Commerce Pertaining to Hindalco's 2nd Supplemental Questionnaire Response Part I (Dec. 7, 2022) ("Hindalco's SQR2 Pt-1") (APPX27172-27496); Verification from Sidley Austin LLP to Secretary of Commerce Pertaining to Hindalco Verification Exhibits (Mar. 24, 2023) ("Hindalco's Verification Exhibits") (APPX38045-39875); Letter from Sidley Austin LLP to Secretary of Commerce Pertaining to Hindalco's Benchmark Submission (Mar. 29, 2023) ("Hindalco's Benchmark Submission") (APPX40047-44110); Response from Sidley Austin LLP to Secretary of Commerce Pertaining to Hindalco Submission of Revised Data Exhibits (Apr. 4, 2023) ("Hindalco's Revised Data Exhibits") (APPX44332-47908); Letter from Sidley Austin LLP to Secretary of Commerce Pertaining to Hindalco's Pre-Preliminary Comments (Apr. 18, 2023) ("Hindalco's Pre-Prelim Comments") (APPX48042-48087).

During this time, Petitioners also submitted certain comments and factual information.  Of relevance to this case are the following submissions by Petitioners: Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners' Benchmark

10

Submission (Mar. 29, 2023) ("Petitioners' Benchmark Submission") (APPX44111-44331); Letter from Kelley Drye & Warren LLP to Secretary of Commerce Pertaining to Petitioners' Pre-Preliminary Comments (Apr. 10, 2023) ("Petitioners' Pre-Prelim Comments") (APPX48000-48041).

The Department issued its verification reports for Hindalco and the GOI in April 2023, finding no inconsistencies with the information they reported in their questionnaire responses.  *See* Memo from USDOC to File Pertaining to Hindalco Verification Report (Apr. 5, 2023) ("Hindalco's Verification Report") (APPX47909-47929); Memo from USDOC to File Pertaining to GOI Verification Report (Apr. 25, 2023) ("GOI's Verification Report") (APPX48088-48100).

On May 4, 2023, the Department published its preliminary results in *Common Alloy Aluminum Sheet From India: Preliminary Results of Countervailing Duty Administrative Review and Partial Recission; 2020-2021*, 88 FR 28487 (May 4, 2023) ("*Preliminary Results*") (APPX2245-2247).  In its *Preliminary Results*, the Department calculated preliminary countervailable subsidy rates for

11

Hindalco[2] of 37.90 percent for 2020 and 32.43 percent for 2021. *See id.* at 28488 (APPX2246), and accompanying PDM (APPX1008-1043) and Prelim Hindalco Calc Memo (APPX1044-2244).

The Department based Hindalco's preliminary subsidy rates in large part on its conclusions regarding the alleged provision of coal for LTAR. The alleged provision of coal for LTAR contributed 33.99 percent and 29.17 percent to Hindalco's subsidy rate for 2020 and 2021, respectively. *See* Prelim Hindalco Calc Memo at Attachment I (APPX1049).

In regard to the alleged provision of coal for LTAR, of particular relevance to this case, first, the Department concluded that this alleged program was specific to Hindalco under 19 U.S.C. § 1677(5A)(D)(iii)(II). The Department did so on the basis that the "electricity power industry," which the Department considered includes CPPs such as those owned and operated by Hindalco, "is a predominant user of the subsidy." *See* PDM at 24-25 and n.162 (APPX1031-1032).

---

[2]    The Department also found Utkal to be cross-owned with Hindalco. *See Preliminary Results*, 88 FR at 28488 n.13 (APPX2246). References to Hindalco, therefore, also include Utkal.

Second, the Department calculated the benefit for Hindalco from the alleged provision of coal for LTAR by using a coal price benchmark based exclusively on UN Comtrade coal export price data supplied by Petitioners, without any adjustments to account for variations in coal grades. *See* PDM at 12, 25 (APPX1019, APPX1032); Prelim Hindalco Calc Memo at 2 (APPX1045). The Department disregarded coal price benchmark information from ICMW/McCloskey supplied by Hindalco. *See* PDM at 12 (APPX1019).

On June 16, 2023, and June 23, 2023, Plaintiff submitted its administrative case brief and rebuttal brief, respectively.[3] *See* Brief from Sidley Austin LLP to Sec of Commerce Pertaining to Hindalco Case Brief (June 16, 2023) ("Hindalco's Case Brief") (APPX48101-48166); Brief from Sidley Austin LLP to Sec of Commerce Pertaining to Hindalco Rebuttal Brief – Resubmission (July 12, 2023) ("Hindalco's Rebuttal Brief") (APPX48221-48245). Plaintiff argued, *inter alia*, that the Department erred in its *Preliminary Results* in

---

[3]    On July 12, 2023, Plaintiff resubmitted its rebuttal brief (under protest) pursuant to the Department's instructions.

its analysis of the alleged provision of coal for LTAR, including with respect to the Department's specificity and benefit determinations for this alleged program.

On November 6, 2023, the Department published its *Final Results*. As with the *Preliminary Results*, the Department calculated final countervailable subsidy rates for Hindalco[4] of 37.90 percent for 2020 and 32.43 percent for 2021. *See Final Results*, 88 FR at 76169 (APPX2300), and accompanying IDM (APPX2254-2298). The Department explained it changed its analysis for certain programs, but made no changes to its methodology for calculating Hindalco's subsidy rates relative to its *Preliminary Results*. *See* IDM at 1-5 (APPX2254-2258). Thus, the alleged provision of coal for LTAR again contributed 33.99 percent and 29.17 percent to Hindalco's subsidy rate for 2020 and 2021, respectively. In the *Final Results*, with respect to the alleged provision of coal for LTAR, the Department continued to, *inter alia*: (i) find this alleged program to be specific to Hindalco under 19 U.S.C. § 1677(5A)(D)(iii)(II), albeit

---

[4]    The Department continued to find Utkal to be cross-owned with Hindalco. *See Final Results*, 88 FR at 76169 n.8 (APPX2300).

under the modified reasoning that "the power (utility) and the power (captive) industries", based on CIL's industry classifications, "comprise a group of industries that is the predominant user of this subsidy"; and (ii) again reject Hindalco's coal price benchmark data from ICMW/McCloskey in favor of Petitioner's UN Comtrade data, without any adjustments to account for variations in coal grades. *See* IDM at 21-25, 31-36 (APPX2274-2278, APPX2284-2289).

Hindalco then timely commenced this action to challenge the Department's determination in this administrative review.

## STANDARD OF REVIEW

The Court "shall hold unlawful" the Department's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).

Under well-established legal principles, "substantial evidence" is "more than a mere scintilla{;} {i}t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d

15

927, 933 (Fed. Cir. 1984) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 477 (1951)).  In addition, "{s}peculation is not {substantial evidence in} support for a finding …." *Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1114, 1117 (Ct. Int'l Trade 1989), *aff'd* 901 F.2d 1089 (Fed. Cir. 1990).

     In determining whether the Department's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {any evidence} which fairly detracts from {the} weight" of the Department's conclusions. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted).  If the Court finds that on balance the Department's determination was not supported by substantial evidence, it must remand the case to the Department for reconsideration.

     As demonstrated below, the Department failed to support its conclusions with substantial evidence, and in fact reached conclusions contrary to the record evidence.  Therefore, the Court

16

should find the Department's determination to be unlawful and
remand this case to the Department to recalculate Hindalco's
subsidy rates.

## ARGUMENT

## I. The Department's Conclusion that the Alleged Provision of Coal for LTAR Is Specific to Hindalco Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

The Department's conclusion in its *Final Results* that the
alleged provision of coal for LTAR is *de facto* specific to Hindalco
under 19 U.S.C. § 1677(5A)(D)(iii)(II) because of "predominant use
by electricity generating industries" is not supported by substantial
evidence on the record and not otherwise in accordance with law.
IDM at 23 (APPX2276).  The Department's conclusion was based on
the faulty theory that CIL's "power (utility)" and "power (captive)"
sectors are "power generating industries" that are "similar in
process and output because both industries purchase non-coking
coal which is used for power generation," and so it is "appropriate to
group these industries."  *Id.* at 24 (APPX2277).

