# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

_____
)
HINDALCO INDUSTRIES                )
LIMITED,                           )
)
     Plaintiff,                 )
)
    v.                             )    Court No. 23-00260
)
UNITED STATES,                     )    PUBLIC
)    VERSION
)
     Defendant,                 )    Business Proprietary
)    Information Denoted
ALUMINUM ASSOCIATION               )    by Brackets [ ] on
COMMON ALLOY ALUMINUM              )    Page(s) 22, 23, 25, 26,
SHEET TRADE ENFORCEMENT            )    31, 35, 36
WORKING GROUP AND ITS              )
INDIVIDUAL MEMBERS                 )
)
     Defendant-Intervenors.     )
_____)

## DEFENDANT'S RESPONSE TO PLAINTFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

                    BRIAN M. BOYNTON
                    Principal Deputy Assistant
                    Attorney General


                    PATRICIA M. MCCARTHY
                    Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

RUSLAN KLAFEHN
Attorney
Office of the Chief Counsel
    for Trade Enforcement and
    Compliance
U.S. Department of Commerce
Washington, D.C.

KYLE S. BECKRICH
Trial Attorney
U.S. Dept. of Justice
Civil Division/National Courts
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9322
Fax: (202) 616-9322
E-mail: kyle.beckrich@usdoj.gov

September 30, 2024

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

STATEMENT PURSUANT TO RULE 56.2. ............................................ 2

    I.    The Administrative Determination Under Review ............... 2

    II.    Issue Presented For Review .................................................... 3

STATEMENT OF FACTS ...................................................................... 3

    I.    Commerce Initiates The First Administrative Review Of The Countervailing Duty Order On Common Alloy Aluminum Sheet From India ..................................................................... 3

    II.    Parties Submit Benchmarking Data To Commerce ............... 4

    III.    In The Preliminary Results, Commerce Finds The Provision Of Coal For Less Than Adequate Remuneration To Be *De Facto* Specific And That UN Comtrade Data Is The Best Available Information For Use As A Coal Benchmark .......... 5

    IV.    In The Final Results, Commerce Continues To Find *De Facto* Specificity And Continues To Use UN Comtrade Data As A Coal Benchmark ....................................................................... 7

SUMMARY OF ARGUMENT ............................................................... 8

ARGUMENT ........................................................................................ 10

    I.    Standard Of Review ............................................................... 10

    II.    Substantial Evidence Supports Commerce's Determination That The Provision Of Coal For Less Than Adequate Remuneration Is Specific ....................................................... 11

        A.    Legal Standard For Specificity ..................................... 11

B.    The Provision Of Coal For Less Than Adequate Remuneration Is *De Facto* Specific.............................. 14

    1.    Substantial Evidence Supports Commerce's Grouping Of The Power (Captive) And Power (Utility) Industries As Power Generating Industries............................................................... 16

    2.    Substantial Evidence Supports Commerce's Determination To Countervail All Coal Supplied By CIL to Hindalco And Hindalco Failed To Raise This Argument Below ......................................... 22

III.    Substantial Evidence Supports Commerce's Calculation Of The Benchmark Prices For Coal ........................................... 26

    A.    Legal Standard For Benchmark Selection.................. 26

    B.    Substantial Evidence Supports Commerce's Benchmark Price Determination.................................. 29

    1.    Substantial Evidence Supports Commerce's Rejection Of The ICMW And McCloskey Data To Calculate The Coal Benchmark Prices .............. 30

    2.    Substantial Evidence Supports Commerce's Exclusive Reliance On The UN Comtrade Data And Rejection Of The ICMW And McCloskey Data Because Those Data Subsets Are Not Product Specific ..................................... 34

    3.    Substantial Evidence Supports Commerce's Decision Not To Adjust The UN Comtrade Data Based On The ICMW And McCloskey Data....... 39

CONCLUSION ......................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*AIMCOR v. United States,*
   141 F.3d 1098 (Fed. Cir. 1998) ........................................................26, 40

*Archer Daniels Midland Co. v. United States,*
   968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ...................................30, 40

*Canadian Solar, Inc. v. United States,*
   23 F.4th 1372 (Fed. Cir. 2022).................................................................13

*Cleo Inc. v. United States,*
   501 F.3d 1291 (Fed. Cir. 2007) .........................................................12, 24

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ..................................................................................11

*Essar Steel Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012) .........................................................29, 30

*Essar Steel Ltd. v. United States,*
   721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ..........................................31

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) .................................................................10

*Guizhou Tyre Co., Ltd. v. United States,*
   348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ..............................31, 41, 42

*LMI-LA Metalli Industriale, S.p.A. v. United States,*
   712 F. Supp. 959 (Ct. Int'l Trade 1989) .................................................25

*Ningbo Dafa Chem. Fiber Co. v. United States,*
   580 F.3d 1247 (Fed. Cir. 2009) ...............................................................11

*Peer Bearing Company-Changshan v. United States,*
   298 F. Supp. 2d 1328 (Ct. Int'l Trade 2003) .........................................31

*Rhone Poulenc Inc. v. United States,*
   899 F.2d 1185 (Fed. Cir. 1990) ...............................................................25

*RZBC Group Shareholding Co., Ltd. v. United States,*
  100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ........................ 8, 35, 36, 39

*Sandvik Steel Co. v. United States,*
  164 F.3d 596 (Fed. Cir. 1998) .............................................. 26

*Ta Chen,*
  342 F. Supp. 2d ...................................................................... 26

*Ugine and ALZ Belgium, Arcelor Stainless USA, LLC v. United States,*
  551 F.3d 1339 (Fed. Cir. 2009) ............................................ 25

*Unemployment Compensation Comm'n v. Argon,*
  329 U.S. 143 (1946) ............................................................... 25

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009) ............................................................... 11

*United States v. L.A. Tucker Truck Lines Inc.,*
  344 U.S. 33 (1952) ................................................................. 25

