

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA  •  ASIA PACIFIC  •  EUROPE

+1 202 736 8329
RPAL@SIDLEY.COM

November 26, 2024

## PUBLIC DOCUMENT

**FILED ELECTRONICALLY**

The Honorable Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

> Re:  <u>Hindalco Industries Limited v. United States, Court No. 23-00260</u>

Dear Mr. Toscano:

On behalf of Hindalco Industries Limited ("Hindalco"), plaintiff in the above-captioned proceeding, we hereby file Hindalco's Reply in Support of Motion for Judgment on the Agency Record.

Copies of the attached public documents have been served on the parties listed in the attached certificate of service.

# SIDLEY

The Honorable Mario Toscano
November 26, 2024
Page 2

Please do not hesitate to contact the undersigned if you have any questions regarding this matter.

Respectfully submitted,

Rajib Pal
Shawn M. Higgins
Kayla M. Scott

Counsel to Plaintiff, Hindalco
Industries Limited

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

HINDALCO INDUSTRIES
LIMITED,

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

ALUMINUM ASSOCIATION
COMMON ALLOY ALUMINUM
SHEET TRADE ENFORCEMENT
WORKING GROUP AND ITS
INDIVIDUAL MEMBERS,

                Defendant-
                Intervenors.

Court No. 23-00260

**PUBLIC DOCUMENT**

## REPLY OF PLAINTIFF IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

Counsel to Hindalco
Industries Limited

November 26, 2024

# TABLE OF CONTENTS

**Page No**

**ARGUMENT**.....................................................................................2

I.  The Department Erred in Concluding the Alleged Provision of Coal for LTAR Is Specific to Hindalco................................................................2

A. Substantial Evidence Does Not Support the Department's Conclusion that Predominant Use Makes the Alleged Provision of Coal for LTAR Specific to Hindalco....................................................3

B. Substantial Evidence Does Not Support the Department's Decision to Countervail All Coal Purchased by Hindalco and Hindalco Exhausted its Remedies....................................................8

II. The Department Erred in Calculating the Benefit to Hindalco from the Alleged Provision of Coal for LTAR................................................11

A. Substantial Evidence Does Not Support the Department's Rejection of the ICMW/McCloskey Benchmark Data....................16

B. Substantial Evidence Does Not Support the Department's Exclusive Reliance on the UN Comtrade Data, as Opposed to the ICMW/McCloskey Data, for its Tier Two Coal Price Benchmark, and Hindalco Exhausted its Remedies...........................................26

C. Substantial Evidence Does Not Support the Department's Decision Not to Adjust the UN Comtrade Data When Constructing its Tier Two Coal Price Benchmark ...............................................34

**CONCLUSION** .........................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Changzhou Trina Solar Energy Co. v. United States*,
  352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ................................... 7, 14

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ............................................... 9

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012) ............................................ 14

*Pohang Iron & Steel Co. v. United States*,
  23 C.I.T. 778 (Ct. Int'l Trade 1999) ...................................... 33

*Qingdao Taifa Grp. Co. v. United States*,
  33 C.I.T. 1090 (Ct. Int'l Trade 2009) ..................................... 32

*RZBC Group Shareholding Co., Ltd. v. United States*,
  100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ....................... 18

*Universal Tube & Plastic Indus., Ltd. v. United States*,
  717 F. Supp. 3d 1332 (Ct. Int'l Trade 2024) ...................... 30

*Zhaoqing Tifo New Fibre Co. v. United States*,
  60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) .................... 9, 33

**Statutes**

19 U.S.C. § 1677(4) ..................................................................... 3

19 U.S.C. § 1677(5)(E)(iv)...................................... 12, 27, 33, 38

19 U.S.C. § 1677(5A)(D) ....................................................... 3

19 U.S.C. § 1677(5A)(D)(iii)(II) ....................................... 3, 5

28 U.S.C. § 2637(d) ............................................................... 8

**Regulations**

19 C.F.R. § 351.511(a)(2)(i)-(ii)........................................................ *passim*

**Administrative Materials**

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy*
*Steel From the People's Republic of China: Final*
*Affirmative Determination, and Final Affirmative*
*Determination of Critical Circumstances, in Part*, 82 FR
58175 (Dep't of Commerce Dec. 11, 2017), and
accompanying Issues and Decision Memorandum ("*Cold-*
*Drawn Mechanical Tubing from China* IDM")...................................21

*Certain Hot-Rolled Carbon Steel Flat Products from India:*
*Final Results of Countervailing Duty Administrative*
*Review*, 73 FR 40295 (Dep't of Commerce July 14, 2008),
and accompanying Issues and Decision Memorandum
("*Certain Hot-Rolled Steel from India* IDM") ..............................34, 36

*Certain Tool Chests and Cabinets From the People's Republic*
*of China: Final Affirmative Countervailing Duty*
*Determination*, 82 FR 56582 (Dep't of Commerce Nov. 29,
2017), and accompanying Issues and Decision
Memorandum ("*Tool Chests and Cabinets from China*
IDM") .......................................................................................25

*Certain Uncoated Paper From the People's Republic of China:*
*Final Affirmative Countervailing Duty Determination*, 81
FR 3110 (Dep't of Commerce Jan. 20, 2016) and
accompanying Issues and Decision Memorandum
("*Certain Uncoated Paper from China* IDM")........................................4

*Citric Acid and Certain Citrate Salts From the People's*
*Republic of China: Final Results of Countervailing Duty*
*Administrative Review; 2010*, 77 FR 72323 (Dep't of
Commerce Dec. 5, 2012) and accompanying Issues and
Decision Memorandum ("*Citric Acid from PRC* AR2 IDM")...............5

Final Results of Redetermination Pursuant to Court
    Remand, *RZBC Group Shareholding Co., Ltd. v. United
    States*, Ct. No. 14-00041 (December 3, 2015) ("*Citric Acid
    from China* Remand Results")......................................................19, 20

