Slip Op. 25-95

## UNITED STATES COURT OF INTERNATIONAL TRADE

HINDALCO INDUSTRIES LIMITED,

     Plaintiff,

v.

UNITED STATES,

     Defendant,

     and,

ALUMINUM ASSOCIATION
COMMON ALLOY ALUMINUM
SHEET TRADE ENFORCEMENT
WORKING GROUP AND ITS
INDIVIDUAL MEMBERS,

     Defendant-Intervenors.

Before: Joseph A. Laroski, Jr., Judge

Court No. 23-00260

## <u>OPINION</u>

[Sustaining in full the final results of the administrative review of the countervailing duty order on common alloy aluminum sheet from India and denying plaintiff's motion for judgment on the agency record.]

                                Dated: July 22, 2025

<u>Rajib Pal</u>, Sidley Austin, LLP, of Washington, DC, argued for plaintiff Hindalco Industries Limited.  With him on the briefs were <u>Shawn M. Higgins</u> and <u>Kayla M. Scott</u>.

<u>Kyle S. Beckrich</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant United States.  With him on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel,

arguing for defendant, was Ruslan N. Klafehn, Office of the Chief Counsel for Trade
Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Brooke M. Ringel, Kelley Drye & Warren, LLP, of Washington, DC, argued for
defendant-intervenors Aluminum Association Common Alloy Aluminum Sheet
Trade Enforcement Working Group and Its Individual Members.  With her on the
brief were John M. Herrmann II, Joshua R. Morey, and Melissa M. Brewer.


Laroski, Judge: This action is a challenge to the final results issued by the U.S.

Department of Commerce ("Commerce") in the first administrative review of the

countervailing duty ("CVD") order on common alloy aluminum sheet imported from

India ("CAAS from India").  Disputed here are two of Commerce's determinations

related to the provision of coal for less than adequate remuneration ("LTAR").

Common Alloy Aluminum Sheet from India: Final Results of Countervailing Duty

Administrative Review; 2020-2021, 88 Fed. Reg. 76,168 (Nov. 6, 2023) ("Final

Results"); see Common Alloy Aluminum Sheet from India: Issues and Decision

Memorandum for the Final Results of the Countervailing Duty Administrative

Review; 2020-2021, P.R. 4370548 (Oct. 31, 2023) ("IDM").  Specifically, Plaintiff

Hindalco Industries Limited ("Hindalco") challenges Commerce's findings that the

provision of coal for LTAR was de facto specific and that U.N. Comtrade provided

the best benchmark for calculating the benefit conferred by the coal subsidy in

question.  IDM at 4, 16–36.  Regarding Commerce's specificity finding, Hindalco

argues that Commerce unreasonably grouped two Indian industry classifications to

justify its preferred predominant user finding.  Regarding Commerce's choice of

benefit calculation benchmark, Hindalco contends that Commerce unreasonably

omitted benchmark data that closely matched the Indian coal industry in

constructing its world market price calculations.  The Government, for its part,

defends both aspects of its determination as supported by substantial evidence and

otherwise in accordance with law.  Defendant-Intervenors Aluminum Association

Common Alloy Aluminum Sheet Trade Enforcement Working Group and its

Individual Members (the "Association Members") likewise view Commerce's

findings as reasonable.  For the reasons detailed below, the court agrees with the

Government, and, accordingly, denies Hindalco's motion for judgment on the agency

record in full and enters judgment sustaining Commerce's findings.

## BACKGROUND

### I.    Administrative Review of CVD Order on CAAS from India

Commerce published the relevant CVD order on CAAS from India on April

27, 2021.  See Common Alloy Aluminum Sheet from Bahrain, India, and the

Republic of Turkey: Countervailing Duty Orders, 86 Fed. Reg. 22,144 (Apr. 27,

2021) ("Order").  Commerce initiated the first administrative review of the Order on

June 9, 2022.  See Initiation of Antidumping and Countervailing Duty

Administrative Reviews, 87 Fed. Reg. 35,165 (June 9, 2022) ("Initiation").  The

initiation notice identified Hindalco as a producer or exporter of CAAS from India.

Id.  The period of review was August 14, 2020, through December 31, 2021.  After

the Initiation, Hindalco and the Government of India ("GOI") provided Commerce

with information in response to questionnaires, verification, and other opportunities

to submit documentation and comments.  See, e.g., Hindalco Section III

Questionnaire Response, C.R. 4275846-01, P.R. 4275953-01 (Aug. 17, 2022)

("Hindalco IQR"); GOI Section II Questionnaire Response, C.R. 4277913-01, P.R.

4277937-01 (Aug. 24, 2022) ("GOI IQR").  During this period, the Association

Members also submitted information and comments as Petitioners.  See, e.g.,

Petitioners' Benchmark Submission, C.R. 4359819-01, P.R. 4359825-01 (Mar. 29,

2023) ("Petitioners' Benchmark").  In April 2023, Commerce issued verification

reports which found no informational inconsistencies.  See Hindalco Verification

Report, C.R. 4363116-01, P.R. 4363117-01 (Apr. 5, 2023); GOI Verification Report,

C.R. 4369402-01, P.R. 4369399-01 (Apr. 25, 2023).

On May 4, 2023, Commerce published the Preliminary Results of its review.

See Common Alloy Aluminum Sheet from India: Preliminary Results of

Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 28,487 (May

4, 2023) ("Preliminary Results"); see Decision Memorandum for the Preliminary

Results of the Countervailing Duty Administrative Review of Common Alloy Sheet

from India; 2020-2021, P.R. 4370548-02 (Apr. 27, 2023) ("PDM").  In the

Preliminary Results, Commerce found: first, that the provision of coal for LTAR was

de facto specific based primarily on information from the Indian Ministry of

Statistics and Program Implementation ("MSPI"); and next, that monthly world

market pricing for coal from U.N. Comtrade was a more appropriate benchmark for

purposes of evaluating Hindalco's coal purchases than the two alternatives

proposed by Hindalco, which Commerce concluded were insufficiently reliable.  See

PDM at 12, 24.  Consistent with these conclusions and other findings that are not

the subject of this litigation, Commerce calculated total ad valorem countervailable

subsidy rates for Hindalco at 37.90 percent and 32.43 percent for 2020 and 2021,

respectively.  See id. at 4; see also Preliminary Results.