To the contrary, CIL's "power (captive)" sector *is not a power
generating industry* that the Department may group with the "power

17

(utility)" sector; rather, CIL's "power (captive)" sector, which

accounts for CPPs operated by *a wide variety of manufacturers*

across India, is itself *a group of numerous disparate industries* that

do not share similar process and output with the "power (utility)"

sector, which accounts for power utility companies that supply

electricity to the grid. Accordingly, the Department lacks factual or

legal basis to group CIL's "power (utility)" and "power (captive)"

sectors for its specificity analysis, so this Court should remand this

case to the Department with instructions to find this alleged

program not specific to Hindalco after re-evaluating specificity

without such grouping.[5]

Even if the Department's *de facto* specificity analysis was

lawful, its decision to countervail all of Hindalco's coal purchases

_____

[5]     Once the Department rectifies its grouping error, it follows that
the alleged provision of coal for LTAR is not specific to Hindalco and not
countervailable because it is neither *de jure* specific under 19 U.S.C. §
1677(5A)(D)(i) (as the Department already concluded) nor *de facto*
specific under any provision of 19 U.S.C. § 1677(5A)(D)(iii). However,
given this Court's standard of review, Hindalco focuses in this brief only
on the Department's erroneous conclusion that the alleged provision of
coal for LTAR is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II),
and reserves its right to further address why this alleged program is not
specific to Hindalco in this administrative review under any aspect of 19
U.S.C. § 1677(5A)(D) should it be necessary upon remand.

was not based on substantial evidence and not otherwise in
accordance with law because certain of Hindalco's facilities that
purchased coal from CIL are classified in CIL's "others (non-coking)"
sector and not in CIL's "power (captive)" sector.  Because Hindalco's
facilities in CIL's "others (non-coking)" sector are not part of the
group of industries the Department found to be predominant users
of the subsidy, the Department erred in countervailing Hindalco's
coal purchases from CIL for its "others (non-coking)" facilities.
Thus, if the Court finds the Department's grouping of CIL's "power
(utility)" and "power (captive)" sectors for the specificity analysis to
be lawful, it should still remand this case to the Department with
instructions to not countervail CIL's coal supplied to Hindalco's
facilities in the "others (non-coking)" sector.

Below, Hindalco addresses: (1) the legal framework for the
Department's specificity analysis; (2) why the record does not
support a finding that the alleged provision of coal for LTAR is
specific to Hindalco based on predominant use by "electricity
generating industries"; and (3) why, even if the alleged provision of
coal for LTAR is specific to Hindalco based on predominant use by

19

"electricity generating industries," the record does not support the Department countervailing all of Hindalco's coal purchases from CIL.

## A. Legal Framework

For an alleged subsidy to be countervailable, the program must be "specific." 19 U.S.C. § 1677(5)(A). Domestic subsidies can be specific either by law (*de jure*) or in fact (*de facto*). *See id.* § 1677(5A)(D).

Under the statute, a subsidy is *de jure* specific if "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." *Id*. § 1677(5A)(D)(i).[6] A subsidy can also be *de jure* specific where conditions or eligibility requirements of the program favor a particular industry or enterprise. *See id*. § 1677(5A)(D)(ii).

A subsidy may be *de facto* specific where: (I) the actual recipients of the subsidy, whether considered on an enterprise or

---

[6] The "reference to an enterprise or industry … includes a group of such enterprises or industries." 19 U.S.C. § 1677(5A)(D).

industry basis, are limited in number; (II) an enterprise or industry is a predominant user of the subsidy; (III) an enterprise or industry receives a disproportionately large amount of the subsidy; and/or (IV) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others. *See id*. § 1677(5A)(D)(iii).  The Department's regulations state that the factors are to be considered sequentially.  19 C.F.R. § 351.502(a).

The Department is instructed to use a "rule of reason" with respect to specificity to "avoid the imposition of countervailing duties in situations where … the benefit of the subsidy is spread throughout an economy."  Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act (URAA), H.R. Doc. No. 103-316, vol. 1 at 930 (1994) ("SAA"), reprinted in 1994 U.S.C.C.A.N. 4040, 4242.

For determining which industry may be the predominant user of an alleged subsidy program (the relevant *de facto* specificity factor here), the Department utilizes the prevalent industrial classification system of the government authority at issue.  This is evident from

the Department's instruction to the GOI in its Initial Questionnaire stating, "{i}n identifying the industries, please use whatever resource or classification scheme the Government normally relies upon to define industries and to classify companies within an industry," GOI's IQR Pt-II at 9 (APPX18516), and its similar practice in other proceedings. *See, e.g.*, *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission of Administrative Review in Part, and Intent To Rescind in Part; 2021*, 88 FR 29084 (Dep't of Commerce May 5, 2023) and accompanying Issues and Decision Memorandum at 24-25; *Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 36305 (Dep't of Commerce June 16, 2022) and accompanying Issues and Decision Memorandum at 49-50; *Certain Fabricated Structural Steel From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 85 FR 5384 (Dep't of Commerce Jan. 30, 2020) and accompanying Issues and Decision Memorandum at 42-43.

The Department has explained that "{u}nder our normal analyses of whether an industry is a predominant user of a subsidy or whether an industry receives a disproportionately large amount of a subsidy, we compare the use of a particular program by the industry being investigated … to the use of the program by recipients in other industries{.}" *Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 FR 12186 (Dep't of Commerce Mar. 11, 2005) and accompanying Issues and Decision Memorandum at 30.

For example, in *Certain Oil Tubular Goods From Turkey*, in evaluating the alleged specificity of the provision of natural gas for LTAR to respondents that were part of the iron and steel industry, the Department found that a different industry – the power industry – consumed approximately 47.5 percent of natural gas in Turkey, while the iron and steel industry's share was only 5 percent of the power industry's consumption. *See Certain Oil Country Tubular Goods From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 79 FR 41964 (Dep't of Commerce July

23

18, 2014) and accompanying Issues and Decision Memorandum

("*OCTG from Turkey* IDM") at 31 and n.230. On this basis, the

Department explained:

> This usage information shows that while nearly
> all industries in Turkey (including services) used
> natural gas, the power industry was clearly the
> predominant user. Therefore, we find that the
> provision of natural gas for LTAR is specific to
> the power industry within the meaning of section
> 771(5A)(D)(iii)(II) of the Act. Because we are
> finding that Borusan and Toscelik are not part of
> the power industry in Turkey, we also find that
> Borusan and Toscelik did not benefit from this
> program.

*Id.* at 31.[7]

Additionally, in *Chlorinated Isocyanurates From China*, when

evaluating the specificity of the provision of urea for LTAR, the

Department wrote:

---

[7]    The Department dismisses the *OCTG from Turkey* IDM in its
specificity analysis because the respondents there did not use
natural gas to produce power, unlike the power industry, which was
the predominant user of the subsidy at issue. *See* IDM at 24
(APPX2277). However, the Department misunderstands the
proposition that *OCTG from Turkey* supports – *i.e.,* the respondent
must be properly part of the industry that is found to be the
predominant user of the subsidy in order for the subsidy to be
specific to that respondent based on the predominant use factor.
*OCTG from Turkey* does not address how to define an industry or
when it is appropriate to group industries.

> Lastly, Petitioners contend that the subject
> merchandise industry need not be among those
> users for which the program is specific to benefit
> from a subsidy so long as fertilizer {(*i.e.*, a
> different industry)} is the predominant user of
> urea. A finding of specificity based on
> predominant use under section 771(5A)(D)(iii)(II)
> of the Act is premised on predominant use by a
> particular "enterprise or industry." For that
> reason, a common-sense reading of section
> 771(5A)(D)(iii)(II) of the Act supports an
> interpretation limiting a finding of
> countervailability to that enterprise or industry
> making predominant use of the subsidy.

*Chlorinated Isocyanurates From the People's Republic of China:*

*Final Affirmative Countervailing Duty Determination; 2012*, 79 FR

56560 (Dep't of Commerce Sept. 22, 2014), and accompanying Issues

and Decision Memorandum at 41 (citing *OCTG from Turkey* IDM at

30-31).

In sum, for the predominant use prong of the *de facto*

specificity analysis, the Department's practice is to: (1) define

industries consistent with the classification scheme of the relevant

government authority; and (2) countervail a subsidy program only

with respect to respondents that are in the industry (or group

thereof) found to make predominant use of the subsidy.

**B.     The Department's Conclusion that Predominant Use Makes the Alleged Provision of Coal for LTAR Specific to Hindalco Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law**

The Department's finding of *de facto* specificity for this alleged program in its *Final Results* is an egregious error unsupported by substantial evidence on the record.  The Department concluded the alleged provision of coal for LTAR is "*de facto* specific {under 19 U.S.C. § 1677(5A)(D)(iii)(II)} because the record indicates predominant use by electricity generating industries."  IDM at 23 (APPX2276).  Despite CIL lacking a classification for "electricity generating industries," the Department stated it was appropriate to group the "power (utility)" and "power (captive)" sectors as "power generating industries" based on the view that these sectors were "similar in process and output because both industries purchase non-coking coal which is used for power generation."  *Id.* at 24 (APPX2277).  However, the Department's decision to group CIL's "power (utility)" and "power (captive)" sectors is not supported by substantial evidence or Department precedent, so the Department's finding should be reversed and remanded, as explained below.