## Statutes

19 U.S.C. § 1671 .......................................................................... 13

19 U.S.C. § 1677 .................................................................. passim

28 U.S.C. § 2637 .......................................................................... 25

## Regulations

19 C.F.R. § 351.309 ....................................................................... 24

19 C.F.R. § 351.502 ....................................................................... 14

## Other Authorities

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) ................................................................................................31

*Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2010*, 77 Fed. Reg. 72,323 (Dep't of Commerce Dec. 5, 2012) .............16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016) ......................................................29

*Uncoated Paper From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Dep't of Commerce Jan. 20, 2016).......................................................19

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

_____

|  |  |
|---|---|
| ) | |
| HINDALCO INDUSTRIES ) | |
| LIMITED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 23-00260 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| ALUMINUM ASSOCIATION ) | |
| COMMON ALLOY ALUMINUM ) | |
| SHEET TRADE ENFORCEMENT ) | |
| WORKING GROUP AND ITS ) | |
| INDIVIDUAL MEMBERS ) | |
| ) | |
| Defendant-Intervenors. ) | |

_____)

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the

agency record, responses thereto, replies, and all other papers, it is

hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United

States.

Dated: _____, 2024      _____
         New York, NY                              JUDGE

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

_____
)
HINDALCO INDUSTRIES                           )
LIMITED,                                       )
                                              )
        Plaintiff,                        )
                                              )
    v.                                )    Court No. 23-00260
                                              )
UNITED STATES,                                )    PUBLIC
                                              )    VERSION
                                              )
        Defendant,                        )    Business Proprietary
                                              )    Information Denoted
ALUMINUM ASSOCIATION                          )    by Brackets [ ] on
COMMON ALLOY ALUMINUM                         )    Page(s) 22, 23, 25, 26,
SHEET TRADE ENFORCEMENT                       )    31, 35, 36
WORKING GROUP AND ITS                         )
INDIVIDUAL MEMBERS                            )
                                              )
        Defendant-Intervenors.            )
_____)

## DEFENDANT'S RESPONSE TO PLAINTFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiff, Hindalco Industries Limited (Hindalco). Hindalco challenges the final results of the Department of Commerce (Commerce) in the

first administrative review of the countervailing duty order on common alloy aluminum sheet from India, disputing Commerce's determination that the provision of coal for less than adequate remuneration was *de facto* specific, and Commerce's selection of world export price data from the United Nations Comtrade database (UN Comtrade) as benchmarking data for coal in calculating the benefit received by Hindalco.  As explained below, the motion should be denied because Commerce's final results are supported by substantial evidence and are otherwise in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

## I.    The Administrative Determination Under Review

Hindalco challenges Commerce's final results of the first administrative review of the countervailing duty order on common alloy aluminum sheet from India.  *See Common Alloying Aluminum Sheet From India: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,168 (Dep't of Commerce, Nov. 6, 2023) (final results) (Appx2299-2300), and the accompanying Issues and Decision Memorandum (October 31, 2023) (IDM) (Appx2254-2298).  The period of review (POR) is August 14, 2020, through December 31, 2021.

2

## II.    Issues Presented For Review

1.    Whether Commerce's determination that the provision of coal for less than adequate remuneration is *de facto* specific is supported by substantial evidence and otherwise in accordance with law.

2.    Whether Commerce's selection of UN Comtrade data as a coal benchmark to calculate the benefit to Hindalco of the provision of coal for less than adequate remuneration is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

## I.    Commerce Initiates The First Administrative Review Of The Countervailing Duty Order On Common Alloy Aluminum Sheet From India

On April 27, 2021, Commerce published the countervailing duty order on common alloy aluminum sheet from India.  *See Common Alloy Aluminum Sheet from Bahrain, India, and the Republic of Turkey: Countervailing Duty Orders*, 86 Fed. Reg. 22144 (Dep't of Commerce, Apr. 27, 2021) (*Order*), Appx1044-1050.  Having received timely requests for review of the order, Commerce initiated an administrative review of two Indian producers/exporters, including Hindalco.  *See*

3

PUBLIC VERSION

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165, 35,174 (Dep't of Commerce June 9, 2022). Commerce selected Hindalco as the sole mandatory respondent because Hindalco was the only company with a reviewable entry for which a review had been requested. *See Common Alloy Aluminum Sheet From India: Preliminary Results of Countervailing Duty Administrative Review and Partial Recission; 2020–2021*, 88 Fed. Reg. 28,487 (Dep't of Commerce May 4, 2023) (Preliminary Results), Appx2245-2247, and the accompany Preliminary Decision Memorandum (Apr. 27, 2023) (PDM) at 2, Appx1008-1043.

## II.    **Parties Submit Benchmarking Data To Commerce**

Coal is one of the inputs used to produce common alloy aluminum sheet.  Commerce requested factual information to measure the adequacy of remuneration of coal, among other inputs, and Hindalco submitted the following sources of information:  (1) 2020 and 2021 monthly publications of India Coal Market Watch (ICMW) data which include (a) quoted coal export prices of various grades from South Africa, Indonesia, and Australia, (b) domestic government-run auction prices for coal of various grades during the POR, and (c) prices for coal

imported into India, of various grades, during the POR; and (2) coal

price data compiled by McCloskey Thermal Coal Research (McCloskey).

*See* Hindalco March 29, 2023 Benchmark Submission at 2-3,

Appx40048-40049. Petitioners submitted 2020 and 2021 monthly world

market prices for exports of coal for Harmonized Tariff Schedule (HTS)

subheadings 2701.12 and 2701.19, sourced from UN Comtrade. *See*

Petitioners March 29, 2023 Benchmark Submission at 3, Appx44113.