*High Pressure Steel Cylinders From the People's Republic of
    China: Final Results of Countervailing Duty
    Administrative Review; 2016*, 83 FR 63471 (Dep't of
    Commerce December 10, 2018), and accompanying Issues
    and Decision Memorandum ("*High Pressure Steel
    Cylinders From China* IDM") ..........................................17, 18, 19, 20

*Notice of Final Results of Countervailing Duty
    Administrative Review: Certain Softwood Lumber
    Products from Canada*, 70 FR 73448 (Dep't of Commerce
    December 12, 2005), and accompanying Issues and
    Decision Memorandum ........................................................................35

## Other Authorities

BLACK'S LAW DICTIONARY (12th ed. 2024)....................................................4

Statement of Administrative Action (SAA) accompanying the
    Uruguay Round Agreements Act (URAA), H.R. Doc. No.
    103-316, vol. 1 (1994) ("SAA"), reprinted in 1994
    U.S.C.C.A.N. 4040.........................................................................4, 5

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

HINDALCO INDUSTRIES
LIMITED,

                 Plaintiff,

    v.

UNITED STATES,

                 Defendant,

ALUMINUM ASSOCIATION
COMMON ALLOY ALUMINUM
SHEET TRADE ENFORCEMENT
WORKING GROUP AND ITS
INDIVIDUAL MEMBERS,

                 Defendant-
                 Intervenors.

Court No. 23-00260

**PUBLIC DOCUMENT**

**REPLY OF PLAINTIFF IN SUPPORT OF
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Hindalco Industries Limited ("Hindalco") replies to

responses by Defendant, United States ("U.S."), on September 30,

2024 ("U.S. Brief"), and Defendant-Intervenors, Aluminum

Association Common Alloy Aluminum Sheet Trade Enforcement

Working Group and its Individual Members ("Association"), on

October 29, 2024 ("Association Brief") (collectively, "Defendants"), to

1

Hindalco's Memorandum of Points and Authorities dated June 17, 2024 ("Hindalco Brief").[1]  For reasons discussed previously and below, Hindalco respectfully requests that the Court reverse the Department's final results in AR1 of the CVD order on CAAS from India, and remand with instructions to recalculate Hindalco's subsidy rates.

## ARGUMENT

## I.    The Department Erred in Concluding the Alleged Provision of Coal for LTAR Is Specific to Hindalco

As elaborated further below, the Department's *Final Results* erred in finding the alleged provision of coal for LTAR to be *de facto* specific based on predominant use by CIL's "power (utility)" and "power (captive)" sectors as "power generating industries," IDM at 23-24 (APPX2276-2277), and by countervailing coal purchased by Hindalco facilities not in those sectors.  Defendants' arguments do not undermine these conclusions.

---

[1]    Abbreviations and short citations used herein are identical to those in Hindalco Brief.

**A.      Substantial Evidence Does Not Support the Department's Conclusion that Predominant Use Makes the Alleged Provision of Coal for LTAR Specific to Hindalco**

The Department's finding in its *Final Results* that the alleged provision of coal for LTAR is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II) based on "predominant use" by CIL's "power (utility)" and "power (captive)" sectors as a group of "power generating industries," IDM at 23-24 (APPX2276-2277), is unsupported by substantial evidence and unlawful.

Defendants' arguments in support of the Department, *see* U.S. Brief at 16-22; Association Brief at 7-15,[2] are grounded in the false premise that the activity of "power generation" may be used to define "industries" for purpose of the specificity statute, 19 U.S.C. § 1677(5A)(D).  That is not so.  In fact, 19 U.S.C. § 1677(4) defines

---

[2]      The Association also inexplicably refutes an alleged claim by Hindalco that only one industry can be the predominant user of a subsidy.  *See* Association Brief at 5-7.  Hindalco never made this claim, and instead argued that *the facts here* support a predominant use finding by only one industry, the "power (utility)" industry, which Hindalco is not part of.  *See* Hindalco Brief at 23-25, 35-37.  Hindalco extensively argued that, while the Department may find multiple predominant users, it does not do so when one industry accounts for an overwhelming majority of the use of a subsidy, as is the case here.  *See* Hindalco's Case Brief at 18-24 (APPX48130-48135); Hindalco's Pre-Prelim Comments at 13-17 (APPX48054-48058).

"industry" in relation to the production of a "*product*" (emphasis
added). Moreover, BLACK'S LAW DICTIONARY (12th ed. 2024), defines
"industry" as: "an aggregate of enterprises employing similar
production and marketing facilities *to produce items having
markedly similar characteristics*" (emphasis added).

Defendants justify the Department's grouping of "power
generation" industries by asserting that the analysis turns on
whether the provided coal, which the Association stresses is the
subsidy at issue, is "used for power generation." U.S. Brief at 17, 20;
*see also* Association Brief at 11-14.[3] However, with coal as the
subsidy at issue, the fact that the provided coal is used for power
generation due to its inherent nature is inapposite. *See* SAA at 932
("the fact that use of the subsidy may be limited due to the inherent
characteristics of the good … in question would be irrelevant for … a
*de facto* specificity analysis."). By relying on the use of coal for
power generation as the foundation for its *de facto* specificity

---

[3]    While the Department may have previously found the provision of
coal to be *de facto* specific to power generators, regardless of whether
the respondent sold the generated electricity to the grid*, see Certain
Uncoated Paper from China* IDM at 30-31, this is not persuasive
precedent where no party challenged that result.

conclusion, it is the Department that is creating an artificial

grouping of disparate industries to conjure specificity where none

exists.

It cannot be that *any* "basis" for grouping industries is

permissible for determining whether a group of industries is

predominantly using a subsidy under 19 U.S.C. §

1677(5A)(D)(iii)(II). *See* U.S. Brief at 18-19.[4]  Such grouping must

be within the "rule of reason".  SAA at 930.