      Following the Preliminary Results, Hindalco, GOI, and petitioners including

the Association Members submitted case and rebuttal briefs as part of the review

process.  In relevant part, Hindalco focused its administrative briefing on the same

two issues that it raises in this litigation.  See Hindalco Case Brief, C.R. 4390557-01

P.R. 4390530-01, (June 16, 2023) at 1–3. After accounting for the input from

interested parties, Commerce issued its Final Results.

## II.    Final Results of the Administrative Review and Related Analysis

      On November 7, 2023, Commerce promulgated the Final Results, which

encompassed its reasoning and findings in the IDM.  See generally Final Results;

IDM.  In its ultimate analysis, Commerce adjusted how it framed the specificity

issue in response to Hindalco's critique of the industry classifications referenced in

the PDM. Nevertheless, Commerce maintained its conclusion that the provision of

coal LTAR was de facto specific.  See IDM at 16–25.  Regarding the benefit

calculation, Commerce continued to rely on the U.N. Comtrade benchmark data and

found the same overall subsidy rates.  See id. at 4, 25–36.

### A.     Commerce's Approach to De Facto Specificity

In the IDM, Commerce maintained its conclusion regarding specificity but modified its reasoning in response to interested party input.  IDM at 16–21.  In the PDM Commerce relied on industry classification information provided by the GOI; whereas in the IDM Commerce relied on the classifications used by Coal India Limited ("CIL"), India's state-run coal supplier.  IDM at 21, 45.  Both Hindalco and GOI had recommended this change in their administrative briefing because the CIL does not actually use GOI's broader National Industrial Classification ("NIC") system, and instead relies on its own industry classifications.  See id. at 16–17 (citing Hindalco Case Brief at 10–14); id. at 18–19 (citing GOI Case Brief at 5–8).  Despite Commerce agreeing to rely on CIL's industry classification terminology, this change did not materially alter its ultimate specificity finding.

Commerce began its specificity analysis by discussing the industry classification terminology used CIL.  Id. at 23, 45.  As classified by CIL, the relevant Indian industries and their respective shares of coal received for LTAR during the relevant period are as follows: power (utility) received 75.47 percent; power (captive) received 7.44 percent; other basic metal received 0.10 percent; and other received 13.75 percent.  Id. at 45.  From this initial review of CIL's approach to classifying industries Commerce found that the "power (utility) and the power (captive) industries, i.e., the power generating industries, which used 82.02 percent of the coal in India, are the predominant users of coal."  Id. at 23; see id. at 45.  The

remainder of Commerce's specificity analysis centered on supporting and clarifying

the conclusion that under CIL's classification system it is reasonable to analyze and

characterize the two "power" industry classifications collectively rather than

defining the predominant user of Indian coal based on a single label.  See id.

Commerce then analyzed how Hindalco's business fit within the CIL scheme.

Commerce observed that Hindalco's questionnaire responses and corporate

disclosures stated that "Hindalco's aluminum manufacturing units comprise the full

value chain," including not only the refining, smelting, rolling, and extruding

activities common to many aluminum businesses, but also "coal mining [and]

captive power generation."  Id. at 24 (citing Hindalco IQR at 165).  Commerce

further noted that Utkal, a company affiliated with Hindalco, operates "captive

power producing units."  Id. (citing Hindalco IQR at 165).  From this, Commerce

determined that Hindalco and its affiliate are "power generators" and, accordingly,

that CIL rightly viewed these businesses as part of the "power (captive)" industry in

analyzing the industries and companies to which it dispatched coal.  Id.

      Commerce acknowledged that it focused on whether the provision of coal for

LTAR was de facto specific, and more precisely on whether the "predominant user"

factor embodied in subsection 1677(5A)(D)(II) was satisfied.  See id. at 21–22; see

also 19 U.S.C. § 1677(5A)(D)(II).  Commerce did not find that the subsidy here was

de jure specific or that the "limited number" factor supported a de facto specificity

finding.  See generally IDM; PDM; 19 U.S.C. § 1677(5A)(D).  Likewise, in

concluding that the predominant user factor supported a de facto specificity finding, Commerce did not analyze the remaining factors enumerated in subsection 1677(5A)(D).  See IDM at 22 ("if a single factor warrants a finding of specificity, Commerce will not undertake further analysis.") (citing 19 C.F.R. § 351.502(a)).

To contextualize its discussion of de facto specificity, Commerce highlighted guidance from the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"), which explains that the purpose of the specificity inquiry is to "function as an initial screening mechanism to winnow out only those subsidies which truly are broadly available and widely used throughout an economy."  Id. at 22 (quoting H.R. Doc 103-316, Vol. 1 (1994) at 929).

After considering interested party comments, Commerce relied on a prior determination to support that it is reasonable to group industries "similar in process and output," id. at 23–24, Commerce reasoned CIL's "power" industries are similar in process and output insofar as they both "purchase non-coking coal which is used for power generation."  Id. at 23–24 (citing Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2010, 77 Fed. Reg. 72,323 (Dec. 5, 2012), accompanying Issues and Decision Memorandum at Comment 4 ("Citric Acid from China").