26

The Department defends its decision to group CIL's "power (utility)" and "power (captive)" sectors as "power generating industries" based on similar "process and output" by citing the decision in *Citric Acid from PRC*.  IDM at 23-24 (APPX2276-2277) (citing *Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2010*, 77 FR 72323 (Dec. 5, 2012) and accompanying Issues and Decision Memorandum at Comment 4 ("*Citric Acid from PRC* AR2 IDM")).[8]  However, the Department is both wrong in adopting the approach of *Citric Acid from PRC* and in its factual determination that the "process and output" of the "power (utility)" and "power (captive)" sectors are sufficiently similar to justify grouping these as "power generating industries."

*Citric Acid from PRC* is distinct from the present case.  First, in *Citric Acid from PRC*, the Department was considering the

---

[8]     The portion of the *Citric Acid from PRC* AR2 IDM quoted by the Department derives from that proceeding's first administrative review. *See Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 76 FR 77206 (Dec. 12, 2011) and accompanying Issues and Decision Memorandum at 52 ("*Citric Acid from PRC* AR1 IDM").

27

appropriateness of grouping sub-sectors within an industry, not separate industries. *Citric Acid from PRC* AR1 IDM at Comment 7; *Citric Acid from PRC* AR2 IDM at Comment 4.

Second, the Department's *de facto* specificity analysis and decision to group sub-sectors was under a "limited number of industries" theory, not a "predominant user" theory. *Id.* It does not follow that the same considerations for grouping sub-sectors under 19 U.S.C. § 1677(5A)(D)(iii)(I), which examines the total number and make-up of users, would also apply for grouping distinct industries under 19 U.S.C. § 1677(5A)(D)(iii)(II), which examines whether the distribution of use by a particular industry or industries is concentrated.

For a limited number of industries analysis, the Department may not want overly specific industry definitions to undermine the reality that a program is utilized by only a few industries. However, for predominant use, which is not based on the number of industries *per se* but rather the intensity at which certain industries are using the alleged subsidy, it is less important to prevent "workarounds" of specificity findings by ensuring industries are not artificially

separated, especially where there is a clear predominant user.

Given these different considerations, the Department's decision to

group industries based on similar "process and output" under the

predominant user prong of the *de facto* specificity analysis is legally

questionable.

As a factual matter, notably, CIL's sector classifications pre-

date the present CVD proceeding. *See, e.g.*, GOI's IQR Pt-II at

Exhibit COAL-3 (Coal Directory of India FY2018-19) (APPX18997,

19088). Consequently, there is no question here of the GOI or CIL

attempting a "workaround" of a specificity finding.

Additionally, it is incorrect that CIL's "power (utility)" sector

(or power companies) and "power (captive)" sector (or CPPs) are

sufficiently similar in "process and output" so as to justify grouping

these as "power generating industries." While it is true that both

power companies and CPPs use coal to produce electricity, power

companies do so solely to produce electricity that is sold as a

commodity to the grid. Their output is electricity. By contrast,

CPPs are owned and operated by a wide variety of manufacturers

that use the coal-generated electricity to make some other end

product, so they undertake additional production processes and
output a product that is *not electricity*.

In Hindalco's case, Hindalco uses its CPPs to produce
aluminum or copper as an output, and does not sell even one unit of
electricity to the grid.  *See* Hindalco's Verification Exhibits at
Exhibit VE-10 (**[**




**]**) (emphases in original)

(APPX38857).  Nothing in the Department's verification reports for
Hindalco or the GOI questions this explanation that Hindalco does
not sell any electricity to the grid.  *See generally* Hindalco's
Verification Report (APPX47909-47929); GOI's Verification Report
(APPX48088-48100).  Instead, the Department explicitly
acknowledges that Hindalco and Utkal operate CPPs in support of
aluminum (and copper) production, so it is undisputed that Hindalco
and Utkal are only part of CIL's "power (captive)" sector, and not

30

part of CIL's "power (utility)" sector.  *See* Hindalco's Verification Report at 8 (APPX47916); IDM at 24 (APPX2277).

Moreover, the GOI explained explicitly that CIL's "power (captive)" sector consists of "captive power plants (CPP) set up by *various manufacturing industries*{.}"  GOI's IQR Pt-II at 10 (emphasis added) (APPX18517).  This description was entirely lost on the Department in concluding that CIL's "power (captive)" sector is a "power generating industr{y}" like CIL's "power (utility)" sector.

The fact that CIL's "power (captive)" sector is made up of many industries, unlike CIL's "power (utility)" sector, is also supported by the GOI's explanation of the National Industrial Classification ("NIC") codes that correspond with those particular sectors.  As the GOI explained, the "power (utility)" sector corresponds with NIC Code D-35102 for "{e}lectric power generation by coal based thermal power plants," while the "power (captive)" sector does not have any specific assigned code under the NIC; rather CPPs fall under "{s}everal" NIC codes based on the "various industries" that set up the CPPs.  GOI's SQR1 Pt-I at 3, 7 (APPX24786, 24790).  Thus, it should be clear that CIL's "power (utility)" and "power (captive)"

sectors are not "power generating industries … sufficiently similar in process and output" that may be grouped.  To the contrary, there is no basis in law or fact to group the "power (utility)" sector with various manufacturing industries.

In this regard, as an initial matter, the Department does not explain – nor can it based on substantial record evidence – why it is appropriate to group all the various industries that fall within CIL's "power (utility)" sector.  The only thing these industries have in common is that they share an intermediate input – *i.e.*, electricity, which *every* industry uses.  These industries, however, have disparate ultimate outputs.  Simply having a common intermediate input – especially electricity – is a tenuous basis for grouping these industries.  Rather, such grouping runs contrary to the "rule of reason" behind the specificity test designed to ensure that widespread subsidies are not countervailed.  SAA at 930.

The Department also does not explain – nor can it based on substantial record evidence – why it is appropriate to group all the various industries that fall within CIL's "power (captive)" sector with CIL's "power (utility)" sector.  Claiming that CPPs and power

companies are similar "power generating industries" is like

asserting homes or businesses with rooftop solar panels for self-use

for various purposes are the same as solar power companies that

generate and sell solar power to the grid. Or that a company that

extracts crude oil solely to sell the crude oil is the same as a

company that extracts crude oil to manufacture and sell downstream

products such as plastics, rubber, cosmetics, etc. Such grouping

makes little sense.

Once it is clear that CIL's "power (utility)" sector is distinct

and dissimilar from its "power (captive)" sector, the conclusion that

the alleged provision of coal for LTAR is not *de facto* specific to

Hindalco pursuant to the "predominant user" factor under 19 U.S.C.

§ 1677(5A)(D)(iii)(II) follows naturally based on the relevant legal

framework and record evidence.

As explained above, the Department typically adopts the

industry classification of the government authority providing the

alleged subsidy. Here, the alleged government authority, CIL,

treats the "power (utility)" sector and the "power (captive)" sector as

two distinct sectors. *See* GOI's IQR Pt-II at 11 (APPX18518). CIL

even has distinct auctions for *non*-power sectors, which include the "power (captive)" sector. *See id.* at 14, Exhibit COAL-15 (APPX18521, 19611). Moreover, as Hindalco explained during verification, [

                    ]. Hindalco's Verification Exhibits at Exhibit VE-10 (APPX38857). All of this further supports the conclusion that CIL does not view CPPs as similar to the "power (utility)" sector and treats these sectors as completely separate, as should the Department. Given these sectors are distinct and the undisputed fact that Hindalco does not sell any electricity to the grid, it is clear that Hindalco is not part of the sector that makes predominant use of CIL's coal – *i.e.*, the "power (utility)" sector.

      As also explained above, where the respondent's enterprise or industry is not the predominant user of an alleged subsidy, the Department will not find the subsidy to be specific to the respondent under 19 U.S.C. § 1677(5A)(D)(iii)(II), even if a *different* enterprise or industry that is not at issue is the predominant user of the subsidy. In light of this legal framework, the facts on record demonstrate that the Department cannot find the alleged provision

34

of coal for LTAR to be *de facto* specific based on 19 U.S.C. §

1677(5A)(D)(iii)(II) because it is CIL's "power (utility)" sector in

India that is the predominant user of CIL's coal, and Hindalco

indisputably does not operate in CIL's "power (utility)" sector.  The

latter is because, as explained above, Hindalco does not sell (*i.e.*,

distribute) any of the electricity it produces in its CPPs to the

market.[9]

The remainder of the analysis must, therefore, be conducted in

light of these facts.  The correct analysis using the same underlying

data would show that, by the quantity of coal dispatched, CIL sold

approximately the following percentages of coal to the following

sectors: **[      ]** percent in 2021 and **[         ]** percent in 2020 to

---

[9]    In other cases where the Department has found a respondent to be part of the power generation industry, those companies actually sold excess energy to the grid and therefore were acting akin to a power utility company.  *See, e.g., Certain Uncoated Paper From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty*, 80 FR 36968 (June 29, 2015) and accompanying Preliminary Decision Memorandum at Section XI.B.1, unchanged in *Certain Uncoated Paper From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 FR 3110 (Jan. 20, 2016).  Hindalco does not sell *any* electricity to the grid, so it cannot be considered part of the Indian power generating industry.