## III. In The Preliminary Results, Commerce Finds The Provision Of Coal For Less Than Adequate Remuneration To Be *De Facto* Specific And That UN Comtrade Data Is The Best Available Information For Use As A Coal Benchmark

In the preliminary results, Commerce calculated net

countervailable subsidy rates for Hindalco of 37.90 percent and 32.43

percent, for entries occurring in 2020 and 2021, respectively. *See*

Appx2245-2247. Commerce found *de facto* specificity based on

predominant usership of the power generating industries. PDM at 24-

25, Appx1031-1032. Commerce reasoned that "{a}pproximately 82.8

percent of {Coal India Limited's (CIL)} coal is sold to the power sector

including captive power plants, while 13.3 percent of its coal is sold to

others (non-coking) including the aluminum sector, 1.8 percent to

sponge iron units, and the remaining 2.1 percent is sold to other sectors.

On this basis, the program is specific pursuant to section

771(5A)(D)(iii)(II) of the Act because the electricity power industry is a

predominant user of the subsidy." PDM at 24-25, Appx1031-1032.

Commerce also preliminarily determined to use UN Comtrade

data for the coal benchmarking as opposed to other data placed on the

record by Hindalco. PDM at 12, Appx1019. With respect to the ICMW

data, Commerce found "that import prices and the domestic

government-run auction prices from ICMW are not appropriate as

benchmark prices because these sources represent prices that

{Commerce} determined to be distorted by government involvement."

PDM at 12, Appx1019. With respect to the ICMW and the McCloskey

data, Commerce preliminarily determined that these data subsets were

not reliable because they "lack{ed} necessary descriptive information,

including information regarding the methodology used to calculate the

'unit values' and the sources of the information." PDM at 12, Appx1019.

Additionally, "the ICMW data include information from three countries,

and the McCloskey data is limited to ten countries, seven of which

report specific ports or regions within those countries."  PDM at 12,

Appx1019.

## IV.   In The Final Results, Commerce Continues To Find *De Facto* Specificity And Continues To Use UN Comtrade Data As A Coal Benchmark

On November 6, 2023, Commerce published the final results, and

made no changes to the countervailable subsidy rates for Hindalco of

37.90 percent and 32.43 percent, for entries occurring in 2020 and 2021,

respectively.  *See* Appx2299-2300.  Commerce continued to find that the

provision of coal for less than adequate remuneration was *de facto*

specific.  IDM at 21-25, Appx2274-2278.  Commerce explained that

> the information on the record similarly indicates
> that a group of industries, i.e., the power (utility)
> and the power (captive) industries,
> predominantly used non-coking coal to generate
> electricity. Therefore, we continue to find that
> industries in India that buy coal to generate
> electricity comprise a group of industries that is
> the predominant user of this subsidy, within the
> meaning of section 771(5A)(D)(iii)(II) of the Act,
> and therefore this subsidy is specific.

IDM at 25, Appx2278.

Commerce also continued to use UN Comtrade for the coal

benchmarks.  IDM at 31-36, Appx2284-2289.  Commerce

explained that the ICMW and the McCloskey data did not have

underlying quantity and value data and that Commerce "is unable

to accurately calculate weighted averages of the ICMW and

McCloskey data, which are from single or limited country sources

and therefore potentially distorted." IDM at 32, Appx2285.

Commerce recognized that this Court has acknowledged the

reasonableness of Commerce's preference for weighted averages

for benchmarks because "{t}he method ensures that high prices

from countries with low-volume exports do not skew the

benchmarks upward." IDM at 32, Appx2285 (quoting *RZBC*

*Group Shareholding Co., Ltd. v. United States*, 100 F. Supp. 3d

1288, 1309 (Ct. Int'l Trade 2015)).

## SUMMARY OF THE ARGUMENT

Commerce's *de facto* specificity finding is supported by substantial

evidence. Commerce reasonably determined that the power (captive)

and power (utility) sectors published under CIL's internal industry

classification scheme should be grouped together and found to be the

predominant user of coal supplied by CIL. Both power sectors purchase

non-coking coal that is used for power generation. Indeed, the record is

clear that Hindalco uses non-coking coal for the purpose of power

PUBLIC VERSION

generation.  Moreover, the power generating industries used nearly 83 percent of the coal dispatched by CIL during the period of review.  Thus, Commerce appropriately found that the power generating industries were the predominant user of coal supplied by CIL for less than adequate remuneration.  The Court should reject Hindalco's arguments to the contrary because Hindalco attempts to artificially separate two similar industries.

Commerce's determination to use the UN Comtrade data is also supported by substantial evidence.  The UN Comtrade data is the only data subset on the record that allows Commerce to calculate weighted-average benchmarks.  Commerce has a strong preference for doing so because this method prevents distortion of benchmarks through low-volume exports.  The UN Comtrade data is also the most product specific data on the record because it represents benchmarks for all coal Hindalco purchased.

Conversely, the ICMW and the McCloskey data that Hindalco submits are unreliable.  These data subsets do not contain underlying quantity and value data, do not divulge the sources of their information, and do not adequately describe the methodology used to come up with

PUBLIC VERSION

their prices such that Commerce cannot calculate a reliable benchmark price. Indeed, the ICMW and the McCloskey data are not specific to many of the grades of coal that Hindalco purchased during the period of review as is shown by Hindalco's attempt at calculate speculative values for more than two thirds of the grades it purchased.

**ARGUMENT**

## I.    **Standard Of Review**

The Court sustains any determination, finding, or conclusion made by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" means "more than a mere scintilla" of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (internal quotation marks and citations omitted).

Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

## II.    Substantial Evidence Supports Commerce's Determination That The Provision Of Coal For Less Than Adequate Remuneration Is Specific

### A.    Legal Standard For Specificity

A subsidy is countervailable if the following elements are satisfied: (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. *See* 19 U.S.C. § 1677(5)(A)-(B); *see also* 19 U.S.C. § 1677(5)(D), (5)(E), and (5A). When Commerce "determines that the government of a country or any public entity within the territory of a

PUBLIC VERSION

country is providing, directly or indirectly, a countervailable subsidy" to exporters or producers of subject merchandise with respect to the manufacture, production, or export, Commerce must impose countervailing duties commensurate with the level of subsidization. 19 U.S.C. § 1671(a)(1); *see Canadian Solar, Inc. v. United States*, 23 F.4th 1372, 1375 (Fed. Cir. 2022).