Thus, while Defendants dismiss the composition of CIL's

"power (captive)" sector, with the U.S. saying this is "immaterial"

and the Association calling this a "red herring", U.S. Brief at 21;

Association Brief at 11, whether these entities share sufficiently

similar process and output with one another and those in CIL's

"power (utility)" sector, and hence produce *items with similar*

*characteristics*, to justify grouping these sectors for a predominant

---

[4]    Defendants misread the grouping analysis in *Citric Acid from*
*China.  See* U.S. Brief at 18; Association Brief at 10.  This case
addressed whether "specific subcategories" under "Mining;
Manufacturing; and Electric Power, Gas and Water Production and
Supply" were "closely related to the citric acid industry in terms of
processes and outputs" for determining if there was a limited number of
recipients of the subsidy, which is not at issue here.  *Citric Acid from*
*PRC* AR2 IDM at 37.

user specificity analysis is indeed the core question. As explained in Hindalco Brief at 29-33, the Department failed to identify record evidence to this effect to justify its grouping decision. None of Defendants' arguments undermine this conclusion.

Captive power producers ("CPPs"), including Hindalco, do not produce electricity as an output, unlike CIL's "power (utility)" sector. Rather, the production of electricity for CPPs is an intermediate step in the manufacturing process of some other good; in Hindalco's case, aluminum and copper. *See* Hindalco's Verification Exhibits at Exhibit VE-10 (APPX38857). An intermediate manufacturing step is *not an output*.

In addition, the entities in CIL's "power (captive)" sector undertake many additional processes beyond the generation of electricity to manufacture various goods. *See* Hindalco Brief at 31 (citing GOI's IQR Pt-II at 10 (APPX18517)). Neither the Department nor Defendants have explained why it is appropriate to group otherwise different industries for the predominant user specificity analysis where there is an overlap of just part of a manufacturing process. Neither point to record evidence showing

that "power (utility)" companies, Hindalco, and other CPPs actually have similar processes (other than overlap in electricity generation)[5] and outputs to justify grouping them.

Further, this Court has recognized that it is "nonsensical" to disregard the composition of a proffered industry in assessing whether a subsidy is specific. *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1331 (Ct. Int'l Trade 2018) ("*Changzhou Trina Solar II*"). Such a shallow analysis may result in both the Department finding specificity where a subsidy is actually widely available or gamesmanship by respondents to avoid specificity. *See id.* at 1330-31.[6] Thus, again, the composition of CIL's "power (captive)" sector is critical to the analysis.

Because CIL's "power (captive)" sector comprised entities in several disparate industries producing disparate products, the

---

[5]    The Association states that "use of non-coking coal" should be considered a shared process and electricity a shared output. Association Brief at 9. However, as discussed above, simple use of the alleged subsidy based on its inherent characteristics is not relevant here because all recipients would use the alleged subsidized input based on its inherent characteristics.

[6]    As discussed in Hindalco Brief at 29, CIL's sector classifications pre-date the present CVD proceeding so there is no question here of the GOI or CIL attempting a "workaround" of specificity.

Department's decision to group it with CIL's "power (utility)" sector was not supported by substantial evidence and unlawful.

**B.    Substantial Evidence Does Not Support the Department's Decision to Countervail All Coal Purchased by Hindalco and Hindalco Exhausted its Remedies**

If this Court affirms the Department's conclusion that the alleged provision of coal for LTAR is *de facto* specific based on predominant use by CIL's "power (utility)" and "power (captive)" sectors, it should conclude that coal supplied by CIL outside of those sectors cannot be countervailed due to lack of specificity.

Defendants are incorrect that Hindalco failed to exhaust this argument, *see* U.S. Brief at 23-25; Association Brief at 15, and that the Department properly countervailed coal supplied to Hindalco's facilities classified outside of CIL's "power (utility)" and "power (captive)" sectors because those facilities also use coal for power generation, *see* U.S. Brief at 25-26; Association Brief at 15-21.

First, Hindalco did not fail to exhaust its remedies.  While this Court "shall, *where appropriate*, require the exhaustion of administrative remedies", 28 U.S.C. § 2637(d) (emphasis added), one instance where it is not appropriate to do so is where the

8

Department "changed its position … after the party's case brief would have been filed." *Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007).  In such instance, "there was nothing to exhaust" at the administrative level, and the "first meaningful opportunity to challenge Commerce's decision" is on appeal. *Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1346, 1350 (Ct. Int'l Trade 2015) ("*Zhaoqing Tifo New Fibre*").

In the *Preliminary Results*, the Department determined that the predominant user of the alleged coal subsidy was the "electricity power industry", which it defined based on a faulty interpretation of record evidence.  *See* PDM at 24-25 (APPX1031-1032).  Recognizing this, in the *Final Results*, the Department changed its specificity analysis to rely on CIL's industry classifications.  *See* IDM at 23-24 (APPX2276-2277).

Because the Department changed its specificity analysis in the *Final Results* to rely on CIL's industry classifications, Hindalco's "first meaningful opportunity" to challenge the Department's decision to countervail coal provided to facilities that were outside the two predominant user classifications is now on appeal.  This was

9

not an issue when Hindalco submitted its case brief. Accordingly, Hindalco did not fail to exhaust its remedies.

Second, Defendants are incorrect that coal provided to Hindalco's facilities not classified in CIL's "power (utility)" or "power (captive)" sectors should be countervailed. *See* U.S. Brief at 25-26; Association Brief at 16-21. As explained above, the relevant question for specificity is not whether a subsidized input is used for the same purpose as a predominant user of the subsidy, *see* U.S. Brief at 25-26; rather, it is whether the subsidy is specific to the *industry* that is the predominant user. Because the Department's specificity analysis relied on CIL's sector classifications and found that only the "power (utility)" and "power (captive)" sectors were predominant users, and some of Hindalco's facilities that purchased coal were not in those sectors, the Department's decision to countervail said purchases was not supported by substantial evidence and unlawful.

Additionally, the Association is incorrect to argue that the Department's "tied" upon bestowal approach for the benefit of an input provided for LTAR should apply to determining whether such

a subsidy is specific to the recipient. *See* Association Brief at 16-21. Whether a subsidy was "tied" upon bestowal is relevant for determining whether the subject merchandise may *benefit* from a subsidy received by a company, but has no bearing on the threshold question that arises before the benefit analysis as to whether the subsidy is specific and therefore countervailable in the first instance.