Next, Commerce sought to distinguish two prior determinations which Hindalco and GOI viewed as relevant to the specificity inquiry here.  In one such determination, Commerce had found that the administrative respondents were not

part of the Turkish power industry, a conclusion that precluded a specificity finding.
See <u>Certain Oil Country Tubular Goods from the Republic of Turkey: Final
Affirmative Countervailing Duty Determination and Final Affirmative Critical
Circumstances Determination</u>, 79 Fed. Reg. 41,964 (July 18, 2014), <u>accompanying
Issue and Decision Memorandum</u> at 31 ("<u>OCTG from Turkey</u>").  Commerce reasoned
that this determination is inapposite because Hindalco is part of the "power
(captive) industry."  <u>IDM</u> at 24.  On the related point of whether and how Commerce
may properly group industries together in analyzing specificity, Hindalco and GOI
cited another prior determination in which the discussion had turned on whether a
single industry was the predominant user.  <u>See</u> <u>Chlorinated Isocyanurates from the
People's Republic of China: Final Affirmative Countervailing Duty Determination</u>,
79 Fed. Reg. 56560 (September 22, 2014), <u>accompanying Issue and Decision
Memorandum</u> at 41 ("<u>Chlorinated Isos from China</u>").  Commerce viewed this
determination as similarly unhelpful because it neither concluded generally that
grouping of industries is inappropriate nor found specifically that the agricultural
and chemical industries it had considered in the prior determination warranted
grouping based on the process and output criteria discussed in <u>Citric Acid from
China</u>.  <u>IDM</u> at 25.  In Commerce's view, the determinations cited by Hindalco
neither meaningfully informed nor materially undermined its specificity analysis.
As Commerce summarized: "we continue to find that industries in India that buy

coal to generate electricity comprise a group of industries that is the predominant user of this subsidy . . . and therefore this subsidy is specific." Id.

### B.    Commerce's Approach to Benchmark Calculation

In the Final Results, Commerce maintained its reasoning and conclusion regarding its chosen benchmark – U.N. Comtrade – and the final duty rates for the two-year period subject to the review.  It did so despite advocacy by Hindalco and GOI in favor of two alternative benchmarks, International Coal Market Watch ("ICMW") and McCloskey.  As Hindalco argued at the administrative level, these alternatives more closely align with the overall characteristics of the Indian economy and the specific grade characteristics of the coal used by Hindalco. Commerce disagreed, reasoning that ICMW and McCloskey insufficiently describe relevant information on data methodology and sourcing and depend on a relatively incomplete sampling of information from a handful of countries.  These limitations, in Commerce's view, render the ICMW and McCloskey data less complete and less reliable.  Commerce instead opted for the U.N. Comtrade benchmark data.

Commerce situated its coal benchmark analysis under "tier two" within subsection 351.511(a) of its regulations.  See PDM at 10; 19 C.F.R. § 351.511(a). Commerce explained that 351.511 calls on Commerce to evaluate potential benchmarks in tiers based on availability.  See PDM at 10; 19 C.F.R. § 351.511(a). If "market prices from actual transactions within the country under investigation" are unavailable, then Commerce turns its attention to tier two "world market prices

that would be available to purchasers in the country under investigation." <u>See</u>
<u>PDM</u> at 10; 19 C.F.R. § 351.511(a). Here, Commerce reasoned that a tier-two focus
was necessary because the Indian coal market "is distorted due to the presence of
the government." Specifically, Commerce observed that India's state-owned coal
companies, including CIL, comprise more than 90 percent of domestic production
and more than 70 percent of domestic consumption. <u>PDM</u> at 11. Commerce then
considered the three benchmark sources proffered by interested parties and
evaluated whether they reflect "world market prices that would be available to" coal
purchasers like Hindalco. <u>See</u> <u>PDM</u> at 11–13; <u>IDM</u> at 25–36.

 Commerce observed limitations with the ICMW and McCloskey data.
Commerce reasoned, "these values lack necessary descriptive information, including
information used to calculate the 'unit values' and the sources of the information,"
<u>IDM</u> at 31, and framed its benchmark comparison as follows:

> In general, it is Commerce's practice, where we have reliable data from
> a broad set of countries that is reflective of world prices, not to use data
> from single or limited country sources because such sources may be self-
> selected and may distort the benchmark by overemphasizing a limited
> number of countries. Therefore, we used the 2020 and 2021 monthly
> world market prices of exports of coal . . . sourced from [U.N.
> Comtrade] . . . .

<u>Id.</u> Commerce emphasized its view that the "limited country sources" reflected in
the ICMW and McCloskey data limit the utility of these benchmarks, particularly
given the availability of global data it viewed as reliable. <u>Id.</u>

Next, Commerce found that the ICMW and McCloskey data lack quantity data sufficient to enable weighted-average monthly benchmark calculations, which is Commerce's preferred approach. Id. at 31–32. It further observed that the price quotes in Hindalco's proposed benchmarks reflect information from "the last day of the month" and, accordingly "are not representative of the prices of coal throughout that respective month." Id. at 33. Commerce underscored its detail and reliability concern, asserting it was "unable to determine how ICMW derived these quoted prices or whether the methodology for preparing the prices is reasonable." Id.

Commerce addressed Hindalco's concerns about "product similarity and factors affecting comparability," or the extent to which the ICMW and McCloskey data better reflected the coal grades of the subject merchandise. Id. at 33–34. Commerce noted that Hindalco had not identified any specific Harmonized Tariff Schedule of the United States provisions that pertain to its products and had instead offered benchmark data that only captured some of the coal grades used by Hindalco. Id. at 34. From this, Commerce put forth an average of U.N. Comtrade data related to tariff subheadings 2701.12 and 2701.19 as an appropriate alternative in the absence of a more detailed and reliable option. Id. Commerce found that despite highlighting the importance of selecting a benchmark that accounts for product similarity, Hindalco had offered benchmarks that did not closely align with the coal grades it used – a mismatch that undermined the purported similarity advantages of the ICMW and McCloskey data. See id. (noting

how Hindalco purchased a wide array of coal grades from CIL, but ICMW and

McCloskey's price data did not cover each of the same grades).