35

"power (utility)" (*i.e.*, excluding CPPs); **[      ]** percent in 2021 and
**[      ]** percent in 2020 to "others (non-coking)" (which includes
aluminum); **[      ]** percent in 2021 and **[      ]** percent in 2020 to
"power (captive)" (*i.e.*, CPPs); **[      ]** percent in 2021 and **[      ]**
percent in 2020 to "sponge iron"; and the remaining in each year to
other sectors, including cement, steel, fertilizer, and others (coking).
*See* GOI's IQR Pt-II at 11 (APPX18518). **{GOI BPI}** Clearly, the
"power (utility)" sector is the one predominant user of CIL's coal,
and no other sector consumes a comparable amount of CIL's coal.

In light of the legal framework discussed above, these facts
demonstrate unequivocally that CIL's "power (utility)" sector in
India is the predominant user of CIL's coal.  Because CIL supplies
coal to Hindalco's facilities classified in CIL's "power (captive)" and
"others (non-coking)" sectors, the sectors that Hindalco is part of
based on CIL's classification system, which themselves include
many distinct industries and a basket "other" category, used at most
**[      ]** percent in 2021 and **[      ]** percent in 2020 collectively of
CIL's coal supply.  *See id*. at 11 (APPX18518).  **{GOI BPI}** These
shares pale in comparison to the shares used by the "power (utility)"

36

sector. Because the "power (utility)" sector is *such* a predominant user over other sectors, the facts here do not support finding multiple predominant users of the alleged program.

Thus, the record information clearly indicates that CIL's "power (utility)" sector and that sector alone is the one predominant user of CIL's coal. Because the Department's decision to group the "power (utility)" and "power (captive)" sectors is not supported by substantial evidence or otherwise lawful, this Court must remand this case to the Department to find the alleged provision of coal for LTAR not specific to Hindalco after re-evaluating specificity without such grouping.

## C.    Even if the Department's Specificity Analysis Was Lawful, the Department's Decision to Countervail All Coal Purchased by Hindalco from CIL Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

However, if this Court finds the Department's conclusion that the alleged provision of coal for LTAR is *de facto* specific to Hindalco based on predominant use by the "power (utility)" and "power (captive)" sectors was lawful, it follows from the jurisprudence discussed above that coal supplied by CIL outside of those sectors

that are the predominant users of CIL's coal cannot be specific and, therefore, cannot be countervailed.

The record shows CIL supplies coal to Hindalco's facilities as follows:

> The coal supplied to the mandatory respondent, Hindalco, falls under following categories – **[**


> **]**.

GOI's IQR Pt-II at 11 (APPX18518). **{GOI BPI}**

Thus, the Department at a minimum must not countervail the coal supplied by CIL to Hindalco's **[**

**]** because those facilities operate in CIL's "others (non-coking)" sector to which CIL's coal supply is undoubtedly not specific based on the Department's own analysis. **{GOI BPI}** Rather, the Department may countervail only the coal supplied by CIL to Hindalco's **[**

**]** because those are the only Hindalco facilities that operate in CIL's "power (captive)" sector. **{GOI BPI}**

38

In light of the foregoing, the Department's decision to

countervail *all* coal purchases from CIL made by Hindalco, even

where Hindalco's facilities purchasing the coal do not fall in the

"industries" found to be making predominant use of the subsidy as

per the Department's own analysis, is unsupported by substantial

evidence and not in accordance with law.  Accordingly, if the Court

upholds the Department's *de facto* specificity conclusion based on

predominant use by CIL's "power (utility)" and "power (captive)"

sectors, it should still remand this case to the Department with

instructions to not countervail CIL's coal supplied to Hindalco's

facilities in the "others (non-coking)" sector.

## II.     The Department's Calculation of the Benefit to Hindalco from the Alleged Provision of Coal for LTAR Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

Even if the Department's specificity determination with respect

to the alleged provision of coal for LTAR was lawful, the

Department's calculation of the benefit to Hindalco from this alleged

program is not supported by substantial evidence on the record and

not otherwise in accordance with law.  *See* IDM at 31-36

(APPX2284-2289).  The Department erred by failing to use

39

benchmarks comparable with Hindalco's grade-wise coal purchases from CIL to determine the quantum of the benefit. Specifically, the Department declined to use the FOB world export price data for specific grades of thermal/steam coal supplied by Hindalco from independent commercial sources ICMW and McCloskey to construct its tier two coal price benchmark (*i.e.*, before addition of import duties and delivery charges), because it concluded that these sources lacked methodological information, did not contain quantity and value figures, and covered too few countries.[10]  *Id.*  Instead, the Department relied exclusively on non-specific UN Comtrade coal export price data supplied by Petitioners.[11]  *Id.* at 31 (APPX2284).

Faced with clear record evidence that Hindalco purchases non-coking coal by grade and that coal prices vary drastically by grade, by rejecting the more product-specific FOB world export price data

---

[10]    Hindalco supplied the ICMW and McCloskey data at Hindalco's Benchmark Submission at Exhibits BENCH-1 (APPX40057-43585) and BENCH-4 (APPX43840-43863).  The ICMW data are summarized in Hindalco's Benchmark Submission at Exhibit BENCH-2 (APPX43586-43834).  The ICMW and McCloskey data are also both summarized in Hindalco's Case Brief at Annex (APPX48165).

[11]    Petitioners supplied the UN Comtrade data at Petitioners' Benchmark Submission at Attachment 1 (APPX44123-44139).

for specific grades of thermal/steam coal from ICMW/McCloskey, the Department failed to account for "product similarity" and "factors affecting comparability," such as "… quality … and other conditions of purchase or sale," as the statute and the Department's regulations require.  19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(2)(i)-(ii).  As discussed further below, the Court should reverse the Department's calculation of the benefit to Hindalco from this alleged program, and remand this case with instructions to re-calculate that benefit lawfully.

Below, Hindalco addresses: (1) the legal framework for the Department's benefit analysis; (2) why the record does not support the Department's outright rejection of the ICMW/McCloskey data as tier two benchmarks; (3) why the Department erred in not using the ICMW/McCloskey data exclusively for its tier two coal price benchmark; and (4) why the Department erred in not at least using the ICMW/McCloskey data to adjust its UN Comtrade benchmark to account for variations in coal grades.

41

**A.      Legal Framework**

The Department's selection of a benchmark for the benefit

analysis for an alleged provision of goods or services for LTAR is

controlled by the statute and its regulations.  The statute states that a

countervailable subsidy confers a benefit when "goods or services are

provided for less than adequate remuneration."  19 U.S.C. §

1677(5)(E)(iv).  It also defines "adequate renumeration" as follows, with

particular reference to taking into account "quality" considerations and

"other conditions of purchase or sale" in such analysis:

> {T}he adequacy of remuneration shall be
> determined in relation to prevailing market
> conditions for the good or service being provided
> or the goods being purchased in the country
> which is subject to the investigation or review.
> Prevailing market conditions include price,
> *quality*, availability, marketability,
> transportation, and *other conditions of purchase
> or sale*.

*Id.* (emphases added).

The Department's regulations at 19 C.F.R. § 351.511(a)(2)

establish a three-tier hierarchy of sources to be used as benchmarks

to assess adequate renumeration for alleged provisions of goods or

services.  In addressing the definition of adequate remuneration, the

42

Department makes note that it "will consider *product similarity* …

and other *factors affecting comparability*." 19 C.F.R. §

351.511(a)(2)(i) (emphases added). The Department explains that if

no useable tier one prices are available for the comparison under

§ 351.511(a)(2)(i), it will seek to use a tier two benchmark – the

relevant tier here – that is based on world market prices. Again, the

Department explains that for the tier two benchmark, it will take

into account "factors affecting comparability":

> {T}he Secretary will seek to measure the
> adequacy of remuneration by comparing the
> government price to a world market price where
> it is reasonable to conclude that such price would
> be available to purchasers in the country in
> question. Where there is more than one
> commercially available world market price, the
> Secretary will average such prices to the extent
> practicable, *making due allowance for factors*
> *affecting comparability*.

*Id.* § 351.511(a)(2)(ii) (emphasis added).

Thus, both the statute and the Department's regulations

require taking into account factors affecting comparability when

selecting a benchmark. *See Jiangsu Zhongji Lamination Materials*

*Co. v. United States*, 625 F. Supp. 3d 1355, 1370 (Ct. Int'l Trade

2023) ("The Federal Circuit previously has stated that Commerce's

43

selected remuneration benchmark is required to be 'comparable' to the input used in the production of the subject merchandise.") (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273-74 (Fed. Cir. 2012)).