Domestic subsidies, such as the one at issue in this proceeding, can be specific as a matter of law (*de jure*). *See* 19 U.S.C. § 1677(5A)(D)(i)-(ii). A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i). However, when legislation enacting a subsidization program does not, on its face, limit the program to an enterprise or industry, there may be reason to believe that program is still specific to certain enterprises or industries. *See* 19 U.S.C. § 1677(5A)(D)(iii). Thus, domestic subsidies can also be specific as a matter of fact (*de facto*). *Id.* In such cases, Commerce conducts a *de facto* specificity analysis under 19 U.S.C. § 1677(5A)(D)(iii).

In the Statement of Administrative Action (SAA) that
accompanied the 1994 Uruguay Round Agreements Act, Congress
expounded on how Commerce should conduct the specificity analysis.
*See* Statement of Administrative Action, H.R. Doc. 103-316 at 911-955
(1994). The purpose of this analysis "is to function as an initial
screening mechanism to winnow out only those subsidies which truly
are broadly available and widely used throughout an economy." SAA at
929. Pursuant to 19 U.S.C. § 1677(5A)(D)(iii), a subsidy is *de facto*
specific if any one of the following four factors exist:

> (I)   The actual recipients of the subsidy, whether considered on
>        an enterprise or industry basis, are limited in number.
> (II)  An enterprise or industry is a predominant user of the
>        subsidy.
> (III) An enterprise or industry receives a disproportionately large
>        amount of the subsidy.
> (IV)  The manner in which the authority providing the subsidy
>        has exercised discretion in the decision to grant the subsidy
>        indicates that an enterprise or industry is favored over
>        others.

19 U.S.C. § 1677(5A)(D)(iii)(I)-(IV). Notably, "any reference to an
enterprise or industry includes a group of enterprises or industries." 19
U.S.C. § 1677(5A)(D). In determining whether a subsidy is *de facto*
specific, Commerce "will examine the factors contained in {19 U.S.C.
§ 1677(5A)(D)(iii)} sequentially in order of their appearance. If a single

13

factor warrants a finding of specificity, {Commerce} will not undertake further analysis."  19 C.F.R. § 351.502(a).

## B. The Provision Of Coal For Less Than Adequate Remuneration Is *De Facto* Specific

Commerce found that the provision of coal by CIL was *de facto* specific because the power generating industries are the predominant user of coal when compared to other industrial sectors under 19 U.S.C. § 1677(5A)(D)(iii)(II).  IDM at 23, Appx2276.  Based on an examination of the record evidence, Commerce concluded that it was appropriate to group the power (utility) and power (captive) industries—power generating industries—because both industries are similar in process and output (that is, both industries purchase non-coking coal, which is used for power generation).  IDM at 24, Appx2277; *see* 19 U.S.C. § 1677(5A)(D) ("any reference to an enterprise or industry . . . includes a group of such enterprises or industries").  These power generating industries used nearly 83 percent of the coal in India provided by CIL over the period of review and were the top two individually listed sectors.  IDM at Attachment, Appx2298.  The second closest individually listed sector used only 1.65 percent of coal dispatched by CIL.  IDM at Attachment, Appx2298.  Therefore, Commerce found the

14

PUBLIC VERSION

provision of coal for less than adequate remuneration to be *de facto* specific in accordance with 19 U.S.C. § 1677(5A)(D)(iii)(II), which provides that "a subsidy may be specific as a matter of fact" when "an enterprise or industry is a predominant user of the subsidy."  IDM at 25, Appx2278.

Hindalco argues that the provision of coal for less than adequate remuneration is not *de facto* specific.  Hindalco contends that Commerce's grouping of "power (utility)" and "power (captive)" sectors as "power generating industries" is flawed because, although the power (captive) industry generates electricity for "numerous disparate industries that undertake various production processes to output various products," the power (utility) industry produces and outputs electricity only to the grid.  Hindalco Br. at 4-5, 26, 29-34.  Based on this distinction, Hindalco further argues that the power (utility) industry is the one predominant user.  *Id.* at 34-37.  Thus, Hindalco claims that these industries cannot be grouped for purposes of the specificity analysis because they do not share similar process and output, and the provision of coal for less than adequate remuneration is not *de facto* specific.  *Id.* at 5, 36-37.

Alternatively, Hindalco argues that even if Commerce's specificity analysis is lawful, Commerce erred in countervailing all coal provided by CIL during the period of review because Hindalco purchased some coal from facilities within a different sector to which the provision of coal for less than adequate remuneration is not specific.  Hindalco Br. at 37-39.

As shown below, Hindalco's arguments fail.

### 1. Substantial Evidence Supports Commerce's Grouping Of The Power (Captive) And Power (Utility) Industries As Power Generating Industries

Substantial evidence supports Commerce's grouping of the power (captive) and power (utility) industries as power generating industries because both industries purchase non-coking coal which is used for power generation.  IDM at 24; *see Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2010*, 77 Fed. Reg. 72,323 (Dep't of Commerce Dec. 5, 2012) (*Citric Acid from China*), and accompanying IDM at Comment 4.

Examining CIL's internal industry classifications, Commerce found that the power (captive) and power (utility) industries were both

power generating industries and because both industries used non-coking coal to generate electricity, it was appropriate to group them. IDM at 24, Appx2277; *see* 19 U.S.C. § 1677(5A)(D) (explaining that "{f}or purposes of this paragraph and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries").

The record supports Commerce's determination. Indeed, according to a submission by the Government of India, "non-coking coal . . . is mainly used for power generation." Appx18576-18577. The same submission states that "69.9% of the total electricity generation" in India is coal based. Appx19645. Likewise, Hindalco's FY 2021-22 annual report indicates that "Hindalco's aluminum manufacturing units comprise the full value chain, from bauxite mining, alumina refining, coal mining, *captive power generation* and aluminum smelting to downstream value addition of Aluminum rolling, extruding and foil making." Appx9534 (emphasis added). Accordingly, Commerce's conclusions that the power (captive) and power (utility) industries both use non-coking coal to generate electricity and that Hindalco is a power generator are supported by record evidence.