Accordingly, the Department should not have countervailed coal purchases made by Hindalco's facilities that were not identified as part of CIL's "power (utility)" or "power (captive)" sectors.

## II.    The Department Erred in Calculating the Benefit to Hindalco from the Alleged Provision of Coal for LTAR

The Department's choice to rely exclusively on UN Comtrade data to construct a tier two benchmark for coal is not supported by substantial evidence and unlawful because it ignores the Department's *statutory* obligation to ensure the benchmark is comparable with the provided good. The gist of Defendants' arguments, *see* U.S. Brief at 26-40; Association Brief at 22-32, is that achieving a tier two benchmark more reflective/representative of the entire world market takes precedence over one that is more comparable with the provided good. Even if the Department's

regulation, 19 C.F.R. § 351.511(a)(2)(i)-(ii) (the "Benchmark Regulation"), could be read in this fashion, that is not what the applicable statute, 19 U.S.C. § 1677(5)(E)(iv), says, and it is the statute that controls.  Moreover, the Benchmark Regulation also does not support Defendants' position.

First, the statute, 19 U.S.C. § 1677(5)(E)(iv), says nothing about a "world market price".  Rather, it says that "adequacy of remuneration shall be determined in relation to *prevailing market conditions* for the good … provided", and those "{p}revailing market conditions include… *quality* … and *other conditions of purchase or sale*" (emphases added).  The concept of a tier two "world market price" was designed by the Department in its Benchmark Regulation to implement the statute, but its meaning cannot conflict with the paramount statutory obligation that the benchmark for measuring adequacy of remuneration must reflect "quality" and "other conditions of purchase or sale" comparable with those of the provided good.

Second, Defendants and the Department read into the Benchmark Regulation words (*i.e.*, "reflective" or "representative")

that do not exist.  That is, the first sentence of 19 C.F.R. §

351.511(a)(2)(ii) refers to "a world market price"; it does not refer to

"a price *reflective/representative* of the entire world market."  If the

first sentence required a price reflective/representative of the entire

world market, the second sentence on averaging more than one

commercially available world market price would be unnecessary,

because the first sentence would already require such an average.

This indicates "a world market price" in the first sentence simply

means a price *from* the world market; and the second sentence

indicates that multiple commercially available prices *from* the world

market may be used and averaged only to the extent they achieve

the paramount statutory concern of comparability with the provided

good.

The Association's particular argument that the Department

must find a reflective/representative world market price *before*

assessing comparability, Association Brief at 28, is wrong for the

foregoing reasons, and because both this Court and the Federal

Circuit have confirmed that comparability is the paramount concern,

with only those prices from the world market comparable with the

provided good being relevant. *See Changzhou Trina Solar II*, 352 F. Supp. 3d at 1332-33 (holding the Department's failure to consider whether "{UN} Comtrade data was based on too broad a product category to provide an accurate world market price" constituted reversible error); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012) (holding the Department's regulations require that "a tier 2 world market price … be a *comparable* market-determined price") (emphasis added). The Association's interpretation also has nonsensical implications: it suggests that if a record contains two alternative benchmarks, with one reflective/representative of the entire world market for a product completely different from the provided good and another from a portion of the world market for a product comparable with the provided good, the Department would need to use the former, which is simply inconsistent with the statute.

The Association's claim that comparability is only a "secondary portion of the rule" for tier two benchmarks, Association Brief at 28, is also wrong. Under 19 C.F.R. § 351.511(a)(2)(i), the Department must "consider product similarity … and other factors affecting

comparability" when selecting tier one benchmarks. Because tier one and tier two benchmarks are alternative approaches to measuring the same statutory concept – adequate renumeration – the same comparability concerns dictated by statute must govern both. The phrase "making due allowance for factors affecting comparability" in § 351.511(a)(2)(ii) confirms that tier two benchmarks are subject to the same comparability requirements as tier one benchmarks – not that comparability is somehow demoted to "secondary" status for tier two benchmarks.

Here, the record clearly shows Hindalco purchases coal from CIL on a grade-specific basis, coal prices vary dramatically by grade, and only the ICMW/McCloskey data provide commercially available grade-specific coal prices from the world market (and from a sufficient portion of it, at that). *See* Hindalco Brief at 64-72. In these circumstances, the statute, the Benchmark Regulation, judicial precedent, and common sense all require the Department to use the ICMW/McCloskey data, and use such data exclusively or in the alternative use such data to adjust the UN Comtrade data when constructing its tier two coal price benchmark.

**A.    Substantial Evidence Does Not Support the Department's Rejection of the ICMW/McCloskey Benchmark Data**

As the ICMW/McCloskey data are the only benchmark data on record that provide grade-specific coal prices, in these circumstances where the record clearly establishes that Hindalco purchases coal on a grade-specific basis, the Department abdicated its statutory obligation (*i.e.*, to identify a benchmark comparable with the provided good) by rejecting the ICMW/McCloskey data on various alleged (and incorrect) technical grounds, and Defendants' support for the Department is unavailing.  Defendants complain that the ICMW/McCloskey data: (1) lack quantity information that prevents weight-averaging; (2) feature insufficient country coverage; (3) use quotes from the last day of each month, rather than prices throughout a month; (4) use quotes rather than actual transactions; and (5) lack sufficient methodological and source information.  None of these concerns justify the Department's choice to ignore its statutory mandate to ensure comparability and reject the grade-specific ICMW/McCloskey data in favor of the basket-category UN Comtrade data.

First, Defendants argue that the ICMW/McCloskey data should be rejected because their lack of quantity information makes calculation of weighted-average benchmarks impossible.  *See* U.S. Brief at 32-33, Association Brief at 23.  However, the Department has no statutory obligation to weight-average benchmarks.  As the U.S. itself explains, the reason why the Department uses weight-averaged benchmarks in certain situations is "because it leads to more accurate benchmarks."  U.S. Brief at 32.  Thus, when weight-averaging would result in *less* accurate benchmarks – because weight-averaging would require the Department to discard useful information and result in a net loss in comparability – the Department declines to weight-average.  *See, e.g.*, *High Pressure Steel Cylinders From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 83 FR 63471 (Dep't of Commerce December 10, 2018), and accompanying Issues and Decision Memorandum ("*High Pressure Steel Cylinders From China* IDM") at Comment 2 (collecting cases where the Department declined to weight-average rather than exclude useful data).[7]

---

[7]      *See infra* note 8.