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2020) and 19

U.S.C. § 1516a(a)(2) (2020). Section 1581(c) provides for exclusive jurisdiction over

any civil action commenced under section 1516a. 28 U.S.C. § 1581(c). A challenge

to the final results of an administrative review conducted by Commerce is a

reviewable determination under section 1516a(a)(2). 19 U.S.C. § 1516a(a)(2); see,

e.g., Changzhou Trina Solar Energy Co. Ltd. v. United States, 352 F. Supp. 3d 1316,

1323 (CIT 2018). In reviewing such a challenge, the court sustains Commerce's

analysis and findings unless they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Whether a determination by Commerce is supported by substantial evidence and

otherwise in accordance with law typically turns on whether its analysis and

findings are reasonable based on its consideration of the administrative record.

See, e.g., Worldwide Door Components, Inc. v. United States, 119 F.4th 959, 968

(Fed. Cir. 2024) ("Substantial evidence is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.") (quotation omitted).

## DISCUSSION

Hindalco challenges Commerce's conclusions that Indian coal subsidies were

specific to the industry in which Hindalco operates and that the benefit Hindalco

received from subsidized coal should be calculated by using the U.N. Comtrade

benchmark rather than the alternative benchmarks proposed by Hindalco.  For the

reasons detailed below, the sustains Commerce's approach to each of these issues.

I.    **Whether Commerce's specificity determination is supported by substantial evidence and otherwise in accordance with law.**

    A.    Party Arguments

    Hindalco argues Commerce's that specificity analysis was unreasonable

because Commerce's grouping of CIL's "power (utility)" and "power (captive)"

classifications is neither supported by substantial evidence nor consistent with past

practice.  Hindalco Br. at 25.  Hindalco objects specifically to Commerce's

characterization of the two "power" classifications used by CIL as "power generating

industries" that are similar in "process and output."  Id. at 26.  Hindalco contends

that Commerce's reasoning and conclusion on this point are flawed due to misplaced

reliance on a prior determination, Citric Acid from China.  Id.  To Hindalco, this

citation by Commerce is inapposite because Citric Acid from China involved the

"limited number" prong of analysis and the "appropriateness of grouping sub-

sectors within an industry, not separate industries."  Id.  Despite acknowledging

that both "power (utility)" and "power (captive)" companies "use coal to produce

electricity," Hindalco contends that the two categories are not similar in process and

output because only utility companies sell electricity as an output.  Id. at 29.

Hindalco further attempts to distinguish these classifications as follows:

> The only thing these industries have in common is that they share an intermediate input – *i.e.*, electricity, which *every* industry uses. These industries, however, have disparate ultimate outputs. Simply having a common intermediate input – especially electricity – is a tenuous basis for grouping these industries. Rather, such grouping runs contrary to the "rule of reason" behind the specificity test designed to ensure that widespread subsidies are not countervailed.

Id. at 32. Thus, Hindalco reasons, captive power companies like Hindalco, no matter where they land in CIL's scheme, are not "power generating industries" and cannot reasonably be grouped with utility providers for the de facto specificity analysis. Id. at 32–33. Despite acknowledging that CIL's "power (utility)" classification may be properly understood as a predominant user of the coal subsidy, Hindalco maintains that the two "power" classifications reflect only a superficial similarity between companies in the utility and captive power categories and that it is unreasonable to group captive power companies with their utility peers. Id. at 36.

Hindalco elaborates that the statutory and common definition of the term "industry" in section 1677 undermines Commerce's decision to group CIL's "power (utility)" and "power (captive)" industry classifications for purposes of its de facto specificity finding. Hindalco Reply Br. at 3–7 (discussing 19 U.S.C. § 1677(4)). Here, Hindalco contends that Commerce's grouping of the two CIL classifications labeled "power" based on its assessment that those sectors consist of businesses that use coal for "power generation" is unreasonable because it misapprehends the "process and output" by which those businesses make end products and depends unduly on the "inherent characteristics" of coal is an energy input. Id. Hindalco

also explains that, notwithstanding the fact that "utility" and "captive" power companies both use coal to generate electricity, the companies under these CIL umbrellas do not all produce electricity as an output, with Hindalco and others using coal to generate "captive" electricity for internal manufacturing needs.  Id.

Hindalco also contests Commerce's ability to lawfully countervail certain coal supplied by CIL to Hindalco refineries that fall within the "others (non-coking)" category of the CIL classification scheme.  Hindalco Br. at 38.  Under this view, Commerce may only countervail the coal supplied to those Hindalco power plants that are identified as part of the "power (captive)" sector.  Id.  Yet Hindalco declines to offer citation or otherwise reference applicable law to support this alternative argument.  Id. at 38–39.  Instead, it posits simply that any countervailing duty here must apply only to the provision of coal received under the industry classification that led to Commerce's de facto specificity finding.  Id.  Notably, Hindalco does not address the fact that its "others (non-coking)" plants also received LTAR coal.

Taken together, Hindalco argues that Commerce opted for a cursory consideration of the CIL industry classifications and rested its conclusion on a literal, superficial evaluation of the "power" industries and their collective consumption of a supermajority of the coal provided by CIL.  This, Hindalco surmises, unlawfully overlooks the true nature of "power generating industries" within India and how Hindalco and other businesses use coal from CIL.