The Department's obligation to "mak{e} due allowance for factors affecting comparability," like "product similarity" and "quality," is paramount in selecting a tier two benchmark. The Department accordingly has a practice of rejecting UN Comtrade's "basket categor{ies}"to rely exclusively on more product-specific data when they are available to construct tier two benchmarks. *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 40491 (Dep't of Commerce July 7, 2022), and accompanying Issues and Decision Memorandum at 51 ("*Crystalline Silicon Photovoltaic Cells* IDM") (rejecting UN Comtrade's "basket category" in favor of industry publication data because "{a}lthough the UN Comtrade dataset may include prices for solar glass, it includes prices for a broader array of tempered products .... PV

44

Insights prices are specific to solar glass {but} the UN Comtrade prices are not") (citation omitted); *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination*, 86 FR 41013 (Dep't of Commerce July 30, 2021), and accompanying Issues and Decision Memorandum at 48-49 ("*Mobile Access Equipment from China* PDM") (rejecting UN Comtrade in favor of more specific "USA Trade Online" data for a tier two benchmark for steel engines), reversed on other grounds in *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 57809 (Dep't of Commerce Oct. 19, 2021), and accompanying Issues and Decision Memorandum at 88-89 ("*Mobile Access Equipment from China* IDM"). *C.f. Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 FR 58175 (Dep't of Commerce Dec. 11, 2017), and accompanying Issues and Decision Memorandum at 40-41 ("*Cold-Drawn Mechanical Tubing from*

*China* IDM") (rejecting GTA in favor of more specific steel industry

publications for a tier two benchmark for steel billets).

Indeed, when the Department finds that certain sources have

superior comparability, it *must* use those sources exclusively: the

Department cannot dilute its most comparable sources by averaging

them with a less-comparable source.  19 C.F.R. § 351.511(a)(2)(ii)

(directing the Department to "average such prices *to the extent*

*practicable, making due allowance for factors affecting*

*comparability*") (emphasis added).  In a recent case where the

Department did otherwise – averaging a product-specific industry

source with "basket headings" from UN Comtrade – the CIT held

that the Department "failed to properly make allowance for 'factors

affecting comparability'" and required it to rely on the product-

specific dataset exclusively or explain itself.  *Changzhou Trina Solar*

*Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1331-35 (Ct. Int'l

Trade 2018) ("*Changzhou Trina Solar II*") (citing 19 C.F.R. §

351.511(a)(2)(ii)).

One implication of the Department's practice of using product-

specific data and its obligation to consider "quality" is its "practice of

46

deriving benchmark prices by grade," particularly when record

evidence indicates the good in question is purchased by grade.  *See*

*Certain Uncoated Paper From the People's Republic of China: Final*

*Affirmative Countervailing Duty Determination*, 81 FR 3110 (Jan.

20, 2016) and accompanying Issues and Decision Memorandum at

25-26 ("*Certain Uncoated Paper from China* IDM") (citing *Certain*

*Steel Wheels From the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination, Final Affirmative Critical*

*Circumstances Determination*, 77 FR 17017 (Dep't of Commerce

Mar. 23, 2012), and accompanying Issues and Decision

Memorandum at Comment 15); *Circular Welded Austenitic Stainless*

*Pressure Pipe from the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination*, 74 FR 4936 (Dep't of Commerce

Jan. 28, 2009), and accompanying Issues and Decision

Memorandum at Section V.A.1; *Certain Hot-Rolled Carbon Steel*

*Flat Products from India: Final Results of Countervailing Duty*

*Administrative Review*, 73 FR 40295 (Dep't of Commerce July 14,

2008), and accompanying Issues and Decision Memorandum at

Sections I.A.4 and I.A.5 ("*Certain Hot-Rolled Steel from India* IDM");

and *Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 FR 73448 (Dep't of Commerce Dec. 12, 2005), and accompanying Issues and Decision Memorandum at Section I(F); *Supercalendered Paper From Canada: Final Results of Countervailing Duty Expedited Review*, 82 FR 18896 (Dep't of Commerce Apr. 24, 2017), and accompanying Issues and Decisions Memorandum at 56-57 (footnote omitted) (using benchmarks that "take into account both species and grade" because "record evidence demonstrates that Catalyst's purchases of logs are heavily influenced by the grade/quality of the log").

For example, in *Uncoated Paper from China*, the Department computed tier two benchmarks for coal that were specific to the "categories of coal purchased by {respondent} during the {period of investigation}," noting that this approach "is consistent with the Department's practice of deriving benchmark prices by grade when such data are available and when the record evidence indicates that the respondent firm purchases the good in question on a grade specific basis." *Certain Uncoated Paper from China* IDM at 25-26.

48

When the Department is faced with a trade-off between benchmark data that are more comparable with the respondent's purchased good and other non-statutory preferences (*e.g.*, monthly over annual data, broader country coverage, weight-averaged data, etc.) for calculating a benchmark, the CIT has held that the Department may not select an over-inclusive dataset as a tier two benchmark to satisfy its other preferences because "not all flaws in data are equally problematic," and "there is no statutory or regulatory basis for allowing {other} preference{s} to overcome vital comparability concerns." *Changzhou Trina Solar II* at 1332-35 (addressing, in this instance, a preference for monthly over annual data).

Thus, the Department does not select over-inclusive datasets to satisfy its preference for sources covering a broader range of countries when constructing tier two benchmarks, as long as the more comparable dataset with thinner country coverage is still representative of world market prices. *See, e.g.*, *Cold-Drawn Mechanical Tubing From China* IDM at 40-41 (rejecting UN Comtrade in favor of industry data covering fewer countries in

respect of steel ingots); *Mobile Access Equipment from China* PDM at 48-49 (rejecting UN Comtrade in favor of a dataset reflecting "only … U.S. exports to the world" because the latter was more product-specific).

In *Cold-Drawn Mechanical Tubing*, the Department rejected a dataset with global coverage in favor of steel industry publication data that "only represent{ed} countries in a similar geographic location" because the global dataset's more general categories swept steel billets into the same category as other kinds of steel inputs whereas the steel industry data provided prices "specific to billet inputs of the type purchased by {respondents}." *Cold-Drawn Mechanical Tubing From China* IDM at 41-42. The Department found that the large increase in product specificity in the industry dataset outweighed the small loss in global coverage. *Id.* at 40-42. The Department, thus, exclusively relied on the industry data. *Id.* at 41.

The Department also rejected UN Comtrade data in favor of data that reflected only U.S. exports in *Certain Mobile Access Equipment* because the latter data were more product-specific as a

50

tier two benchmark for diesel engines. *Mobile Access Equipment from China* PDM at 48-49.[12]  The Department found that the UN Comtrade data "may include engines covering a range of power levels, including higher-power engines that are not used in subject merchandise because they are of greater size and horsepower." *Id.* at 48.  By contrast, the USA Trade Online data were more specific and distinguished between engines of different power levels.  The Department relied exclusively on the more specific USA Trade Online data despite its narrower country coverage:

> While the USA Trade Online Data reflect only … U.S. exports to the world, and as such do not provide the same country coverage as UN Comtrade data, we find it preferable to the UN Comtrade data because it is reported on the same basis as which diesel engines are sold, *is more specific in HTS number*, and can be altered to reflect the diesel engines used in subject merchandise.

*Id.* at 48-49 (emphasis added).

---

[12]    The Department adopted a different benchmark for diesel engines in its final IDM in this case, but did so because it decided to countervail a larger set of goods that the USA Trade Online data did not cover – not because it reversed its reasoning from the PDM. *See Mobile Access Equipment from China* IDM at 88-89.

With respect to the adequacy of data being used in the calculation of a tier two benchmark, the Department regularly uses data from "commercially published independent sources for use in the {relevant} industry" with only general descriptions of methodology so long as "it is clear from the record that the purpose of the assessments is to provide market prices for various products." *See Certain Tool Chests and Cabinets From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 82 FR 56582 (Dep't of Commerce Nov. 29, 2017), and accompanying Issues and Decision Memorandum at 25 ("*Tool Chests and Cabinets from China* IDM"). *See also Cold-Drawn Mechanical Tubing from China* IDM at 40-41 ("{a}lthough we agree that the sources that Hongyi used (*i.e.*, AMM, Platts, Steelguru, Metal Expert World Steel Data and Steel Orbis) use various pricing techniques, it is clear from the record that the purpose of the assessments is to provide transparent market prices of various products"). The Department "{does} not have a practice of verifying such data." *Tool Chests and Cabinets From China* IDM at 25.