17

PUBLIC VERSION

Commerce's approach in this case–to consider whether both industries could be grouped because they use non-coking coal to generate electricity–is entirely consistent with its approach in other cases.  For example, in *Citric Acid from China*, Commerce determined whether a specificity finding was appropriate for three major industrial groups:  Mining; Manufacturing; and Electric Power, Gas and Water Production and Supply.  *See Citric Acid from China*, IDM at 37. Commerce grouped the industries due to similarity of processes and outputs.  *Id.* at 39.  That is precisely what Commerce did in this case– Commerce grouped the power (utility) and power (captive) industries based on similar processes and outputs, purchasing non-coking coal to generate power.

Hindalco attempts to distinguish this case by asserting that Commerce was considering the grouping of sub-sectors within an industry in *Citric Acid from China*, rather than considering distinct industries.  As demonstrated above, that distinction misreads *Citric Acid from China* and, in any event, is irrelevant because the statute permits Commerce to group industries so long as there is a basis to do

so.  19 U.S.C. § 1677(5A) ("any reference to an enterprise or industry . . . includes a group of such enterprises or industries").

Hindalco does not dispute that both industries use non-coking coal to generate power but argues that the two industries should be treated separately because the end use of the electricity generated differs between the industries.  Hindalco Br. at 29-30.  Namely, Hindalco argues that the power (utility) industry generates electricity to sell to the grid, whereas the power (captive) industry uses the electricity it generates but does not sell it to the grid.  *Id.*

But contrary to Hindalco's argument, a power generator does not need to actually sell electricity to the grid to be considered a power generator.  *See Uncoated Paper From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3,110 (Dep't of Commerce Jan. 20, 2016), and accompanying IDM at 30-31.  In *Uncoated Paper from China*, Commerce determined that the provision of coal was specific to power generators.  *Uncoated Paper from China*, IDM at 30.  Commerce found one of the respondents, a paper manufacturer, was a part of the power generating industry because it used the coal purchased for "power generation purposes, and the

19

generated power and steam is used in the company's operations, including the production of subject merchandise." *Id.* at 30-31.  That respondent did not sell electricity to the grid but was still a power generator because it operated a captive power plant that was disconnected from the grid.  *Id.* at 30-31 n.185.

In this case, Commerce reasonably found Hindalco to be a power generator because it purchased non-coking coal to use for power generation.  Appx9534, Appx47916.  Hindalco's specific use for the power its captive power plants generated is immaterial to Commerce's reasonable conclusion that Hindalco is nonetheless part of the power generating industry.

Similarly, Hindalco's argument that the captive power plants operate "in support of aluminum (and copper) production" is inapposite because it does not reconcile the fact that Hindalco purchased coal exclusively for use in power generation.  Hindalco Br. at 29-31.  Even if that power generation ultimately supports Hindalco's aluminum and copper production, the relevant question is whether the coal is used for power generation.  The record establishes that Hindalco specifically

uses coal for power generation.  Thus, Commerce reasonably

determined that Hindalco was part of the power generating industry.

Next, Hindalco argues that the power (captive) sector is made of

many industries that set up captive power plants such that "it should be

clear that CIL's power (utility) and power (captive) sectors are not

power generating industries . . . sufficiently similar in process and

output that may be grouped."  Hindalco Br. at 31-33.  Once again,

Hindalco's argument misses the forest for the trees.  That the power

(captive) sector is made up of many industries is immaterial so long as

power (captive) sector purchases coal for the purpose of power

generation.  Indeed, by Hindalco's own argument, the power (captive)

sector itself could not be grouped for specificity purposes because it is

comprised of multiple industries.  In this case, the record is clear that

Hindalco and its affiliates purchase coal for one purpose, power

generation.  Appx47916.  Because the power (utility) sector also

purchases coal for that purpose, Commerce appropriately grouped the

sectors in its specificity determination regarding whether coal had been

provided for less than adequate remuneration.

PUBLIC VERSION

In short, the facts of this record demonstrate that *two* power generating industries used nearly *83 percent* of the coal dispatched by CIL. IDM at Attachment, Appx2298. It matters not that Commerce's specificity analysis applies to two industries. 19 U.S.C. § 1677(5A) ("any reference to an enterprise or industry . . . includes a group of such enterprises or industries"). Those two industries share similar processes and outputs, and thus were reasonably grouped. That Hindalco would have preferred Commerce to narrow its analysis of what constitutes a predominant industry is no basis for this Court to disturb Commerce's decision when Commerce's decision is supported by substantial evidence. *Cleo Inc*, 501 F.3d at 1296. Thus, Commerce's determination should be sustained.

**2. Substantial Evidence Supports Commerce's Determination To Countervail All Coal Supplied By CIL to Hindalco And Hindalco Failed To Raise This Argument Below**

Hindalco argues that even if Commerce's specificity analysis is correct, Commerce cannot countervail coal supplied by CIL to certain of Hindalco's [          ] because those [          ] are not part of the power sector. Hindalco Br. at 37-39. Hindalco argues that some CIL-supplied coal went to Hindalco's [          ] that are classified as

22

"others (non-coking)." *Id.* at 38.  Thus, Hindalco contends that only the coal going to Hindalco's [          ] can be found to be specific because those are the only facilities that fall under the power (captive) classification.  *Id.* at 39.

However, Hindalco has failed to exhaust the argument that Commerce should not countervail all coal supplied by CIL.  "In any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  A "reviewing court usurps the agency's function when it sets aside an agency determination upon a ground not theretofore presented and deprives the {agency} of an opportunity to consider the matter, make its ruling, and state the reason for its action."  *Unemployment Compensation Comm'n v. Argon*, 329 U.S. 143, 155 (1946); *see also United States v. L.A. Tucker Truck Lines Inc.*, 344 U.S. 33, 37 (1952); *Rhone Poulenc Inc. v. United States*, 899 F.2d 1185, 1189-1190 (Fed. Cir. 1990); *LMI-LA Metalli Industriale, S.p.A. v. United States*, 712 F. Supp. 959, 968 (Ct. Int'l Trade 1989).