Moreover, the concern that the U.S. cites as motivating the Department's preference for weight-averaging does not apply to the ICMW/McCloskey data. According to the U.S., the Department prefers to weight-average monthly data to ensure that "high prices from countries with low-volume exports do not skew the benchmarks upward." U.S. Brief at 32-33, citing *RZBC Group Shareholding Co., Ltd. v. United States*, 100 F. Supp. 3d 1288, 1309 (Ct. Int'l Trade 2015) ("*RZBC Group Shareholding Co.*"). The ICMW/McCloskey data avoid this problem by design because they do not include countries with low-volume exports to begin with. *See* Hindalco Brief at 74. If anything, it is UN Comtrade that includes a slew of countries with "high prices {and} low-volume exports."

Indeed, the Department has explained that the U.S.' principal authority for weight-averaging, *RZBC Group Shareholding Co., see* U.S. Brief at 32-33, "is an outlier" motivated by the "unique facts of that case." *High Pressure Steel Cylinders From China* IDM at Comment 2. *RZBC Group Shareholding Co.* pertained to the *Citric Acid from China* proceeding and involved a "unique" situation where the presence of countries with low-volume, high-price exports in the

18

dataset posed an unusually severe threat to the representativeness of the benchmark if values were not weight-averaged.  *See High Pressure Steel Cylinders From China* IDM at Comment 2 (discussing Final Results of Redetermination Pursuant to Court Remand, *RZBC Group Shareholding Co., Ltd. v. United States*, Ct. No. 14-00041 (December 3, 2015) ("*Citric Acid from China* Remand Results")); *see also Citric Acid from China* Remand Results at 2-3 (clarifying that the unique facts requiring weight-averaging were the "small-quantity, high-price transactions in the underlying data").

"In more recent cases," the Department has explained that it prefers to abandon weight-averaging rather than exclude a useful dataset.  *See High Pressure Steel Cylinders From China* IDM at Comment 2.[8]  The unique low-volume, high-exports problem that led

---

[8]    *Citric Acid from China* and *High Pressure Steel Cylinders From China* concerned situations where the Department sought to combine weightable and unweightable datasets to create a benchmark.  ("Weightable" datasets include quantity information; "unweightable" datasets do not).  *Citric Acid from China* Remand Results at 5-6; *High Pressure Steel Cylinders From China* IDM at Comment 2.  To create a benchmark for steam coal in *Citric Acid from China* Remand Results, the Department first simple-averaged the weightable and unweightable datasets by country and month.  It then used the quantity information from the weightable dataset to weight the resulting combined dataset.  *Citric Acid from China* Remand Results at 5-6.  The Department

the Department to weight-average in *Citric Acid from China*

Remand Results does not arise in the ICMW/McCloskey data.

Second, Defendants argue that the ICMW/McCloskey data do

not represent a world market price because they cover fewer

countries than the UN Comtrade data. *See* U.S. Brief at 30-31;

Association Brief at 24 ("*the number of countries* in each dataset is

not equivalent to *the volume of trade*") (emphasis in original). This

argument fails because, *inter alia*, as discussed above, the reference

to "world market price" in 19 C.F.R. § 351.511(a)(2)(ii) means a price

---

explained that this approach was motivated by "the facts of this
particular case" – wherein "small-quantity, high-price transactions"
posed an outsize threat to the data. *Id.* at 2, 5. In *High Pressure Steel
Cylinders From China*, again seeking to average weightable and
unweightable datasets, the Department reiterated that its approach in
*Citric Acid from China* Remand Results was an "outlier" motivated by
the "unique facts of that case" and that "{i}n more recent cases,
Commerce typically calculates a simple average of weight-averaged and
simple-averaged datasets." *High Pressure Steel Cylinders From China*
IDM at Comment 2. *Citric Acid from China* and *High Pressure Steel
Cylinders From China* establish the Department's practice of refusing
to exclude unweightable data merely because the data are
unweightable. This practice should have led the Department to use the
ICMW/McCloskey data in this case despite those data lacking
associated quantity information, and do so exclusively because unlike
*Citric Acid from China* and *High Pressure Steel Cylinders From China*
with multiple sets of benchmark data comparable with the provided
good, here the ICMW/McCloskey data are the only benchmark data on
record comparable with the provided grade-specific coal.

*from* the world market, not a price *reflective/representative* of the entire world market.

Even if that were not the case, the focus on country coverage mistakes mechanism for goal. The Department has no statutory obligation to maximize the number of countries in its benchmark data. Its statutory obligation is to create a comparable benchmark. As the Department explained in its *Final Results*, its occasional preference for broad country coverage is motivated by concern that data from fewer countries "may be self-selected and may distort the benchmark by overemphasizing a limited number of countries." IDM at 31 (APPX2284). However, absent evidence that data from a smaller group of countries poses these concerns, the Department readily uses such data. *See, e.g.*, *Cold-Drawn Mechanical Tubing from China* IDM at 40-41 (explaining that "we disagree that we should disregard {respondent's} proposed {tier two} benchmark data because they only represent countries in a similar geographic location" as such data were still a "world market price"); Hindalco Brief at 44-46 (collecting cases).

As explained in Hindalco Brief at 74-75, the ICMW/McCloskey data pose no risk of the distortion and self-selection concerns that drive the Department's occasional preference for broad country coverage. This is because the ICMW/McCloskey data cover the vast majority of trade volume in the UN Comtrade data the Department otherwise chose to use. *Id.* The ICMW/McCloskey data do not "overemphasiz{e} a limited number of countries" or suffer from self-selection relative to the UN Comtrade data, *compare* IDM at 31 (APPX2284), because the benchmarks constructed from each source largely cover the same trade volume.