The Government's response, simply and unsurprisingly, is that Commerce's approach to de facto specificity is reasonable. At the outset, the Government's argument defending Commerce's analysis rests on two points. First, in reviewing the CIL industry classifications it used to assess specificity, Commerce fairly determined that the "power (utility)" and "power (captive)" labels constituted, in lay terms, a logical pair because the businesses within those categories are "power generating" in their use of CIL. Gov. Br. at 16–17. Second, the Government emphasizes that section 771(5A)(D) provides, in part: "any reference to an enterprise or industry . . . includes a group of such enterprises or industries." Id. at 17 (quoting 19 U.S.C. § 1677(5A)(D)). These two points, in the Government's view, provide a sturdy foundation for Commerce's decision to treat the "power" labels used by CIL as unified in its specificity analysis. Further, the Government responds to Hindalco's arguments concerning the process and output of various Indian industries and the IDM's treatment of past specificity analyses conducted by Commerce; in substance, the Government's arguments on these points reiterate that Commerce's focus on "power generation" in its predominant user analysis is reasonable and sufficient. Id. at 17–22.

The Government responds to Hindalco's argument on the countervailability of its coal usage within the "others (non-coking)" category with two points. First, the Government argues that Hindalco failed to exhaust this argument by not raising it during the administrative process. Id. at 22–25. Second, the Government

contends that there is ample support in the administrative record for the proposition that even Hindalco's "others (non-coking)" operations purchased coal for LTAR from CIL for captive power generation. Id. at 25–26. Thus, the Government contends, Hindalco neither raised this legal argument in its administrative briefing nor populated the record with evidence supporting the view that its operations included purchases of coal for non-power uses that should not be countervailable.

B.    Legal Framework

For Commerce to countervail an alleged subsidy under its statutory framework, the program under review must be "specific." 19 U.S.C. § 1677(5A). When an alleged subsidy "expressly limits access to the subsidy to an enterprise or industry," or where the program includes conditions or eligibility requirements favoring certain enterprises or industries, it is de jure specific. Id. § 1677(5A)(D)(i)–(ii). When the alleged subsidy program does not meet the criteria to be deemed de jure specific, Commerce may still find a program de facto specific based on one or more statutory criteria. Id. § 1677(5A)(D)(iii). By considering in sequence four factors that may indicate de facto specificity, Commerce evaluates record evidence to determine if the available facts suggest that the benefit conferred to the enterprise or industry subject to its investigation is nevertheless specific. See 19 C.F.R. § 351.502(a) ("In determining whether a subsidy is de facto specific, [Commerce] will examine the factors . . . sequentially in order of their appearance.")

To date, this court's cases under section 1677(5A)(D)(iii) have typically involved Commerce's analysis of the first statutory factor or category – namely, whether the "actual recipients of the subsidy . . . are limited in number." Id. § 1677(5A)(D)(iii)(I). But when Commerce finds that this first inquiry does not indicate de facto specificity, it turns to the second statutory question – namely, whether an "enterprise or industry is a predominant user of the subsidy." Id. § 1677(5A)(D)(iii)(II). The same subparagraph in section 1677 clarifies that "any reference to an enterprise or industry is a reference to a foreign enterprise or industry and includes a group of such enterprises or industries." Id. § 1677(5A). To frame its industry analysis, Commerce often uses the prevalent industrial classification system of the government authority or subsidy provider at issue. See, e.g., IDM at 16, 23. Thus, the statutory question boils down to whether Commerce finds reasonable support for the conclusion that an importer operates within a group of enterprises or industries that is a predominant user of the subject program. See IDM at 22–23 (citing SAA at 911–955) (outlining the industry-classification oriented analysis under this factor).

C.    Analysis

Commerce's analysis concerning de facto specificity is supported by substantial evidence and otherwise lawful. Its approach to whether Hindalco's purchases of coal from CIL satisfies the "predominant user" factor of section 1677 is both consistent with the applicable statutory framework and substantially

supported by record evidence.  See 19 U.S.C. § 1677(5A)(D).  Further, Commerce's

determination sufficiently considered Hindalco and GOI's positions by addressing

interested party concerns. Hindalco's well-reasoned critiques of the NIC and CIL

classification systems do not overcome or undermine the basic legal and factual

justifications Commerce provided in support of its specificity finding.

Regarding the legal foundations of Commerce's conclusion, Hindalco

overcomes neither section 1677's authorization of "grouping" industries in the

specificity analysis nor Commerce's thorough treatment of interested party

comments and consideration of its own prior determinations concerning specificity.

Regarding the factual foundations of Commerce's conclusion, meanwhile, Hindalco

fails to undermine the significance of CIL's "power" classifications and the share of

LTAR coal utilization that those industry categories represent.  Taken together,

Commerce worked through the applicable law and record evidence with reasonable

care and nuance, arriving at a well-founded, well-reasoned conclusion.

As noted above, Commerce gave Hindalco and GOI ample consideration

during the administrative process, laying out their positions in the IDM with

precision and responding to them in sequence.  That Commerce accepted Hindalco's

suggestion to focus on the CIL classification scheme rather than the NIC system it

had prioritized in the PDM indicates the responsiveness and nuance with which

this specificity inquiry.  The form, content, reasoning, and citations contained in the

IDM lend support to the view Commerce approached this issue reasonably from a

process and procedure perspective.  That context is meaningful here.

　　　By focusing on the industry categories CIL used in providing LTAR coal to

Indian businesses, Commerce consulted the approach it had taken in prior

determinations relating to the same statutory framework and responded to

Hindalco's proposed approach based on those examples.  IDM at 23–25.  First,

Commerce defined industries consistent with the classification scheme of the

relevant government authority.  See id.; Hindalco Br. at 23–25 (citing OCTG from

Turkey; Chlorinated Isos from China).  In doing so, Commerce directed its attention

to the CIL categories, including "power (utility)," "power (captive)," and "other (non-

coking)."  IDM at 25.  Then, Commerce addressed Hindalco's next analytical

suggestion concerning specificity; it "countervail[ed] a subsidy program only with

respect to respondents that are in the industry (or group thereof) found to make

predominant use of the subsidy."  Hindalco Br. at 25.  In further clarifying its

approach to determining whether any respondents, such as Hindalco, were "in the

industry (or group thereof) found to make predominant use of the subsidy,"

Commerce referred to section 1677 and its admonition that reference to an

enterprise or industry within the specificity context "includes a group of such

enterprises or industries."  IDM at 25 (quoting 19 USC § 1677(5A)).