For the Department to reject independent industry sources, it is not enough that their "methodology lacks transparency," *Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2020 WL 4464251, at \*5 (Ct. Int'l Trade Aug. 4, 2020) ("*Changzhou Trina Solar III*"); rather, the source must "lack{} *any* substantive information as to the methodology and sources used to compile the data" or fail to specify the delivery terms it reports. *See Barium Chloride From India: Final Affirmative Countervailing Duty Determination*, 88 FR 1044 (Dep't of Commerce Jan. 6, 2023), and accompanying Issues and Decision Memorandum ("*Barium Chloride from India* IDM") at 30 (emphasis added).[13] The Department's focus should be on whether it has enough information to confirm that the data being provided are in fact comparable to the provided good. *See Multilayered Wood Flooring From the People's Republic of China:*

---

[13] Although the Department rejected industry publications in this case, it did so because the sources lacked several characteristics ICMW and McCloskey have: *inter alia*, several of the sources failed to specify the sale and delivery terms of their unit values, reported prices on an annual (not monthly) basis, and failed to provide "any" explanation of methodology. *Barium Chloride from India* IDM at 31-33. By contrast, as discussed in the remainder of this section, the record establishes both ICMW and McCloskey report values on a FOB basis, use monthly values, and indicate their methodology.

*Final Results of Countervailing Duty Administrative Review; 2020*, 88 FR 34828 (May 31, 2023) and accompanying Issues and Decision Memorandum at 67 ("{T}he lack of volume and value information does not make the ITTO data *incomparable* to other benchmarking data available on the record, and therefore is not sufficient grounds to exclude a dataset from the calculation of a benchmark.") (emphasis added).

*Tool Chests and Cabinets from China* illustrates the level of methodological information the Department requires from publications like ICMW and McCloskey. There, the Department used data from steel industry publications with proprietary methodology and without access to the underlying data because "the data come{} from commercially published independent sources for use in steel and other industries." *Tool Chests and Cabinets From China* IDM at 25. It was enough for one source to state that its assessments "are designed to produce price assessments that are representative of market value, and of the particular markets to which they relate," and for another to state that its prices "are derived from actual international & local transactions made,

confirmed by both the sellers and buyers." *Id*. *See also Cold-Drawn Mechanical Tubing From China* IDM at 40-41 (quoting similar language from steel industry publications as sufficient description of methodology).

Similarly, this Court recently affirmed the Department's decision to base a tier two benchmark on data from industry publication PV Insights over a petitioner's objection that "PV Insights is unreliable because its methodology lacks transparency." *Changzhou Trina Solar III* at \*5. The Court observed that "Commerce considered {petitioner's} concerns regarding PV Insights, but concluded the data w{ere} reliable." *Id*. at \*5. As such, the Court upheld the Department's decision. *Id*. at \*6.

Finally, the Department also has a practice of using available world market price data to adjust benchmarks for variations in grade. For example, in *Certain Hot-Rolled Carbon Steel Flat Products from India*, to determine tier two benchmarks for iron ore lumps and fines, the Department used world market price data from an industry publication called Tex Report, and then adjusted that data for varying percentages of iron (FE) content. *See Certain Hot-*

*Rolled Steel from India* IDM at Section I.A.4 ("We also adjusted our

calculations for iron (FE) content."). Specifically, the Department:

> {F}irst used the data provided and information
> contained in invoices and contracts provided on
> the record to derive the actual percentage Fe
> content of the domestic iron ore that was
> purchased. We then multiplied the derived
> domestic percentage Fe content by the
> benchmark price per percentage Fe content.
> Where the data were not available, to derive the
> actual percentage Fe content of the domestic iron
> ore purchase, we multiplied the reported base Fe
> content of the domestic purchase by the
> benchmark price per percentage Fe content. This
> resulted in the benchmark price per wet metric
> ton for iron ore of the same Fe content as the
> domestic iron ore purchase.

*Id. See also id.* at Section I.A.8.

In sum, under the statute and its regulations, the Department

is required to take into account factors affecting comparability when

selecting benchmarks, must favor benchmark data that are more

comparable with the purchased good, and under its own practice,

regularly considers product grades when constructing tier two

benchmarks. Further, the Department's practice is to accept

commercially available pricing data so long as there is sufficient

information to confirm the data are comparable with the purchased

good at issue, and use available world market price data to adjust

benchmarks for variations in grade.

## B.    The Department's Decision to Outright Reject the ICMW/McCloskey Benchmark Data Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

Both the ICMW and McCloskey data contain sufficient

methodological information for the Department to confirm the data

are comparable with Hindalco's coal purchases, so the Department's

decision to outright reject such data is not supported by substantial

evidence and not otherwise in accordance with law.

The grade-specific thermal/steam coal FOB world export price

data from ICMW and McCloskey are the same kind of "commercially

published independent sources … designed to produce price

assessments … representative of market value" discussed above that

have traditionally received deference on methodology from the

Department. *See Tool Chests and Cabinets From China* IDM at 25.

ICMW and McCloskey are both "commercially available" sources

because their publications are available to any member of the public

upon purchase. *See, e.g.*, Hindalco's Benchmark Submission at

Exhibit BENCH-1, p. 145 of Jan. 2020 report (providing contact

information to purchase ICMW subscriptions) (APPX40203)[14] and Exhibit BENCH-6 (demonstrating how Hindalco purchased the McCloskey data) (APPX43921-43926).  Indeed, the Department regularly relies on commercial industry publications like ICMW and McCloskey, such as SteelGuru, AMM, Platts, Steel Orbis, PV Insights, and GTM Research, in the steel and solar industries.  *See, e.g.*, *Cold-Drawn Mechanical Tubing From China* IDM at 40-41; *Changzhou Trina Solar III* at \*4-5.

Moreover, ICMW and McCloskey provide at least as much methodological information as their peer publications in the steel and solar industries long accepted by the Department.  *See Tool Chests and Cabinets From China* IDM at 25.

ICMW states that its prices for thermal coal exports from various countries are **[          ]** from specific dates.  *See, e.g.*, Hindalco's Benchmark Submission at Exhibit BENCH-1, page 2 of the January 2020 report (APPX40060).  For example, the January 2020 report states that **[**

---

[14]    Subsequent monthly ICMW issues contain similar language.  *See* Hindalco's Benchmark Submission at Exhibit BENCH-1 (APPX40057-43585).

PUBLIC VERSION

]. *Id.* (emphases added).[15]

Furthermore, by email with Hindalco's counsel, an ICMW

representative confirmed that the prices Hindalco asked the

Department to rely on in this instance are FOB world export prices:

[

---

[15]    Similar language recurs in subsequent months of the report. *See* Hindalco's Benchmark Submission at Exhibit BENCH-1 (APPX40057-43585).

59

].

Hindalco's Benchmark Submission at Exhibit BENCH-3 (pleasantries and intermediate text omitted) (APPX43836-43837).

Finally, ICMW is published by the independent entity

[

], and attests that its information is [

]. *See, e.g.*, *id.* at Exhibit BENCH-1, page 145 of January 2020 report (APPX40203).[16]

McCloskey, which is another commercially available independent source of industry information, similarly provides sufficient methodological information. The McCloskey report in Exhibit BENCH-4 states in the header row of its monthly dataset that the values it contains are [

---

[16] Similar language recurs on the cover pages or final pages in subsequent months of the report. *See* Hindalco's Benchmark Submission at Exhibit BENCH-1 (APPX40057-43585).

PUBLIC VERSION

]. *Id.* at Exhibit BENCH-4 (APPX43847-43855).[17]  This statement indicates that McCloskey's analysts [

], thereby indicating the data's methodology.  The same header rows identify other information regarding the underlying data, such as the various regions or representative ports for which prices are reported, and that prices are reported on a FOB basis.  *Id.*  And by email with Hindalco's counsel, a McCloskey representative confirmed various aspects of their methodology, including that the column headers marked with FOB represent FOB export prices:

[

---

[17]    Similar language is used with respect to data provided for other periods (yearly, quarterly, and weekly).  *See* Hindalco's Benchmark Submission at Exhibit BENCH-1 (APPX40057-43585).

62

PUBLIC VERSION

].

*Id*. at Exhibit BENCH-6 (cleaned up) (APPX43922-43926).

Thus, both ICMW and McCloskey provide sufficient descriptions of their methodology and confirm the delivery terms of their data, meaning there is sufficient information for the Department to confirm comparability of such data with Hindalco's purchased coal.  The Department regularly accepts these kinds of sources in the steel and solar industries, and there is no reason coal industry publications should receive different treatment.

63

PUBLIC VERSION

Accordingly, the Department's decision to outright reject such data

is not supported by substantial evidence on the record or otherwise

lawful, so this Court should reverse the Department's decision and

remand this case to the Department to utilize Hindalco's

ICMW/McCloskey benchmark data in its benefit analysis for the

alleged provision of coal for LTAR.

## C.    The Department's Decision Not to Use the ICMW/ McCloskey Data Exclusively for its Tier Two Coal Price Benchmark Is Unsupported by Substantial Evidence and Not Otherwise in Accordance with Law

The Department's decision not to exclusively rely on the grade

specific thermal/steam coal FOB world export price data from ICMW

and McCloskey for its tier two coal price benchmark is not supported

by substantial evidence on the record and not otherwise in

accordance with law.