Accordingly, a plaintiff must exhaust administrative remedies. *See Ugine and ALZ Belgium, Arcelor Stainless USA, LLC v. United*

*States*, 551 F.3d 1339, 1347 (Fed. Cir. 2009); *see also Sandvik Steel Co. v. United States*, 164 F.3d 596, 599-602 (Fed. Cir. 1998) (a party is not entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted).  A party that fails to exhaust administrative remedies may not raise the issue *de novo* before the trial court.  *AIMCOR v. United States*, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998).

"The prescribed remedy for challenging Preliminary Results issued by {Commerce} is to file a case brief with the agency setting forth objections."  *Ta Chen*, 342 F. Supp. 2d at 1205.  Commerce's regulations require that a case brief "must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  19 C.F.R. § 351.309(c)(2).  Hindalco did not argue in its administrative case brief that only the coal supplied by CIL to

24

Hindalco's [        ] could be countervailed.  Applying the exhaustion

doctrine, the Court should not allow Hindalco to raise the issue now.[1]

Nevertheless, if the Court were to excuse Hindalco's failure to

exhaust, the Court would find that Hindalco's argument contradicts the

record evidence.  As relied on by Commerce, Hindalco reported that its

"aluminium manufacturing units" use "captive power generation."

Appx9534.  Similarly, the financial statement of Utkal, a cross-owned

affiliate of Hindalco, indicate that "{a}lumina refinery and other

associated operations require significant amount of power. Such power

is mostly supplied through captive power generation units which are

coal based."  Appx10035.  Thus, contrary to Hindalco's contention, the

[               ] uses coal powered captive power plants for energy.

Appx10035; *see* Hindalco Br. at 38 ("{T}he Department at a minimum

must not countervail the coal supplied by CIL to [

                                ] because those facilities operate in

CIL's 'others (non-coking)' sector." (emphasis added)).

---

[1] Although there are exceptions to the exhaustion doctrine, *Corus
Staal BV v. United States*, 30 I.T.R.D. (BNA) 2111, n.11 (Ct. Int'l Trade
2006), none apply in this case.  Simply stated, there is no reason
Hindalco could not have raised the issue to Commerce.

Indeed, at verification, Hindalco officials explained that "Hindalco uses coal for captive power plants." Appx47916. Thus, Hindalco did not make a distinction as to any uses of coal other than for captive power plants at either its [          ] or its [          ]. Commerce will find entities to be a part of the power generating industry to the extent that they are generators of power. *See* IDM at 24, Appx2277. Substantial evidence indicates that Hindalco used CIL-supplied coal for captive power plants exclusively, and Commerce properly countervailed all coal provided to Hindalco by CIL.

## III. Substantial Evidence Supports Commerce's Calculation Of The Benchmark Prices For Coal

### A. Legal Standard For Benchmark Selection

When foreign entities export goods to the United States, countervailing duties are applied to offset countervailable subsidies provided to the exporters by foreign governments. A countervailable subsidy requires that the exporter receive a "benefit." 19 U.S.C. § 1677(5)(B). Among other things, a benefit is conferred where "goods . . . are provided . . . for less than adequate remuneration." *Id.* § 1677(5)(E)(iv). In determining whether government-subsidized goods have been provided for less than adequate remuneration, Commerce

identifies a benchmark price (market price) to compare with the price of the goods receiving a government subsidy. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (*Essar II*). If the exporter is receiving government-subsidized goods for less than the benchmark price, it is receiving a "benefit."

Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good . . . resulting from actual transactions." 19 C.F.R. § 351.511(a)(2)(i). This is known as a "tier 1" benchmark. *See Essar II*, 678 F.3d at 1273. When using a tier 1 benchmark, the goal is to identify actual transactions within the relevant market, and to define that market as specifically as possible, in order to most accurately reflect the price of the specific product at issue.

However, when data for actual transactions within the relevant market are not available, Commerce calculates a "tier 2" benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(ii), which provides,

> If there is no useable market-determined price with which to make the comparison under paragraph (a)(2)(i) of this section, {Commerce} will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to

27

> conclude that such price would be available to
> purchasers in the country in question. Where
> there is more than one commercially available
> world market price, {Commerce} will average
> such prices to the extent practicable, making due
> allowance for factors affecting comparability.

In other words, when actual data from the market at issue are not

available, Commerce uses broad, worldwide data and takes the average

of that data to reasonably approximate the market price. When

calculating a tier 2 benchmark price, Commerce is not required to use

data for products that are "nearly identical" to the product purchased by

the exporter. *See Archer Daniels Midland Co. v. United States*, 968 F.

Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014). Rather, the regulation

requires only "that the selected benchmarks be comparable." *Id.*

(concluding that Commerce could use a general benchmark price for

sulfuric acid, without differentiating by grade); *see also Essar II*, 678 F.

3d at 1273-74 ("Though the Australian iron ore is not identical to

NMDC's iron ore, Commerce's regulations require only that it be a

comparable market-determined price that would be available to the

purchasers in the country at issue."). If Commerce determines that

multiple datasets are sufficiently reliable and representative,

"Commerce must average all commercially available world market

prices to arrive at the benchmark figure." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1293 (Ct. Int'l Trade 2010) (*Essar I*) (citing 19 C.F.R. § 351.511(a)(2)(ii)).

"The factors relied upon by {Commerce} when determining appropriate benchmark(s) for valuing an input depend on the facts surrounding the data/information placed on the record of a proceeding and therefore must be evaluated on a case-by-case basis." *See*, *e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying IDM at Comment 6. "The court's role is not to assess whether the benchmark data Commerce used was the 'best available,' but rather whether Commerce's choice was reasonable." *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1274 (Ct. Int'l Trade 2018) (citing *Peer Bearing Company-Changshan v. United States*, 298 F. Supp. 2d 1328, 1336 (Ct. Int'l Trade 2003)).