Third, Defendants argue that the ICMW/McCloskey data should be rejected because their price data are quotes from the last day of each month and thus are allegedly unrepresentative of coal prices throughout a month. *See* U.S. Brief at 33; Association Brief at 25. However, the McCloskey data are monthly averages. *See* Hindalco's Benchmark Submission at Exhibit BENCH-4 (APPX43847-43855) (header indicating prices are "monthly average … prices"). Moreover, the argument fails even as applied to ICMW: Defendants fail to explain why this imagined preference against

22

last-day quotes leads to unrepresentativeness.[9]  The Department

has no statutory obligation to avoid using last-day quotes.  It is only

required to identify a representative world market price, and last-

day prices *are* representative of a world market price on average.

Prices from the last day of each month may be higher than the

monthly average in some months and lower than the monthly

average in others.  But no party has offered any theoretical reason

or empirical evidence to suggest that last-day of month prices

systematically overshoot or undershoot monthly averages so as to

bias calculations on average.

Fourth, the Association argues that the ICMW/McCloskey data

should be rejected because they come from quotes rather than actual

transactions.  *See* Association Brief at 25.  However, as noted, the

McCloskey data do not indicate they are quotes, but rather monthly

average prices.  Hindalco Brief at 60-63; *see also* Hindalco's

Benchmark Submission at Exhibit BENCH-4 (APPX43847-43855).

Moreover, even as applied to the ICMW data, this argument is

---

[9]     Neither party has cited information establishing that the
Department has a preference against last-day quotes in the first place –
perhaps because it does not, as last-day quotes are representative on
average.

unavailing.  The Department has no statutory mandate to use
actual transactions rather than quotes.  Its mandate is to identify a
comparable and representative commercially available benchmark
price, and world market quotes are commercially available.  No
party has provided a reason why prices from quotes are
systematically biased as compared to price data from transactions.

Finally, Defendants argue that the ICMW/McCloskey data
should be rejected because they "contain no explanation of the
methodology they use to establish their prices" and "contain no
sources for the coal prices."  U.S. Brief at 33-34, *see also* Association
Brief at 23-24.  As explained in Hindalco Brief at 58-63, the
ICMW/McCloskey data *do* indicate their source and methodology:
ICMW's figures are "quote{s}" from specific dates; and McCloskey
uses prices from high-volume regions and ports.

The Association insists that the ICMW/McCloskey data
nonetheless provide insufficient source and methodology information
because they do not include details such as the "identities or number
of companies solicited."  Association Brief at 23-24.  However, as
explained in Hindalco Brief at 52-53, the Department never requires

such detailed source information from commercially available sources. It regularly uses data from "commercially published independent sources for use in the {relevant} industry" with only general descriptions of methodology so long as "it is clear from the record that the purpose of the assessments is to provide market prices for various products." Hindalco Brief at 52, citing *Tool Chests and Cabinets from China* IDM at 25.

Faced with these precedents, the Association appears to concede that its problem is not really with ICMW and McCloskey's failure to disclose sufficient source and methodological information; rather, it is the other alleged deficiencies already dismissed above. *See* Association Brief at 24-25 (attempting to distinguish *Changzhou Trina Solar II* and *Tool Chests and Cabinets from China* on the basis that "Commerce rejected the ICMW and McCloskey data in this case for reasons beyond a lack of transparent methodology, which was at issue in the cited cases").

In sum, the Department erred in rejecting the ICMW/McCloskey data. None of Defendants' technical qualms with the ICMW/McCloskey data are serious enough to justify the

Department rejecting these data and abandoning its statutory

mandate for comparability in its benchmark.

**B.    Substantial Evidence Does Not Support the Department's Exclusive Reliance on the UN Comtrade Data, as Opposed to the ICMW/McCloskey Data, for its Tier Two Coal Price Benchmark, and Hindalco Exhausted its Remedies**

Next, the Department should have used the ICMW/McCloskey

data exclusively because they are the only data on record that are

truly comparable to the grade-specific coal Hindalco actually

purchases.  Hindalco Brief at 44-51 explained that use of grade-

specific benchmarks is essential to satisfying the Department's

statutory mandate for comparability where record evidence shows

that a party purchases a good by grade and prices vary by grade.

The Department accordingly has a long-standing practice of using

grade-specific benchmarks in these circumstances.  *Id.* at 46-51

(collecting cases).  However, despite record evidence that Hindalco

purchases coal by grade and coal prices vary by grade, *id.* at 65-68,

the Department abandoned its long-standing practice in this case.

Its choice to rely exclusively on the basket-category UN Comtrade

data, rather than the grade-specific ICMW/McCloskey data, violated

its statutory mandate to account for "quality … and other conditions

26

of purchase or sale" when assessing adequate renumeration. 19 U.S.C. § 1677(5)(E)(iv).

As explained in Hindalco Brief at 65-68, the UN Comtrade data the Department used are not comparable to the grade-specific coal Hindalco purchases. Hindalco only purchases particular grades of non-coking coal with low energy content: "quality" is a "condition{} of purchase." The UN Comtrade data group together a wide variety of coal grades, including ones Hindalco does not purchase, under the same basket categories. *Id.* at 69-71. The Harmonized Tariff Schedule of the United States ("HTSUS") categories corresponding to the UN Comtrade data the Department selected reveal that the Department's UN Comtrade data include kinds of coal other than non-coking coal, such as metallurgical and coking coal. *Id.* at 70-72. Moreover, because Hindalco primarily purchases coal at the less expensive end of the grades and kinds of coal that fall into UN Comtrade's basket categories, UN Comtrade data create a benchmark that is higher than the price of coal Hindalco actually purchases. *Id.* at 68-69.

Defendants offer two responses.  First, the U.S. objects that the ICMW/McCloskey data are not perfectly grade-specific.  It points out that the ICMW/McCloskey data provide actual prices for only four coal grades Hindalco purchased, and that Hindalco identified prices for other grades by using the closest coal grade with reported price information.  U.S. Brief at 36.  The U.S. argues that values derived from this imputation process must be discarded as "conjecture."  *Id*.