　　　Commerce also contextualized its analysis by consulting the SAA's

description of the specificity test's "original purpose, which is to function as an

initial screening mechanism to winnow out only those subsidies which truly are

broadly available and widely used throughout an economy." IDM at 22 (quoting

SAA at 929). In sum, Commerce took care to consult the applicable legal framework

and to ensure that its analytical focus was where it belonged – namely, on

determining the group of industries making predominant use of CIL's coal.

  The principal bases for Commerce's specificity finding are intuitive. First,

Commerce observed reasonably that the "power (captive)" industry, in which

Hindalco principally operates, bears a meaningful similarity to the "power (utility)"

industry based on these industries' use of coal to generate power. Hindalco does not

attempt to undermine the superficial rhetorical similarity between these labels or

the fact that they do both use coal to generate large amounts of electricity.

Hindalco does, however, attack this point as less relevant than Commerce suggests,

emphasizing instead the different industrial processes and outputs of Indian power-

utility companies and the diverse manufacturers that comprise CIL's power-captive

category. Hindalco Br. at 25. Hindalco further argues that Commerce's focus on

the power-generating overlap between these CIL-designated industries overplays

the "inherent characteristics" of coal as an energy input, rendering this an improper

basis on which to group industries for purposes of specificity. Contrary to

Hindalco's framing of the "power" labels used by CIL and the supermajority share of

CIL coal usage they represent, Commerce's burden when grouping industries in

specificity analyses is not so heavy nor so nuanced. Neither the text of section 1677

nor the trade remedies statute more broadly, whether reflected in the SAA, court

precedent, or prior determinations by Commerce, prevent the grouping chosen here.

Several considerations, legal and factual, support Commerce's decision to

"group" the captive and utility power industries and, in turn, to find that this group

of power companies comprised the predominant user of India's LTAR coal regime.

First, it is not immaterial or some non-substantive shorthand that CIL refers to two

industries as "power"; rather than simply listing "captive" and "utility" alongside

nearly a dozen other industry labels, CIL included "power," leaving in the record

before Commerce a strong implication that within India's coal industry companies

that use coal for industrial-scale power generation are similar or even equivalent.

Next, it is noteworthy that the two "power" designations used by CIL refer to the

companies accounting for more than 80 percent of the coal it supplies, with the

remaining individual classifications each accounting for modest individual shares.

With this quantitative picture, the only reasonable implication of Hindalco's

position is that it is not some industry or group thereof other than "power" that

predominantly uses the coal provided by CIL, but rather "power (utility)" alone that

ought to be deemed the predominant user.  It was, of course, Hindalco's prerogative

to make this argument during the administrative process.  But Commerce rejected

this view, observing a reasonably significant similarity in the two CIL "power"

categories – their use of coal to generate power on a large scale – and deeming the

coal usage to be consolidated predominantly around the companies under those two labels. On their own terms, these analytical steps are reasonable.

Yet Commerce's analysis of specificity did not consist only of a recitation of applicable law and consideration of the basic CIL industry data. To address Hindalco and GOI comments, it also considered prior determinations related to similar circumstances. Commerce first highlighted its prior determination in Citric Acid from China, which it viewed as supporting the grouping of industry classifications based on similarity of "processes and output" among the interested parties covered by the classifications in question. IDM at 23–24 (quoting Citric Acid from China at Comment 4); see also PPG Indus., Inc. v. United States, 978 F.2d 1232, 1240 (Fed. Cir. 1992) (highlighting the importance of "the actual make-up of the eligible firms" to Commerce's grouping decisions in specificity analyses). Although pertaining to Commerce's "limited" user analysis under subparagraph (5A)(D)(iii)(I), this determination's discussion of the "processes and outputs" of businesses within different industry classifications reflected an effort by Commerce to understand the "make-up" of the users of the subsidy programs at issue. See Citric Acid from China at Comment 4; see also IDM at 23–24. Even as the parties here disagree as to the persuasiveness of Commerce's reference to this determination, Commerce made a well-reasoned decision regarding whether to group certain industry classifications for purposes of its specificity analysis. Thus, the question is not whether the processes, outputs, or broader "make-up" of

Hindalco and other businesses in the "power (captive)" or "power (utility)"

industries suggest a certain degree of similarity.  Rather, whether Commerce

reasonably approached these facts and the industry grouping decision.  It did.

Simply put, Commerce built on its initial conclusion that the labels used by CIL and

the coal usage of the industries, as labeled, supported a specificity finding – it dug

deeper, looking to how it reasoned through industry grouping decisions in the past.

Both in choosing to consult its prior determinations at all and in how it analyzed

them, Commerce reasonably analogized to Citric Acid from China.

     Commerce also addressed the prior determinations Hindalco highlighted as

persuasive.  First, Commerce observed that OCTG from Turkey does not support

Hindalco's argument because that determination, like here, focused on whether

certain industry respondents used subsidized energy resources to generate power.

IDM at 24 (citing OCTG from Turkey).  Next, Commerce reasoned that Chlorinated

Isos from China is inapposite because it entailed a potential industry grouping that

lacked both record support regarding the make-up of the industries in question and

guidance from past determinations.  Id. (citing Chlorinated Isos from China).  As

noted above, Commerce faced a different situation here insofar as it observed clear

indications in the record that favored its decision to group the "power" industries

and additional support from prior specificity analyses.  Again, however, the

significance of Commerce's treatment of these past determinations, like its review of

Citric Acid from China, is not that these represent binding legal precedents or

bespoke factual analogs. What matters is that Commerce carefully considered these decisions, both to support its decision to group industries and to explain to Hindalco and GOI why their comments did not alter its conclusion. Thus, both the substance of Commerce's reasoning and the process it afforded Hindalco are reasonable.