To justify relying on Petitioners' UN Comtrade benchmark

data, the Department claimed that the ICMW/McCloskey data were

not actually more specific to the coal purchased by Hindalco, the

data for the actual grades Hindalco purchased were derived from too

few countries, and it was reasonable to prefer benchmark data that

64

could be used to derive a weighted-average benchmark.  *See* IDM at 34-36 (APPX2287-2289).  The Department is incorrect on all fronts.

As an initial matter, the ICMW/McCloskey data are in fact more specific to the grades of coal Hindalco purchases than the UN Comtrade data.  The Department should have, therefore, relied exclusively on the ICMW/McCloskey data because the statutory requirement of data comparability trumps the Department's other non-statutory benchmark preferences, and the Department has a "practice of deriving benchmark prices by grade" and of rejecting UN Comtrade "basket categor{ies}" when more specific data are available.  *See Certain Uncoated Paper from China* IDM at 25-26; *Crystalline Silicon Photovoltaic Cells* IDM at 51.

As explained above, it is the Department's practice to use grade-specific benchmark data where the respondent purchases the good at issue on the basis of grade.  *See Certain Uncoated Paper from China* IDM at 25-26.  Hindalco purchases coal on the basis of grade, as is clear from the specification Hindalco provided for each

65

reported coal purchase transaction by Hindalco and Utkal.[18] *See*

Prelim Hindalco Calc Memo at Attachment II, Excel Sheets

**[**

 **]** (APPX1330-2229) (citing Hindalco's Revised Data Exhibits at

Exhibit COAL-4 (Revised 4) (APPX44410-47908) and Hindalco's

SQR2 Pt-I at Exhibit COAL-5 (Revised 3) (APPX27198-27199)).  The

vast majority of Hindalco's coal purchases fall into a small slice of

the wide universe of available coal: Hindalco purchases only non-

coking coal with low gross calorific values ("GCVs"), **[**



 **]**. *See* Hindalco's Verification

Exhibits at Exhibit VE-10 (APPX38857); Hindalco's Verification

Report at 8 (APPX47916); and Prelim Hindalco Calc Memo at

Attachment II, Excel Sheets **[**

 **]** (APPX1330-2229).

---

[18]    In this regard, the Department's observation that "Hindalco and Utkal did not identify the specific {Harmonized Tariff Schedule ("HTS")} subheading that pertains to their purchases of coal," IDM at 34 (APPX2287), is irrelevant, because Hindalco and Utkal purchase coal based on *grade*, not HTS subheading, and they *did* identify the grade for each of their coal purchases.

PUBLIC VERSION

Accounting for grade is critical given the enormous differences between the quality, and hence price, of different grades of coal. For example, CIL sells seventeen different grades of non-coking coal, with GCVs ranging from 2,200 to over 7,000 kcal/kg, as well as six different grades of coking coal, two grades of semi-coking coal, and seven other categories of coal. *See* Hindalco's IQR at Exhibit COAL-8 (APPX16778-16781). The type and grade of coal affects the end-use of the coal, which may vary from steel manufacturing, glass and fertilizer production, road repairs, industrial furnaces, dye, to even pharmaceuticals. *Id.*

Among non-coking coal, there is a wide price variance between different grades. To demonstrate this, Hindalco provided the Department calculations of the grade-wise averages of the available ICMW/McCloskey FOB world export price data. *See* Hindalco's Case Brief at Annex (APPX48164-48166). These calculations show, for example, that **[**

**]**. *See id.* at 36 and n.108, Annex (APPX48148, APPX48166). If the Court prefers a more consistent

67

comparison to understand how non-coking coal prices vary
drastically by grade, it may look at the McCloskey data, which
provide **[**

**]**. *Id.* at Annex (APPX48165).  These grade-wise price
differences are vital given that Hindalco's coal purchases are mainly
of grades of non-coking coal with lower GCVs.

The UN Comtrade data on record mask this complexity in coal
pricing.  These data include two basket category HTS codes:
2701.12 – "Bituminous Coal, Whether Or Not Pulverized, But Not
Agglomerated"; and 2701.19 – "Other Than Anthracite or
Bituminous Coal, Whether Or Not Pulverized But Not
Agglomerated."  *See* Petitioners' Benchmark Submission at
Attachment 1 (APPX44123-44139); *see also* Prelim Hindalco Calc
Memo at Attachment II, Excel Sheet **[                         ]**

PUBLIC VERSION

(APPX1329). No distinction is made for different kinds or grades of coal within these categories.

Meanwhile, Hindalco primarily purchases non-coking coal with low levels of energy content as discussed above, and such low grade coal is demonstrably lower priced and not prevalently traded in international markets. *See* Hindalco's Pre-Preliminary Comments at 26-27 (APPX48067-48068); Hindalco's Benchmark Submission at Exhibit BENCH-2 (APPX43588) and Exhibit BENCH-4 (APPX43840-43863). The coal Hindalco purchases has significantly lower prices than many other grades of coal swept into UN Comtrade's basket categories. Using the UN Comtrade data, without any differentiation by grade, thus generates a coal price benchmark that is higher than the price of coal Hindalco actually purchases, resulting in an improper and grossly inflated calculation of the benefit to Hindalco from the alleged provision of coal for LTAR.

The Department's argument that the UN Comtrade data are more representative of Hindalco's coal purchases than the ICMW/McCloskey data is unpersuasive and unsupported by

69

evidence.  First, the Department erroneously claims Hindalco argues

that the UN Comtrade data "reduce the variety of coal" in the

benchmark.  IDM at 34 (APPX2287).  Hindalco's concern is not the

lack of variety of coal in the UN Comtrade data; rather, it is the

opposite – *i.e.*, the UN Comtrade data capture many varieties of coal

that are dissimilar to the coal Hindalco purchases.

Second, the Department argues that the HTS codes used

(subheadings 2701.12 and 2701.19) are not basket categories

because "HTS basket categories are subheadings that capture a

variety of merchandise under one HTS heading" and "non-coking

coal is the only merchandise reported."  *Id*. at 34 and n.238

(APPX2287).  However, the Department is blatantly wrong.

These HTS subheadings do not include only non-coking coal.

Rather, as the Department should be well-aware from the

Harmonized Tariff Schedule of the United States ("HTSUS"),

subheading 2701.12.00.10 is for "{m}etallurgical coal," which is not

non-coking coal.  *See* Chapter 27, Harmonized Tariff Schedule of the

United States (2021), https://hts.usitc.gov/reststop/file?

release=2021HTSABasic&filename=Chapter%2027 ("HTSUS

Chapter 27"); Hindalco's IQR at Exhibit COAL-8 (APPX16779)

(explaining it is *coking* coal that is used in metallurgical industries).

Additionally, the Department cites record evidence supporting that

HTS subheading 2701.19 includes *coking* (not just non-coking) coal,

despite also claiming that the data for this subheading include only

non-coking coal.  *See* IDM at 34 (APPX2287) ("the GOI's *Coal

Directory* states that '{f}or Coking coal, the only 8-digit code is

'27011910' and all other codes of coal are taken as non-coking coal'")

(citing GOI's IQR Pt-II at Exhibit COAL-1 (APPX18579).

      Moreover, subheading 2701.12.00.50 is an "{o}ther" category, as

is subheading 2701.19, which is for "{o}ther coal," including "{s}ub-

bituminous coal" and "{o}ther."  *See* HTSUS Chapter 27.  U.S.

Customs and Border Protection has described "basket provision{s}"

of the HTS to be those where "merchandise is not so specifically

provided for … by use of the phrase 'not elsewhere specified or

included' or by the use of the term 'other.'"  *See What Every Member

of the Trade Community Should Know About: Tariff Classification*,

U.S. Customs and Border Protection (May 2004) at 11,

https://www.cbp.gov/sites/default/files/documents/icp017r2_3.pdf.

Therefore, HTS subheadings 2701.12 and 2701.19 are, clearly,

basket categories, and ones that include *both* coking and non-coking

coal.

Even if the Department was correct that the UN Comtrade

data for HTS subheadings 2701.12 and 2701.19 report only non-

coking coal, Hindalco has demonstrated that it purchases only

certain grades of non-coking coal and that non-coking coal prices

vary drastically by grade.  Because the UN Comtrade data are not

differentiated by coal grade and more specific data exist on the

record, the Department should, under its own practice, disregard the

UN Comtrade data and instead rely exclusively on the

ICMW/McCloskey data.

The Department's arguments about too few countries being

represented in the ICMW/McCloskey data and its desire for data

that can be weight-averaged is overcome by its controlling

instruction in the statute and regulations to use comparable data, as

discussed above.  Because comparability of data is required by

statute and the Department's regulations, the Department's practice

is to relax its other preferences when they stand in the way of a

72

dataset more comparable to the respondent's purchases. Indeed, only such a result can be lawful under the statute.