## B. Substantial Evidence Supports Commerce's Benchmark Price Determination

Substantial evidence supports Commerce's calculation of the tier 2 benchmark price for coal because the UN Comtrade data is the only

data subset that allows Commerce to calculate product-specific weighted-average benchmarks.  IDM at 31-32, Appx2284-2285. Hindalco contends otherwise; its argument is three-fold.  First, Hindalco argues that Commerce's decision to reject the ICMW/McCloskey data is unsupported by substantial evidence.  Second, Hindalco argues that Commerce erred when it declined to use ICMW and McCloskey data to construct its benchmark because those data were more product-specific to the specific grades and types of coal Hindalco purchased.  Third, Hindalco argues that Commerce should have at least used the ICMW/McCloskey data to adjust its UN Comtrade benchmark to account for variations in coal grades.  Each argument fails.

### 1. Substantial Evidence Supports Commerce's Rejection Of The ICMW And McCloskey Data To Calculate The Coal Benchmark Prices

Commerce reasonably rejected the ICMW and McCloskey data to calculate the coal benchmark prices.  Commerce's practice, in calculating a tier two benchmark, is not to use data from a single or limited country source when reliable data from a broad set of countries is available and reflective of world prices.  IDM at 31, Appx2284.  As

explained in the final results, single or limited country sources may be self-selected and may distort the benchmark by overemphasizing a limited number of countries.  IDM at 31, Appx2284 (citing *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021), and accompanying IDM at Comment 6).

Hindalco argues that Commerce should not have rejected the ICMW and McCloskey data because they are the type of "commercially available" sources that Commerce typically relies on and "provide at least as much methodological information as their peer publications in the steel and solar industries long accepted by the Department." Hindalco Br. at 57-58.  Hindalco then relays the "methodological" underpinnings of the ICMW and McCloskey data, which can be summarized as follows:  ICMW data provide price per ton quotes with specific dates; the ICMW data are published by an independent entity; the McCloskey data report [                                    ] on a FOB basis, with information on regions and ports for those prices. Hindalco Br. at 58-63.  Thus, Hindalco concludes that there is sufficient

31

information for Commerce to use the ICMW and McCloskey data and that Commerce accepts this type of data in other industries. Hindalco Br. at 63-64.

Hindalco misses the point. The methodological concerns that Commerce has with the ICMW and McCloskey data prevent that data from being usable because Commerce is unable to calculate weighted-average monthly benchmarks. Specifically, the ICMW and McCloskey data contain only prices per ton, and they *do not contain quantity data*. Appx43588, Appx43855. As explained in the final results, "without the underlying quantity and value data, Commerce is unable to accurately calculate weighted averages of the ICMW and McCloskey data." IDM at 32, Appx2285.

Commerce's reason for relying on quantity and value data is reasonable and has been acknowledged by this Court because it leads to more accurate benchmarks. In *RZBC Group Shareholding Co.*, the Court explained:

> Like simple averaging, the weight-averaging method blends country-level prices into world benchmarks. But unlike simple averages, weighted averages assign each price a weight proportional to the quantity shipped at that price. What results are benchmarks that favor prices

> from large-quantity shipments. The method
> ensures that high prices from countries with low-
> volume exports do not skew the benchmarks
> upward. Commerce now prefers to use weighted
> averages when the parties report price and
> quantity in a uniform manner.

100 F. Supp. 3d at 1309.

Conversely, the UN Comtrade data *does contain underlying price and quantity data*, and it is the only data on the record that would allow Commerce to derive weighted-average benchmarks for coal. *See* Appx44124; IDM at 32, Appx2285.

Further, neither the ICMW nor McCloskey data contain the source of its coal prices, even if those data provided quantity and value information, which they do not. Appx43588, Appx43855. With respect to the ICMW data providing price quotes with specific dates, as Commerce explained, these prices are not representative of the prices of coal through the respective months because the price quotes are only from the last day of the month. *See* Appx40060; IDM at 33, Appx2286. Accordingly, this data are not representative of coal prices *throughout* a respective month.

In short, the ICMW and McCloskey contain no underlying quantity and value data, contain no explanation of the methodology

they use to establish their prices, contain no sources for the coal prices, and are not representative of Hindalco and Utkal's coal purchases. IDM at 36, Appx2289. Thus, the record reveals that Hindalco's proffered data subsets make it impossible for Commerce to calculate weighted-average benchmarks. And as explained above, Commerce reasonably prefers to use weighted averages to ensure that benchmarks are not skewed. *RZBC Group Shareholding Co.*, 100 F. Supp. 3d at 1309.

The only data subset that enables the use of weighted averages is the UN Comtrade data. Thus, Commerce's outright rejection of the ICMW and McCloskey data is supported by substantial evidence and not contrary to law.

### 2. Substantial Evidence Supports Commerce's Exclusive Reliance On The UN Comtrade Data And Rejection Of The ICMW And McCloskey Data Because Those Data Subsets Are Not Product Specific

If the Court were to entertain Hindalco's challenge to Commerce's rejection of the ICMW and McCloskey data, the Court would find that substantial evidence supports Commerce's exclusive reliance on the UN Comtrade data because that data subset is specific to the coal Hindalco

purchased and representative of world market prices, unlike the ICMW and McCloskey data.

Hindalco attempts to dismiss the Department's analysis of product-specificity.  It argues that it purchases coal with low gross caloric values (GCV) [

].
Hindalco Br. at 66.  Hindalco emphasizes that "{a}ccounting for grade is critical given the enormous differences between the quality, and hence price, of different grades of coal."  Hindalco Br. at 67.  Hindalco asserts that CIL sells seventeen different grades of non-coking coal and then relies on its own calculations as to average prices for [                    ], based on the ICMW and McCloskey data, and uses the McCloskey data to further demonstrate

].  Hindalco Br. at 68.  Hindalco concludes that "these grade-wise price differences are vital given that Hindalco's coal purchases are mainly of grades of non-coking coal with lower GCVs." Hindalco Br. at 68.