The U.S. misses the comparative: although the ICMW/McCloskey data are not perfectly grade-specific, they are dramatically *more* grade-specific than the UN Comtrade data.  The U.S. argues that Hindalco's practice of using some grade-specific prices from ICMW/McCloskey to impute prices for other coal grades is inappropriate.  *Id*.  However, imputing prices for the particular grades of coal Hindalco purchases from basket-category UN Comtrade data is simply a dramatically worse version of the same problem.  UN Comtrade does not report *any* prices by grade.  Thus, when the Department uses UN Comtrade data to estimate prices for the coal grades Hindalco actually purchases, it is extrapolating grade-specific benchmarks from a nebulous overall average that

includes many different kinds and grades of coal. That is still extrapolation: just from much more distant and nebulous anchor points.

Perhaps realizing this problem, second, Defendants attempt to exclude part of the evidence establishing that UN Comtrade uses basket categories on technical grounds. Defendants argue that Hindalco's description of Harmonized System ("HS") codes 2701.12 and 2701.19 – which show that those categories do not include only non-coking coal – amounts to a failure to exhaust administrative remedies because Hindalco failed to raise this argument before the Department. *Id.* at 38*; see also* Association Brief at 30 n.10.

To be clear, Hindalco wins the comparability argument even without the evidence concerning the basket-category nature of HS codes 2701.12 and 2701.19. As explained in Hindalco Brief at 67-69, record evidence shows that no party challenges that coal prices vary widely by grade, and that the UN Comtrade data sweep many grades of coal into HS codes 2701.12 and 2701.19. Only ICMW/McCloskey report grade-specific data.

However, Defendants are nonetheless incorrect that the exhaustion requirement precludes this Court's consideration of the evidence concerning the basket-category nature of HS codes 2701.12 and 2701.19.  This Court has recognized that the exhaustion requirement does not bar parties from raising more specific elaborations of arguments made generally before the Department, so long as the Department was on notice that a party was challenging the general issue.  *See Universal Tube & Plastic Indus., Ltd. v. United States*, 717 F. Supp. 3d 1332, 1336-37 (Ct. Int'l Trade 2024). Hindalco explicitly argued before the Department that HS codes 2701.12 and 2701.19 group a wide variety of coal into basket categories and "make no distinction for different kinds or grades of coal within these categories."  *See* Hindalco's Case Brief at 36-37 (APPX48148-48149).  The Department was clearly on notice that Hindalco was challenging the overinclusive nature of these basket categories, because it discussed this issue in its IDM at 34 (APPX2287) ("{W}e disagree with Hindalco that the UN COMTRADE data reduce the variety of coal to two basket categories …").  Hindalco's explanation before this Court that HS codes 2701.12

and 2701.19 include both coking and non-coking coal merely provides more specific elaboration on Hindalco's earlier point that these categories include "different kinds … of coal." *See* Hindalco's Case Brief at 36-37 (APPX48148-48149).

However, even if the Court were to otherwise consider the HS category descriptions impermissible elaborations, they are permissible here for three reasons.

First, description of the content of HS codes is a legal citation (administrative materials), not a new fact or argument. The exhaustion doctrine does not bar citation to new legal authorities.

Second, evidence specifically establishing that the UN Comtrade categories for HS codes 2701.12 and 2701.19 include kinds and grades of coal other than non-coking coal was on record and explicitly acknowledged by the Department. Petitioner's *own* benchmark submission, for example, shows that HS codes 2701.12 and 2701.19 include kinds and grades of coal other than non-coking coal in the Indian system. Petitioners' Benchmark Submission at Attachment 3 (APPX44162) (showing that HS 2701.19 includes "{c}oking coal," "{s}team coal," and "{o}ther" under the more specific

31

elaborations in India's Harmonized Tariff Schedule).[10]  Moreover,

the Department cited record evidence stating that HS code 2701.19

includes coking coal in its IDM.  Hindalco Brief at 71 (citing IDM at

34 (APPX2287)).

Finally, it was not until the *Final Results* that the Department

made an unexpected factual error stating that HS codes 2701.12 and

2701.19 "are not basket categories" because "non-coking coal is the

only merchandise reported" under these codes.  IDM at 34

(APPX2287).  The exhaustion rule does not bar parties from

contesting issues raised for the first time in the Department's final

results.  *See Qingdao Taifa Grp. Co. v. United States*, 33 C.I.T. 1090,

1093 (Ct. Int'l Trade 2009) ("A party … may seek judicial review of

an issue that it did not raise in a case brief if Commerce did not

address the issue until its final decision, because in such a

---

[10]    The six-digit HS codes are internationally standardized.  UN
Comtrade defines categories at the six-digit HS code level.  National
systems, like the HTSUS and Indian Harmonized Tariff Schedule, then
add additional digits to the international six-digit HS codes to recognize
finer product gradations.  The record evidence establishing that HS
codes 2701.12 and 2701.19 include kinds of coal other than non-coking
coal in both the U.S. and Indian systems establishes that HS codes
2701.12 and 2701.19, the codes that define the UN Comtrade data used,
include different kinds of coal in at least some national systems.

circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level"). Moreover, parties need not predict and anticipatorily rebut every factual error the Department might make to preserve those issues for appeal. *Cf. Pohang Iron & Steel Co. v. United States*, 23 C.I.T. 778 (Ct. Int'l Trade 1999); *Zhaoqing Tifo New Fibre*, 60 F. Supp. 3d at 1350, n.27 (collecting cases). Hindalco only elaborated the content of HS codes 2701.12 and 2701.19 because the Department based its analysis on an unexpectedly blatant and basic factual error regarding their coverage, and made this error for the first time in its *Final Results*. Hindalco cannot have been expected to anticipate that the Department would misread the United States' own tariff schedule.

The ICMW/McCloskey data are the only data on record that are comparable to the kinds and grades of coal Hindalco purchases. Because the Department is required by statute to account for "quality … and other conditions of purchase or sale" when assessing adequate renumeration, 19 U.S.C. § 1677(5)(E)(iv), its failure to rely

exclusively on the ICMW/McCloskey data was not supported by substantial evidence and unlawful.