The court is unpersuaded by Hindalco's argument concerning the countervailability of its operations that CIL classifies as "others (non-coking)." Hindalco has not attempted to support this argument with discernible legal authority. The Government, by contrast, frames this issue in terms of exhaustion of remedies and the record support for Commerce's decision to countervail duties against all of Hindalco's coal usage. Whether framed in terms of exhaustion of remedies or substantial evidence, Hindalco's argument on this point misses the mark. First, the record lacks any indication that Hindalco raised this concern previously or attempted to clarify the scope of its countervailable business activities. Absent comments to that effect, it is unreasonable for Hindalco to demand that Commerce limit its countervailing duties to certain business activities unless the record substantially supports that conclusion independently. Second, the record here supports the opposite conclusion. Hindalco's only use for CIL coal appears to be power generation, no matter whether the coal flows to the "power (captive)" or "others (non-coking)" portions of its business operations. See, e.g., IDM at 24; Hindalco IQR; Hindalco Verification. Even affording Hindalco's conclusory approach the benefit of the doubt, its position does not withstand scrutiny.

In sum, the crux of Commerce's specificity finding is that Hindalco, like a typical utility provider, engages in "power generation" – a fact Commerce pulled directly from Hindalco's Annual Report for the period of review.  Hindalco's power generating use of LTAR coal, in Commerce's view, clarified how two "power" industries appear to use a substantial majority of the coal provided by CIL. Between the labels used by CIL, the coal utilization of the various industries in India, and the <u>IDM</u>'s treatment of Commerce's past decisions relating to specificity, Commerce provided and explained significant support for its specificity finding; Commerce approached this issue reasonably.

## II.    Whether Commerce's benchmark determination is supported by substantial evidence and otherwise in accordance with law.

### A.    Party Arguments

Hindalco argues that by rejecting price data for coal from independent commercial sources, ICMW and McCloskey, in favor of U.N. Comtrade data, Commerce failed to use coal price benchmarks comparable to Hindalco's coal purchases from CIL to quantify the benefit.  Hindalco Br. at 6–7.  In response to Commerce's rejection of the ICMW and McCloskey data due to limited country coverage and a lack of methodological information on data collection, Hindalco asserts that the record details the sources of ICMW and McCloskey's underlying data and their methodology for calculating average prices.  Hindalco Br. at 58–63; Hindalco Reply Br. at 24.  Hindalco contends that Commerce regularly accepts benchmark data with comparable or less detailed methodological information, so

long as there is sufficient information to confirm the data are relevant to the imported merchandise. Hindalco Br. at 52–54; Hindalco Reply Br. at 24–25. Further, Hindalco reasons that despite ICMW and McCloskey's limited country scope, Commerce prefers sources with narrower country coverage when they provide greater product specificity, finding that "the large increase in product specificity in the industry dataset outweigh[s] the small loss in global coverage." Hindalco Br. at 50; Hindalco Reply Br. at 20–22.

Hindalco further argues that the ICMW and McCloskey data provide a more accurate coal price benchmark than the U.N. Comtrade data because they are more specific to the grades of coal Hindalco purchases. Hindalco Br. at 65. CIL sells seventeen different grades of non-coking coal with a wide price variety based on gross calorific values ("GCVs"), and most of Hindalco's purchases fall in the cheaper, low-GCV grades. Id. at 66–67, 69. Because the U.N. Comtrade data categorizes coal into only two baskets, without distinctions for coal grades or between coking and non-coking coal, Hindalco contends that the generated average price benchmark is higher than any price at which Hindalco actually purchases coal. Id. at 69–72. Therefore, Hindalco reasons, even if Commerce decided not to use ICMW and McCloskey to construct an independent benchmark, it should have used the data to adjust the U.N. Comtrade prices. Id. at 77.

The Government responds that the U.N. Comtrade data is the most reliable source on the record to calculate coal price benchmarks because it represents

worldwide prices, and it contains sufficient data and methodology to calculate

weighted average monthly benchmarks.  Gov. Br. at 9–10.  Commerce explains that

the U.N. Comtrade data represents coal prices from a broad set of countries, while

the ICMW and McCloskey data cover only a limited number of countries that may

present skewed results.  Id. at 37.  The Association adds that section 351.511(a)(2)

instructs Commerce to compare the actual local price to a "world market price,"

which means that the limited countries reported in Hindalco's proposed data do not

capture the global price picture the regulation contemplates.  Ass'n Br. 21–23.

Responding to Hindalco's contention that the ICMW and McCloskey data contain

grade-specific price data, the Government argues that these sources lack price

information for most of the grades Hindalco purchases, and for grades where prices

are available, the data often comes from a single country.  Gov. Br. at 36–37.

The Government further notes that unlike ICMW and McCloskey, the U.N.

Comtrade data contains underlying price and quantity data, allowing Commerce to

calculate weighted monthly average benchmarks and mitigating the risk of skewed

data that Commerce feared with Hindalco's proposed sources.  Id. at 32–33, 37.

Thus, the Government explains that Commerce chose not to adjust the U.N.

Comtrade data with ICMW and McCloskey data because it deemed those sources

potentially unreliable.  Id. at 39.  The Association adds that there is no requirement

in Commerce's legal framework or its past practice that a price benchmark be

identical to the goods, especially if a benchmark option presents an unreliable

dataset. Ass'n Br. at 28–29. The Association also cites past determinations where

Commerce rejected product-specific data in favor of datasets that contained better

information on sources, methodology, and price and quantity values. Id. at 26–28;

see Barium Chloride From India: Final Affirmative Countervailing Duty

Determination, 88 Fed. Reg. 1,044 (Dep't Commerce Jan. 6, 2023), accompanying

Issue and Decision Memorandum (Dec. 30, 2022) at 31–33; Countervailing Duty

Investigation of Stainless Steel Sheet and Strip From the People's Republic of

China: Preliminary Affirmative Determination and Alignment of Final

Determination With Final Antidumping Duty Determination, 81 Fed. Reg. 46,643

(Dep't Commerce July 18, 2016), accompanying Preliminary Decision Memorandum

(July 11, 2016), at 33–34. As with their specificity-related arguments, the

Government and Association leverage these past determinations to illustrate the

extent to which Commerce rooted its benchmark analysis in its own past practice.