Additionally, with respect to country coverage, the instant case replicates the tradeoff between product specificity and country coverage that the Department already adjudicated in *Cold-Drawn Mechanical Tubing* and *Certain Mobile Access Equipment*. Although Petitioners' UN Comtrade data cover more countries, they are not "specific" to coal "of the type purchased by {respondents}." *C.f. Cold-Drawn Mechanical Tubing From China* IDM at 41-42. Petitioners' UN Comtrade data sweep other kinds of coal, including "higher-power" grades of coal that "are not used" by Hindalco, into the same basket as Hindalco's coal. *C.f. Mobile Access Equipment from China* PDM at 48. Accordingly, it is not appropriate to use the UN Comtrade data.

Moreover, the rationale driving the Department's preference for broader country coverage does not apply to these sources: the ICMW/McCloskey data pose no risk of "distortion" because they capture the vast majority of trade volume the Department would otherwise use. As the Department explained in its PDM, its

preference for datasets covering a broad set of countries is motivated by concern that using a limited set "may distort the benchmark" and make it unrepresentative of world market prices.  PDM at 12 (APPX1019); *see also* IDM at 31 (APPX2284).

However, the ICMW/McCloskey data are still representative of world market prices because they capture the vast majority of trade volume in the UN Comtrade data the Department decided to use. The three countries covered in ICMW – Australia, Indonesia, and South Africa – account for the following trade volumes in the dataset the Department itself used in its *Preliminary Results*: for HTS 2701.19, **[        ]** in 2020 and **[        ]** in 2021; for HTS 2701.12, **[        ]** in 2020 and **[        ]** in 2021; and combined, **[        ]** in 2020 and **[        ]** in 2021.  *See* Hindalco's Case Brief at 38 and n.114-116 (APPX48150).  McCloskey covers an even greater fraction of trade volume because it includes a number of other countries in addition to Australia, Indonesia, and South Africa.  *See* Hindalco's Benchmark Submission at Exhibit BENCH-4 (APPX43840-43863).

Because the ICMW/McCloskey datasets cover the vast majority of trade volume covered by the UN Comtrade data that the

PUBLIC VERSION

Department chose to use, using them does not "distort" the benchmark. The large gains to comparability of the ICMW/McCloskey data from their increased specificity outweigh the loss from a marginal decrease in global trade volume coverage.

For these reasons, this Court should reverse the Department's benefit calculation for the alleged provision of coal for LTAR based on Petitioners' UN Comtrade benchmark data, and remand this case to the Department with instructions to instead exclusively utilize Hindalco's ICMW/McCloskey benchmark data for this purpose, using either the methodology proposed by Hindalco in the Annex to its Case Brief or a similar methodology. *See* Hindalco's Case Brief at 42-44 and Annex (APPX48154-48156, APPX48164-48166). Hindalco's proposal in this regard is not novel because the Department has a practice of using available world market price data to adjust benchmarks for variations in grade, and applied a similar methodology in *Certain Hot-Rolled Steel From India* by adjusting the benchmark data for varying percentages of iron content, as discussed above and in Hindalco's Case Brief. *See id.* at 44 and n.135 (APPX48156).

**D.  The Department's Decision to Use the UN Comtrade Data for its Tier Two Coal Price Benchmark Without Adjustment to Account for Variations in Coal Grades Is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

Finally, if the Court disagrees with the foregoing and considers it was appropriate for the Department to construct its coal price benchmark using Petitioners' UN Comtrade data (notwithstanding the fact that such data include prices for both non-coking and coking coal, the latter of which Hindalco does not purchase), the Department's decision to use that data without any adjustment to account for variations in coal grades is unsupported by substantial evidence and otherwise not in accordance with law.

Hindalco has already established above that the statute and the Department's regulations, 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(2)(i)-(ii), require the Department to adjust benchmark data to make due allowances for factors affecting the comparability of different grades of the respondent's purchased good. *See, e.g.*, *Changzhou Trina Solar II*, 352 F. Supp. 3d at 1331-1335; *Certain Uncoated Paper from China* IDM at 25-26.

Hindalco has also established above both that Hindalco and Utkal purchase only non-coking coal and do so based on grade (which Hindalco and Utkal have reported for each coal price transaction), and that coal prices vary drastically by grade. *See* Hindalco's Verification Exhibits at Exhibit VE-10 (APPX38857); Prelim Hindalco Calc Memo at Attachment II, Excel Sheets

[

 ] (APPX1330-2229); Hindalco's Case Brief at 36 and n.108, Annex (APPX48148, APPX48166).

Given these legal and factual circumstances, applying a single coal price benchmark reflective of non-coking and coking coal, which is not differentiated by grade, when the record allows the Department to undertake such differentiation, is neither supported by substantial evidence nor in accordance with law.

Even if the ICMW/McCloskey data on record are not usable as tier two coal price benchmark data, the Department could have used such data to attempt to adjust the UN Comtrade coal price data when constructing its tier two benchmark to satisfy its statutory and regulatory obligations in this case. For example, the Department

77

could have: (i) constructed an average price for each month of the POR using the actual grade-wise FOB coal export prices available from ICMW/McCloskey; (ii) determined adjustment factors to account for how grade-wise coal prices deviate from the average; and (iii) applied those adjustment factors to adjust the UN Comtrade coal price data.

In short, the record provides information the Department could have used to adjust the UN Comtrade coal price data to account for variations in coal grades when constructing its tier two coal price benchmark. The Department's failure to do so constitutes legal error. Hence, if the Court believes the Department may calculate its tier two coal price benchmark using the UN Comtrade data, notwithstanding the arguments above and the fact that such data include prices for both non-coking and coking coal, it should still remand this case to the Department with instructions to adjust that data for variations in coal grades before applying it to calculate the benefit to Hindalco from the alleged provision of coal for LTAR.[19]

---

[19]    Hindalco reserves its right to comment on the specific methodology to be applied for such adjustment should it be necessary upon remand.

## CONCLUSION

For the foregoing reasons, Hindalco respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand this case with instructions to recalculate Hindalco's subsidy rates.

A proposed order is attached.

Respectfully submitted,

Rajib Pal
Shawn M. Higgins
Kayla M. Scott

Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Counsel for Hindalco
Industries Limited

Dated: June 18, 2024

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

|  |  |
|---|---|
| HINDALCO INDUSTRIES LIMITED, <br><br>         Plaintiff, <br><br>     v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, <br><br>         Defendant-Intervenors. | Court No. 23-00260 |

## ORDER

Upon consideration of the Motion for Judgment on the Agency Record filed by plaintiff, Hindalco Industries Limited ("Hindalco"), and upon all other papers and proceedings herein, it is hereby

**ORDERED** that Hindalco's Motion for Judgment on the Agency Record is granted; and it is further

**ORDERED** that the U.S. Department of Commerce's determination in *Common Alloy Aluminum Sheet From India: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 FR 76168 (Nov. 6, 2023) is unsupported by substantial record evidence and otherwise contrary to law in respect of the specificity and benefit determinations for the alleged provision of coal for less than adequate remuneration ("LTAR"); and it is further

**ORDERED** that this action is remanded to the Department of Commerce for the purpose of recalculating Hindalco's subsidy rates after re-evaluating the specificity and benefit determinations for the alleged provision of coal for LTAR; and it is further

**ORDERED** that the Department of Commerce shall file its remand determination with the Court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.

**SO ORDERED.**


_____

Joseph A. Laroski, Jr., Judge


Dated: _____, 2024

New York, New York

# CERTIFICATE OF COMPLIANCE

In accordance with the Chambers Procedures of the United States Court of International Trade and the Court's Scheduling Order dated March 18, 2024, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures and Scheduling Order. Specifically, excluding those exempted portions of the brief, as set forth in Chambers Procedure 2(B), I hereby certify that this brief contains 13,940 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

_____
Rajib Pal

# CERTIFICATE OF SERVICE

I hereby certify that copies of the attached document are being served by CM/ECF, on June 18, 2024, addressed to the following parties:

**On behalf of U.S. Department of Justice Commerical Litigation Branch - Civil Division:**
Kyle S. Beckrich
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-9322
Fax: (202) 305-7644
Email: kyle.beckrich@usdoj.gov

**On behalf of U.S. Department of Commerce Office of the Chief Counsel of Trade Enforcement:**
Ruslan N. Klafehn
Of Counsel
1401 Constitution Avenue, NW.
Washington, DC 20230
(202) 482-4339
Fax: (202) 482-4912
Email: ruslan.klafehn@trade.gov

**On behalf of Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members, Aleris Rolled Products, et al.:**
Brooke M. Ringel, Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108
Email: bringel@kelleydrye.com

_____
Rajib Pal