Hindalco's argument is incorrect.  As explained in the IDM, "{t}he GOI's {(Government of India)} Coal Directory indicates that India grades non-coking coal from G1, representing a GCV exceeding 7000, to G17, representing a GCV between 2201 and 2500, and that CIL sells all 17 grades."  IDM at 34, Appx2287; Appx18577-18578.  Hindalco's purchases reflect more than half of the 17 grades, with the majority reflecting [                    ].  *See* Appx48148.  The ICMW and McCloskey data provide "actual prices" for only four of the grades that Hindalco purchased and only one of the grades that Hindalco reported represented the majority of its purchases.  Appx48166.  Thus, the ICMW and McCloskey data, at best, would only be "product-specific" to four grades of coal, and only one grade reported to be from the majority of Hindalco's purchases.  To rectify that deficiency, Hindalco submitted conjecture as to the value of the other grades of coal based on "average GCV per grade to closest actual value."  Appx48165-48166.  This conjecture attempts to extrapolate unknown values based solely on GCV, with no other explanation, support, or considerations.

Even without Hindalco's conjecture, the ICMW and McCloskey data are necessarily unreliable for representativeness concerns.  For

three of the four grades with "actual prices" that were purchased by
Hindalco, the ICMW and McCloskey data provide "actual prices" that
relied on data from a *single country*. *See* Appx48165. As explained
above, Commerce's practice is not to use data from single or limited
country sources when reliable data from a broad set of countries is
available and reflective of world prices. This practice is reasonable and
within Commerce's wide discretion because single or limited country
sources may be self-selected and may distort the benchmark by
overemphasizing a limited number of countries. *See RZBC Group
Shareholding Co.*, 100 F. Supp. 3d at 1308.

Next, Hindalco criticizes Commerce's reliance on the UN
Comtrade data. Hindalco Br. at 68-72. Specifically, Hindalco argues
that the UN Comtrade data includes "two basket category HTS codes":
2701.12 for bituminous coal, and 2701.19 for other coal. Hindalco
contends that these HTS codes do not consider the different kinds or
grades of coal, which is important to Hindalco's coal purchases because
it purchases low grade coal that has significantly lower prices than
other grades swept into "basket categories." Hindalco Br. at 68-69.
Thus, Hindalco contends that the coal benchmark is higher than the

PUBLIC VERSION

price of the coal Hindalco purchases.  As we demonstrate below,

Hindalco's argument is meritless.

First, Hindalco failed to exhaust administrative remedies.

Hindalco argues for the first time that HTS codes 2701.12 and 2701.19

do not include only non-coking coal.  Hindalco Br. at 70-72; *cf*.

Appx48148-48149.  Hindalco had the opportunity before Commerce to

argue that HTS codes 2701.12 and 2701.19 do not include only non-

coking coal but Hindalco did not do so, and thus failed to exhaust its

administrative remedies before Commerce.  *AIMCOR*, 141 F.3d at 1111-

12.  The Court should not consider Hindalco's argument on this issue.

Second, if the Court were to entertain Hindalco's new argument

with respect to the HTS codes, the Court would find that substantial

evidence on the record supports Commerce's use of the UN Comtrade

data for benchmarking purposes.  Commerce need not use

benchmarking data that are "nearly identical" to Hindalco's reported

purchases; rather, the benchmarks need only to be comparable.  *See*

*Archer Daniels*, 968 F. Supp. 2d at 1279.  To that end, the UN Comtrade

data is the only data on the record that allowed Commerce to derive

weighted-average benchmarks based on prices that are representative

of all grades of non-coking coal actually purchased by Hindalco.  IDM at

35, Appx2288.  Commerce's decision to utilize a benchmark that utilizes

weighted averages and represents all grades of non-coking coal is

reasonable and should be sustained.  *Guizhou Tyre*, 348 F. Supp. 3d at

1274.

> **3.      Substantial Evidence Supports Commerce's
>          Decision Not To Adjust The UN Comtrade Data
>          Based On The ICMW And McCloskey Data**

Lastly, Hindalco argues that, based on its new argument that the

UN Comtrade data is "reflective of non-coking and coking coal" and its

continued contention that the UN Comtrade data is not differentiated

by grade, Commerce should have used the ICMW and McCloskey coal

price data to adjust the UN Comtrade data.  Hindalco Br. at 76-78.

This argument assumes the reliability of the ICMW and McCloskey

data, which, as explained above, Commerce properly rejected.  As

Commerce explained, "neither ICMW nor McCloskey indicate the

sources for the coal prices" contained therein, nor are these data subsets

representative of Hindalco's coal purchases.  IDM at 36, Appx2289.

Thus, Commerce found that UN Comtrade data was the best available

information on the record of this review for determining a coal

PUBLIC VERSION

benchmark. IDM at 36, Appx2289. Commerce's decision not to rely on

the ICMW and McCloskey data, even to adjust the UN Comtrade data,

is supported by substantial evidence and in accordance with law.

*Guizhou Tyre*, 348 F. Supp. 3d at 1274.

## CONCLUSION

For these reasons, we respectfully request the Court to deny

plaintiff's motion for judgement on the agency record.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

s/Kyle S. Beckrich

OF COUNSEL:                 KYLE S. BECKRICH
RUSLAN KLAFEHN              U.S. Department of Justice
Attorney                    Commercial Litigation Branch
Office of the Chief Counsel Civil Division
for Trade Enforcement & Compliance   Ben Franklin Station
U.S. Department of Commerce P.O. Box 480
                            Washington, DC 20044
                            Email: Kyle.Beckrich@usdoj.gov

September 30, 2024          *Attorneys for Defendant*

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 7,195 words, including text, footnotes, and headings.

<u>/s/Kyle S. Beckrich</u>
Kyle S. Beckrich