## C. Substantial Evidence Does Not Support the Department's Decision Not to Adjust the UN Comtrade Data When Constructing its Tier Two Coal Price Benchmark

Even if the ICMW/McCloskey data were unsuitable to use as the sole source for a tier two benchmark, in light of the record evidence, the Department was still obligated to make an attempt to adjust the UN Comtrade data to account for differences in coal grade. Its failure to do so was not supported by substantial evidence and unlawful.

Hindalco has explained that the Department has a practice of using quality-specific data to adjust worldwide price data to account for differences in price by quality level when the record makes clear such differences exist and a party purchases goods on a quality-specific basis, and the Department does this even where the quality-specific data used to effect the adjustment covers a small number of countries. *See* Hindalco Brief at 55-56, citing *Certain Hot-Rolled Steel from India* IDM at Sections I.A.4, I.A.8 (adjusting worldwide price data for quality based on information about how prices vary by

quality from the parties' own purchases); *cf. Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 FR 73448 (Dep't of Commerce December 12, 2005), and accompanying Issues and Decision Memorandum at Comment 28 (adjusting a benchmark based on U.S. log prices using data on harvesting costs in Canada to create a more comparable benchmark for Canadian logs).

Hindalco Brief at 77-78 explained how the Department could have mitigated the alleged deficiencies in the ICMW/McCloskey data while still taking advantage of the superior comparability of such data by using a similar strategy here. The Department could have: (1) compared the difference between grade-specific price data and UN Comtrade data for those grades and countries where grade-specific data were available; (2) used this comparison to identify a "conversion factor" to convert UN Comtrade data to grade-specific data; and then (3) used that conversion factor to adjust the UN Comtrade data for differences in grade.

Defendants argue that this approach is inappropriate because it would still require the Department to rely on the

ICMW/McCloskey data and would thereby import all of their alleged flaws. U.S. Brief at 39; Association Brief at 32. However, Defendants fail to engage with the fact that the Department has used dramatically less robust quality-specific data sources to adjust worldwide price data in this way before. In *Certain Hot-Rolled Steel from India*, the Department used data *from the parties' own invoices and contracts* indicating that prices varied by quality to adjust worldwide price data. *Certain Hot-Rolled Steel from India* IDM at Sections I.A.4, I.A.8. The ICMW/McCloskey data are more robust than the quality-specific data the Department used to adjust worldwide price data in *Certain Hot-Rolled Steel from India*. No substantial evidence explains why the Department failed to take a similar approach here.

Using the ICMW/McCloskey data to adjust the UN Comtrade data in this way mitigates many of Defendants' concerns. For example, the adjustment-factor approach addresses Defendants' complaints about country coverage. Defendants' complaints about country coverage are complaints that the ICMW/McCloskey data do not cover enough countries, not that these sources are an inaccurate

gauge of prices and price variations by coal grade in the countries

that they cover.  *See* U.S. Brief at 36-37; Association Brief at 24.  By

comparing UN Comtrade and ICMW/McCloskey data, at least in

those countries that the ICMW/McCloskey data cover, the

Department could have generated accurate conversion factors.  It

could then have used those conversion factors to adjust UN

Comtrade's worldwide dataset.  The resulting data would still be

based on UN Comtrade and cover all of UN Comtrade's countries –

it simply would be adjusted to account for the average difference

between UN Comtrade's basket-category prices and the prices of

grades of coal Hindalco actually purchases.[11]

In Hindalco's case, however, the Department failed to pursue

or even consider any of these alternatives.  Its failure to make any

attempt to adjust the UN Comtrade data to account for differences

in "quality … and other conditions of purchase or sale," as required

---

[11]    In this situation, the resulting dataset would be biased only if the
average difference between UN Comtrade basket-category prices and
ICMW/McCloskey grade-specific prices were systematically different in
the countries ICMW/McCloskey covered as compared to other countries.
Defendants have provided no theoretical justification nor empirical
proof that this is the case.

by the controlling statute, 19 U.S.C. § 1677(5)(E)(iv), was not supported by substantial evidence and unlawful.

*   *   *

In sum, the Department is required by statute and its regulations to account for comparability when selecting tier two benchmarks.  The ICMW/McCloskey data are the only data on record that are comparable to the grade-specific coal Hindalco actually purchases.  Accordingly, the Department erred by: (1) rejecting the ICMW/McCloskey data; (2) failing to use such data exclusively; or (3) at the very least using such to data to make some attempt to adjust the UN Comtrade data to account for price differences by coal grade.

## CONCLUSION

Thus, Hindalco respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand this case with instructions to recalculate Hindalco's subsidy rates.

Respectfully submitted,

Rajib Pal
Shawn M. Higgins
Kayla M. Scott

Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

Counsel for Hindalco
Industries Limited

Dated: November 26, 2024

**CERTIFICATE OF COMPLIANCE**

In accordance with the Chambers Procedures of the United States Court of International Trade and the Court's Scheduling Order dated March 18, 2024, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures and Scheduling Order. Specifically, excluding those exempted portions of the brief, as set forth in Chambers Procedure 2(B), I hereby certify that this brief contains 6,936 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

_____
Rajib Pal

# CERTIFICATE OF SERVICE

I hereby certify that copies of the attached document are being served by CM/ECF on November 26, 2024, addressed to the following parties:

**On behalf of U.S. Department of Justice Commerical Litigation Branch - Civil Division:**
Kyle S. Beckrich
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-9322
Fax: (202) 305-7644
Email: kyle.beckrich@usdoj.gov

**On behalf of U.S. Department of Commerce Office of the Chief Counsel of Trade Enforcement:**
Ruslan N. Klafehn
Of Counsel
1401 Constitution Avenue, NW.
Washington, DC 20230
(202) 482-4339
Fax: (202) 482-4912
Email: ruslan.klafehn@trade.gov

**On behalf of Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members, Aleris Rolled Products, et al.:**
Brooke M. Ringel, Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108
Email: bringel@kelleydrye.com

_____
Rajib Pal