     B.    Legal Framework

     To assess adequate renumeration, Commerce's regulations establish a three-

tier hierarchy of sources used to establish benchmark prices for goods: (1) market

prices within the actual country under investigation; (2) world market prices that

would be available to purchasers in the country; or (3) an assessment of whether the

government price is consistent with market principles. 19 C.F.R. § 351.511(a)(2).

When Commerce finds that market prices from the country under investigation are

unavailable or unreliable, it turns to determining "world market prices" by considering benchmark data from around the world.  See id.

Although Commerce's benchmark analysis is explicitly oriented toward ascertaining the relevant global market price of the merchandise under investigation, it often considers multiple benchmark options with different levels of geographic scope, product specificity, and methodological detail.  Cf. Essar Steel Ltd. v. United States, 678 F.3d 1268, 1273–74 (Fed. Cir. 2012) ("Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue.").  Thus, Commerce may evaluate whether one benchmark is most reliable and representative and, relatedly, whether the available benchmark options allow for the construction of a weighted monthly average price.  See RZBC Group Shareholding Co. v. United States, 100 F. Supp. 3d 1288, 1309 (CIT 2015) ("Like simple averaging, the weight-averaging method blends country-level prices into world benchmarks.").

Aiming to select benchmark data that is both reliable methodologically and representative of the country, industry, and product in question, Commerce may decline to incorporate non-global data proposed during the administrative process, prompting this court to consider whether that non-global data was necessary to constructing a comparable, reasonable benchmark.  See, e.g., Archer Daniels Midland Co. v. United States, 968 F. Supp. 2d 1269, 1278–79 (CIT 2014) (discussing how Commerce must only "select benchmarks that are comparable, not identical" to

prices available in the industry in question and underscoring that a plaintiff

challenging a benchmark determination must show that its "proposed benchmark

calculation is the only reasonable outcome on [the] administrative record").

As with Commerce's specificity analysis, the court reviews its benchmark

determinations under section 351.511(a)(2) for substantial evidence and

reasonableness. Here, the question is not whether Commerce chose the best

benchmark or whether a different combination of benchmark data would have been

more reliable or more representative; rather, the court focuses on whether

Commerce's benchmark determination finds support in the record, rests on sound

reasoning, and is otherwise reasonable. Guizhou Tyre Co., Ltd. v. United States,

348 F. Supp. 3d 1261, 1274 (CIT 2018) (citing Peer Bearing Company-Changshan v.

United States, 298 F. Supp. 2d 1328, 1336 (CIT 2003)).

C.    Analysis

Commerce's decision to rely on U.N. Comtrade data as the benchmark for

coal prices is supported by substantial. First, Commerce reasonably determined

that the ICMW and McCloskey data were not sufficiently reliable to serve as the

basis for world market prices. The datasets suffered from limited country coverage

and a lack of underlying price and quantity data, which risks distorted results. See

Gov. Br. at 37; see also RZBC Group Shareholding Co. v. United States, 100 F.

Supp. 3d 1288, 1308 (CIT 2015). Commerce's decision to discount the sources due to

an absence of verifiable data inputs and global coverage falls within its discretion

under section 351.511(a)(2). Commerce must consider benchmarks reflective of a "world market price," and thus selecting data from only a narrow range of countries fails to satisfy that standard, particularly when such data may omit or overweight price signals. 19 C.F.R. § 351.511(a)(2); see IDM at 32–33.

Second, Commerce's finding that the U.N. Comtrade data was an accurate coal price benchmark is supported by substantial evidence. The dataset allowed Commerce to calculate weighted monthly averages based on underlying price and quantity information from a broad array of exporting countries, which aligns with its regulatory obligation to assess prices reasonably available to purchasers in the subject country. See IDM at 32–33; see also Hindalco Benchmark; Petitioners' Benchmark. Commerce also reasonably rejected the use of ICMW and McCloskey data to adjust for price differences for varying grades of coal. Although Hindalco emphasized the importance of product specificity, particularly in light of the low-GCV coal grades it typically purchases, Commerce explained that the ICMW and McCloskey data lacked sufficient grade coverage and often drew prices from only one country. See IDM at 33–34; Gov. Br. at 36–37. As a result, using these data to modify the U.N. Comtrade averages would have introduced the same reliability concerns that led Commerce to reject them in the first place.

Finally, the court reiterates that its role is not to decide whether a more accurate or precise benchmark could have been constructed, but whether Commerce's choice is grounded in a reasoned analysis and supported by record

Court No. 23-00260                                                          Page 34

evidence.  Guizhou Tyre, 348 F. Supp. at 1274 (citing Peer Bearing Company-

Changshan v. United States, 298 F. Supp. 2d 1328, 1336 (CIT 2003)).  The court

holds that Commerce's benchmark determination here is supported and lawful.

## CONCLUSION

For the foregoing reasons, the court holds that Commerce approached the

specificity and benchmark issues involving Hindalco lawfully.  Commerce satisfied

its obligation to support its conclusions with substantial evidence.  Thus, the court

sustains the determination in full.  Judgment will be entered accordingly.


                                                    /s/      Joseph A. Laroski, Jr.
                                                    Joseph A. Laroski, Jr., Judge

Dated: July 22, 2025
          New York, New York